2022-2204

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT**

---

**TAU-KEN TEMIR LLP, JSC NMC TAU-KEN SAMRUK,
MINISTRY OF TRADE AND INTEGRATION OF THE REPUBLIC
OF KAZAKHSTAN,**
*Plaintiffs-Appellants*

**v.**

**UNITED STATES, GLOBE SPECIALTY METALS, INC.,
MISSISSIPPI SILICON LLC,**
*Defendants-Appellees*

---

Appeal from the United States Court of International Trade in No. 1:21-cv-00173-LMG, Senior Judge Leo M. Gordon

---

**DEFENDANTS-APPELLEES GLOBE SPECIALTY METAL,
INC.'S AND MISSISSIPPI SILICON LLC'S NOTICE AND
REQUEST FOR GUIDANCE**

Adam H. Gordon
Jennifer M. Smith
Lauren Fraid
**THE BRISTOL GROUP PLLC**
1707 L Street, NW, Suite 570
Washington, DC 20036
202-991-2700
Dated:  April 14, 2023     *Counsel to Defendants-Appellees Globe
Specialty Metals, Inc. and Mississippi
Silicon LLC*

Defendants-Appellees Globe Specialty Metals, Inc. ("Globe") and Mississippi Silicon LLC ("Mississippi Silicon") respectfully submit this status report to alert the Court that the third corrected opening brief filed on April 11, 2023 by Plaintiffs-Appellants Tau-Ken Temir LLP, JSC NMC Tau-Ken Samruk, and the Ministry of Trade and Integration of the Republic of Kazakhstan (collectively, "TKT") fails to comply with the Court's rules. In light of this non-compliance, Globe and Mississippi Silicon seek guidance from the Court as to which version of TKT's brief will be considered by the Court, and thus to which Globe and Mississippi Silicon should respond.

TKT filed the initial version of its opening brief on February 28, 2023, after receiving five extensions of time that amounted to over three months of additional time. *See* CM/ECF Doc. 30-1. Despite these extensions, TKT has continued to revise its opening brief, using the Court's three notices of non-compliance as a vehicle for doing so.

Globe and Mississippi Silicon recently became aware of these changes when comparing the versions of TKT's opening brief using Adobe's document comparison feature. Globe and Mississippi Silicon compared TKT's third corrected opening brief filed on April 11, 2023

(*see* CM/ECF Doc 36-1) to its opening brief filed on February 28, 2023

(*see* CM/ECF Doc. 30-1).  The Compare Report, attached as **Exhibit 1**

hereto, reveals 615 changes between text of these briefs.

Many of these changes venture outside of those ordered by the

Court in its several notices of non-compliance.  Moreover, a number of

the changes are substantive in nature, reflecting newly-added sentences

and arguments, deletions of material, and large-scale replacements of

discussion.  These substantive edits are pervasive throughout TKT's

third corrected opening brief.  *See generally* **Exhibit 1**.

Pursuant to Rule 25(i)(1) of the Rules of the U.S. Court of Appeals

for the Federal Circuit, "[a] party wishing to make nonsubstantive

corrections to any document currently on file with the clerk of court

must file a Notice of Correction.  Substantive corrections may only be

made with leave of the court." FED. CIR. R. 25(i)(1).  Additionally, Rule

25(i)(3) states "[a] Notice of Correction must be filed contemporaneously

with the corrected document and must specifically delineate each

correction." FED. CIR. R. 25(i)(3).

TKT failed to comply with these rules.  TKT did not file a Notice of

Correction with respect to its opening brief, did not specifically

delineate each correction made, and did not request leave of the Court to make substantive changes. To the contrary, TKT has notified neither the Court nor the parties of any revisions to its opening brief, instead camouflaging these changes among the changes required by the Court in its notices of non-compliance. In effect, TKT has, so far, granted itself another month-and-a-half of extensions to revise its opening brief.

Due to these substantive changes and the resulting non-compliance with the Court's rules, Globe and Mississippi Silicon do not know which version of TKT's opening brief should be reviewed and cited to in their Response Brief that is currently due on June 5, 2023. Therefore, Globe and Mississippi Silicon respectfully request that the Court provide guidance as to which version of TKT's brief remains validly on the record, and which version should be relied on for the Response Brief.

Respectfully submitted,

*/s/ Adam H. Gordon*
Adam H. Gordon, Esq.
Jennifer M. Smith, Esq.
Lauren Fraid, Esq.
**THE BRISTOL GROUP PLLC**
1707 L Street, NW, Suite 570
Washington, DC 20036
202-991-2700

Dated:  April 14, 2023    *Counsel to Defendants-Appellees Globe Specialty Metals, Inc. and Mississippi Silicon LLC*

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF INTEREST</u>

| | |
|---|---|
| **Case Number** | 22-2204 |
| **Short Case Caption** | Tau-Ken Temir LLP v. US |
| **Filing Party/Entity** | Globe Specialty Metals, Inc. and Mississippi Silicon LLC |

---

**Instructions:** Complete each section of the form.  In answering items 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.  **Please enter only one item per box; attach additional pages as needed and check the relevant box**.  Counsel must immediately file an amended Certificate of Interest if information changes.  Fed. Cir. R. 47.4(b).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 04/14/2023

Signature:  /s/ Adam H. Gordon

Name:  Adam H. Gordon

**FORM 9. Certificate of Interest**

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. ☐ None/Not Applicable |
| Globe Specialty Metals, Inc. | | Globe is a wholly owned subsidiary of Ferroglobe PLC, which is a publicly traded company (NASDAQ:GSM) |
| Mississippi Silicon LLC | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐  Additional pages attached

**4. Legal Representatives.**  List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities.  Do not include those who have already entered an appearance in this court.  Fed. Cir. R. 47.4(a)(4).

☑   None/Not Applicable          ☐   Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |
| | | |

**5. Related Cases.**  Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal.  Do not include the originating case number(s) for this case.  Fed. Cir. R. 47.4(a)(5).  See also Fed. Cir. R. 47.5(b).

☑   None/Not Applicable          ☐   Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |
| | | |

**6. Organizational Victims and Bankruptcy Cases**.  Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).  Fed. Cir. R. 47.4(a)(6).

☑   None/Not Applicable          ☐   Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

## <u>CERTIFICATE OF COMPLIANCE</u>

This notice complies with the type-volume limitation of Rule 27(d)(2)(A) of the Federal Rules of Appellate Procedure.

This notice contains 535 words.

This notice complies with the typeface requirements Rule 32(a)(5) of the Federal Rules of Appellate Procedure, and the typestyle requirements of Rule 32(a)(6) of the Federal Rule of Appellate Procedure, in accordance with Rule 27(d)(1)(E) of the Federal Rule of Appellate Procedure.

This notice has been prepared in a proportionally spaced type face using Microsoft Word in Century Schoolbook 14-point font.


Dated:  April 14, 2023

*/s/ Adam H. Gordon*
Adam H. Gordon
**THE BRISTOL GROUP PLLC**
*Counsel to Defendants-Appellees Globe Specialty Metals, Inc. and Mississippi Silicon LLC*

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 14th day of April, 2023, a copy of the

foregoing notice was served on the following parties by operation of the

Court's electronic-filing system:

Bret Vallacher
Trial Attorney
**U.S. Department of Justice**
Civil Division
Commercial Litigation Branch
P.O. Box 480
Ben Franklin Station
Washington, DC 20044
Email: bret.r.vallacher@usdoj.gov

Peter John Koenig
Counsel
**Squire Patton Boggs LLP**
2550 M Street NW
Washington DC 20037
Email: peter.koenig@squirepb.com

*/s/ Adam H. Gordon*
Adam H. Gordon
**THE BRISTOL GROUP PLLC**
*Counsel to Defendants-Appellees Globe Specialty Metals, Inc. and Mississippi Silicon LLC*

Dated: April 14, 2023

# Exhibit 1

4/13/2023 11:02:09 AM

# Compare Results

Old File:

**TKT CAFC Opening Brief.pdf**

**48 pages (355 KB)**

3/1/2023 6:45:43 AM

versus

New File:

**TKT CAFC Third Corrected Opening Brief.pdf**

**156 pages (4.16 MB)**

| Total Changes | Content | | Styling and Annotations | |
|---|---|---|---|---|
| **615** | 400 | Replacements | 0 | Styling |
| | 133 | Insertions | 0 | Annotations |
| Text only comparison | 82 | Deletions | | |

Go to First Change (page 1)

22-2204

_____

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT
_____

TAU-KEN TEMIR LLP, JSC NMC TAU-KEN SAMRUK, MINISTRY OF TRADE AND INTEGRATION OF THE REPUBLIC OF KAZAKHSTAN,

*Plaintiffs-Appellants*

v.

UNITED STATES, GLOBE SPECIALTY METALS, INC., MISSISSIPPI SILICON LLC,

*Defendants-Appellees*

Appeal from the United States Court of International Trade No. 21-173,
Judge Leo M. Gordon

PRINCIPAL BRIEF OF TAU-KEN TEMIR, LLP; MINISTRY OF TRADE AND INTEGRATION OF THE GOVERNMENT OF THE REPUBLIC OF KAZAKHSTAN; AND JSC NMC TAU-KEN SAMRUK, PLAINTIFFS-APPELLANTS

Counsel to Tau-Ken Temir, LLP; Ministry of Trade and Integration of the Government of the Republic of Kazakhstan; and JSC NMC Tau-Ken Samruk

Peter Koenig, Esq.
Squire Patton Boggs
2550 M Street NW
Washington DC 20236
202 669 1901
peter.koenig@squirepb.com

April 11, 2023 Corrected

010-9233-8739/1/AMERICAS

# CERTIFICATE OF INTEREST PER FEDERAL CIRCUIT RULE 47.4

010-9233-8739/1/AMERICAS

**FORM 9. Certificate of Interest**

Form 9 (p. 1)
July 2020

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 22-2204

**Short Case Caption** Tau-Ken Temir LLP v. United States

**Filing Party/Entity** Tau-Ken Temir LLP; Ministry of Trade and Integration of the Republic of Kazakhstan; JSC NMC Tau-Ken Samruk

---

**Instructions:** Complete each section of the form. In answering items 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance. **Please enter only one item per box; attach additional pages as needed and check the relevant box**. Counsel must immediately file an amended Certificate of Interest if information changes. Fed. Cir. R. 47.4(b).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 09/28/2022

Signature: /s/ Peter Koenig

Name: Peter Koenig

3

FORM 9. Certificate of Interest

Form 9 (p. 2)
July 2020

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☐ None/Not Applicable |
| Tau-Ken Temir LLP | None | JSC NMC Tau-Ken Samruk |
| JSC NMC Tau-Ken Samruk | None | None |
| Ministry of Trade and Integration of the Republic of Kazakhstan | None | None |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐  Additional pages attached

4

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐　None/Not Applicable　　☐　Additional pages attached

| Jeremy Dutra | Of Counsel | Squire Patton Boggs |
|---|---|---|
|  |  |  |
|  |  |  |

**5. Related Cases.** Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. Do not include the originating case number(s) for this case. Fed. Cir. R. 47.4(a)(5). See also Fed. Cir. R. 47.5(b).

☑　None/Not Applicable　　☐　Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑　None/Not Applicable　　☐　Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |

# <u>TABLE OF CONTENTS</u>

**Page**

TABLE OF AUTHORITIES .................................................................. iii

FEDERAL CIRCUIT RULE 47.5 STATEMENT OF RELATED CASES ............1

JURISDICTION STATEMENT ...............................................................1

ISSUES ...........................................................................................1

STATEMENT OF CASE ......................................................................2

SUMMARY OF ARGUMENT ...............................................................3

ARGUMENT ....................................................................................3

    I.    REVIEW STANDARD.................................................................3

    II.    COMMERCE SHOULD ACCEPT TKT'S QUESTIONNAIRE........6

        A.    Commerce Should Have Granted TKT's Initial Two Extension Requests ....................................................6

        B.    Commerce Should Have Accepted TKT's Third Extension Request....................................................7

        C.    Commerce Fails To Apply Any Standard, Much Less A Supportable One, To Decide TKT Extension Requests ..........13

            1.    Commerce Interest In Finality Of Its Investigation.......13

            2.    The Burden "In The Investigation" To Consider Information..............................................................14

            3.    Whether Information Increases Accuracy Of The Calculated Subsidy Margin .............................................16

        D.    The Commerce Regulation Violates The Statute ....................17

        E.    Commerce Speculation Is Unlawful .......................................19

        F.    Commerce Violates Its Practice...............................................22

        G.    The Trade Court Opinion Unlawfully Affirms Commerce For Reasons Commerce Does Not Say ....................................33

-i-

III.    COMMERCE UNLAWFULLY ENDED THE INCENTIVE
TO COOPERATE ................................................................35

IV.    COMMERCE APPLIED AN UNLAWFUL ADVERSE,
PUNITIVE CVD RATE....................................................37

V.    CONCLUSIONS AND RELIEF SOUGHT ......................................40

010-9233-8739/1/AMERICAS

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Statutes**

19 U.S.C. 706(2)(A) ................................................................. 4

19 U.S.C. § 1516a(a)(2)(B)(i) ..................................................... 1

19 U.S.C. § 1516a(b)(1)(B)(i) ..................................................... 3

19 U.S.C. § 1677e ................................................................. 38

28 U.S.C. § 1295(a)(5) ............................................................. 1

28 U.S.C. § 1581(c) ............................................................... 1

**Agency Regulations**

19 CFR § 351.302 (c) ............................................................ 10

Extension Of Time Limits, Final Rule, 78 Fed. Reg. 57,790 (Dep't of
    Commerce Sept. 20, 2013) ........................................ 9, 10, 12, 17, 18

Modification of Regulation Regarding the Extension of Time Limits,
    78 Fed. Reg. 3367, 3370 (Dep't of Commerce Jan. 16, 2013) ................. 18

**Court Cases**

Anderson v. U.S. Sec'y of Agric.,
    462 F. Supp. 2d 1333 (Ct. Int'l Trade 2006) ............................... 4

Artisan Manufacturing Corp. v. United States,
    978 F. Supp. 2d 1334 (Ct. Int'l Trade 2014) .............................. 37

Auto Telecom Co., Ltd. v. United States,
    765 F. Supp. 1094 (Ct. Int'l Trade 1991) ................................. 40

Bebitz Flanges Works Private Ltd. v. United States,
    433 F. Supp. 3d 1297 (2020) ........................................ passim

Böwe–Passat v. United States,
    17 CIT 335 (1993) ....................................................... 34

-iii-

Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.,
    419 US 281 (1974) ....................................................................... 4

Brenner v. Dept. of Veteran Affairs,
    990 F.3d 1313 (Fed. Cir 2021) ..................................................... 5

Celik Halat Ve Tel Sonayi A.S. v. United States,
    557 F. Supp 3d 1348 (Ct. Int'l Trade 2022)............................. 22, 38

Ceramica Regiomontana v. United States,
    10 CIT 399 (1986) ........................................................................ 5

Christensen v. Harris Cty.,
    529 U.S. 576, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000) ................... 11

Clearon Corp. v. United States,
    Slip Op. 20-141 .......................................................................... 36

CP Kelco v. United States,
    949 F.3d 1348 (Fed. Cir. 2020) ..................................................... 4

CS Wind Vietnam Co. v. United States,
    832 F. 3d 1367 (Fed. Cir. 2016) .................................................... 3

DAK Americas LLC v. United States,
    456 F. Supp. 2d 1340 (Ct. Int'l Trade 2020)................................. 31

Dongtai Peak Heavy Indus. v. United States,
    777 F. 3d 1343 (Fed. Cir. 2015) .............................................. passim

Dupont Teijin Films USA, LP v. United States,
    407 F.3d 1211 (Fed. Cir. 2005) ..................................................... 3

Dupont Teijin Films v. United States,
    Slip Op. 13-11 (Ct. Int'l Trade 2013)............................................ 5

Essar Steel Ltd. v. United States,
    678 F.3d 1268 (Fed. Cir. 2012) .................................................... 35

F.11i De Cecco Di Filippo Fara S. Martino S.p.A. v. United States,
    980 F. Supp. 485 (Ct. Int'l Trade 1997)........................................ 35

-iv-

F.11i De Cecco Di Filippo Fara S. Martino S.p.A. v. United States,
  216 F.3d 1027 (Fed. Cir. 2000) ............................................... 35, 38, 39

Glycine & More, Inc. v. United States,
  880 F.3d 1335 (Fed. Cir. Jan. 23, 2018) ................................. 11

Grobest & I-Mei Indus. (Viet.) Co. v. United States,
  815 F. Supp. 2d 1342 (Ct. Int'l Trade 2012) ......................... 13

Guizhou Tyre Co. v. United States,
  415 F. Supp. 3d 1402 (Ct. Int'l Trade 2019) ......................... 36

Hontex Enterprises, Inc. v. United States,
  Slip Op. 03-17 (Ct. Int'l Trade 2003) ................................... 11

Julin Forest Industry Jinqiao Flooring Group Co. Ltd. vs. United
  States, Slip Op. 23-14 (Ct. Int'l Trade 2023) ....................... 15

Kirovo Chepetsky Khimichesky Kombinat, JSC v. United States,
  58 F. Supp. 3d 1397 (Ct. Int'l Trade 2015) ........................... 5

Lucent Techs., Inc. v. Gateway, Inc.,
  580 F.3d 1301 (Fed. Cir. 2009) ............................................ 3

Marmen Inc. v. United States,
  Slip Op. 21-148 (Ct. Int'l Trade 2021) ................................. 13

Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Automobile
  Insurance Co.,
  463 U.S. 29 (1983) ........................................................... 4, 33

National Steel Corp. v. United States,
  913 F. Supp. 593 (Ct. Int'l Trade 1996) .............................. 17

Nippon Steel Corp. v. United States,
  337 F. 3d 1373 (Fed. Cir. 2003) ..................................... 21, 35

Nippon Steel Corp. v. United States,
  458 F.3d 1345 (Fed. Cir. 2006) ............................................ 3

NLRB v. Wash. Star Co.,
  732 F.2d 974 (D.C. Cir. 1984) ............................................ 32

NTN Bearing Corp. v. United States,
    74 F.3d 1204 (Fed. Cir. 1995) ...................................................... 5, 13, 18

Oman Fasteners LLC v. United States,
    Slip Op. 23-17 (Ct. Int'l Trade 2023)...................................... 20, 21, 34

Prime Time Corn. LLC v. United States, 396 F. Supp. 3d 1319 (Ct.
    Int'l Trade 2019)................................................................................ 33

Pro-Team Coil Nail Enterprise Inc. v. United States,
    419 F. Supp. 3d 1319 (Ct. Int'l Trade 2019)...................................... 18

Qingdao SeaLine Trading Co., Ltd. v. United States,
    766 F.3d 1378 (Fed. Cir. 2014) .................................................. 31, 32

SKF USA Inc. v. United States,
    263 F. 3d. 1369 (Fed. Cir. 2001) ....................................................... 31

Solar World Americas Inc. v. United States,
    962 F. 3d. 1351 (Fed. Cir. 2020) ......................................................... 4

Sunpower Corp. v. United States,
    179 F. Supp. 3d 1286 (Ct. Int'l Trade 2016)........................................ 4

Tau Ken Temir LLP et. al. vs. United States et. al., Slip Op. 22-82 (Ct.
    Int'l Trade July 14, 2022)..............................................................passim

Tel Sonayi AS v. United States,
    Slip Op 22-12 (Ct. Int'l Trade 2022)................................................... 7

Timken U.S. Corp. v. United States,
    434 F.3d 1345 (Fed. Cir. 2006) .................................................. 13, 18

West Virginia v. EPA,
    142 S. Ct. 2587 (2022) ..................................................................... 15

Yangzhou Bestpak Gifts & Crafts Co., Ltd. v. United States,
    716 F.3d 1370 (Fed. Cir. 2013) ........................................................ 38

**Commerce Decisions**

Final Determination, Silicon Metal from the Republic of Kazakhstan,
    Inv. C-834-811..............................................................................passim

Notice Of Intent To Rescind Administrative Review of the CVD Order
    On Silicon Metal from The Republic Of Kazakhstan, 12/3/20-
    12/31/2021 ................................................................................................ 37

Small Business Telephones from Taiwan, 43 Fed. Reg. 42,543, 42,550
    (Dep't of Commerce Oct. 17, 1989) ................................................................ 40

# FEDERAL CIRCUIT RULE 47.5 STATEMENT OF RELATED CASES

There is no other appeal in or from this civil action or proceeding in the lower court or body previously before this or any other appellate court.

## JURISDICTION STATEMENT

Per Rule 28(a)(5), this Court's jurisdiction rests on:

The Trade Court had jurisdiction here under 19 U.S.C. § 1516a(a)(2)(B)(i) and 28 U.S.C. § 1581(c). Trade Court Opinion at 2-3; Appx56-57.

The statutory basis for this Court's jurisdiction for appeal is 28 U.S.C. § 1295(a)(5).

The Trade Court entered final judgment on July 14, 2022. Appx2-3. Per Rule 4(a)(1)(B) of the Federal Rules of Appellate Procedure, this appeal was timely filed September 11, 2022.

## ISSUES

Whether the U.S. Department of Commerce's (Commerce) rejection of Plaintiffs-Appellants TKT extension request and questionnaire response was unsupported by substantial evidence, arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

Whether the adverse facts were unsupported by substantial evidence or otherwise not in accordance with law.

-1-

## STATEMENT OF CASE

Plaintiff-Appellants Tau Ken Temir LLP ("TKT"), Ministry ("Ministry") of Trade and Integration of the Government of the Republic of Kazakhstan ("GOK") and JSC NMC Tau-Ken Samruk ("TKS") (TKT and TKS also collectively referred to as "TKT") contest the February 26, 2021 U.S. Department of Commerce ("Commerce") <u>Final Determination in the Countervailing Duty (CVD) Investigation Silicon Metal from the Republic of Kazakhstan</u>, Inv. C-834-811, 86 Fed. Reg. 11,725 (Commerce, Feb. 26, 2021) ("<u>Commerce Final Determination</u>"), Appx136-138, and Commerce's accompanying February 22, 2021 Issues and Decision Memorandum, ("<u>Commerce Decision Memorandum</u>"). Appx189-245. The U.S. Court of International Trade ("Trade Court") sustained the <u>Commerce Final Determination</u> in <u>Tau Ken Temir LLP et. al. vs. United States et. al</u>., Slip Op. 22-82, July 14, 2022 ("<u>Trade Court Opinion</u>"), Appx55-86, which we also contest.

Kazakh silicon metal producer TKT was subject to a Commerce CVD investigation into whether the Kazakh Government subsidizes Kazakh silicon metal exports to the United States. TKT and the Ministry participated in the investigation, answering Commerce questionnaires. Defendant-Appellees U.S. silicon metal producers Mississippi Silicon LLC and Globe Specialty Metals, Inc. (collectively, "Mississippi Silicon") filed the CVD petition that led to this Commerce investigation and participated therein.

# SUMMARY OF ARGUMENT

TKT followed Commerce regulations in its request for an extension to answer the Commerce Subsidy Questionnaire. Thus, the TKT extension requests to answer the Subsidy Questionnaire should have been granted. Further, Commerce imposed adverse inferences on TKT and the Kazakh Government, where substantial evidence was lacking that they did not act to the best of their ability, the statutory condition for adverse inferences.

# ARGUMENT

## I. REVIEW STANDARD

When reviewing a final Commerce CVD decision, this Court applies the same standard of review as the Trade Court. Dupont Teijin Films USA, LP v. United States, 407 F.3d 1211, 1215 (Fed. Cir. 2005). By statute, Commerce CVD decisions must be supported by substantial evidence, considering the record as a whole, and otherwise be in accordance with law. 19 U.S.C. § 1516a(b)(1)(B)(i); CS Wind Vietnam Co. v. United States, 832 F. 3d. 1367, 1373 (Fed. Cir. 2016).[1] Speculation is not substantial evidence. Lucent Techs., Inc. v. Gateway, Inc., 580 F.3d 1301, 1327 (Fed. Cir. 2009).

Per this standard, Commerce decisions must be reasonable. Nippon Steel Corp. v. United States, 458 F.3d 1345, 1351 (Fed. Cir. 2006). Commerce must

---

[1] As to issues in this brief, the trade statute and Commerce regulations on countervailing duty and antidumping (AD) are the same. Trade Court Opinion at 5-7, Appx59-61.

-3-

"examine the relevant data and articulate a satisfactory explanation for its action," Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Automobile Insurance Co., 463 U.S. 29, 43 (1983), including "a rational connection between the facts found and the choice made." Id.; Trade Court Opinion at 3-4; Appx57-58.

Commerce decisions also cannot be arbitrary and capricious. 19 U.S.C. 706(2)(A); Solar World Americas Inc. v. United States, 962 F. 3d. 1351, 1359 n. 2 (Fed. Cir. 2020); Trade Court Opinion at 7-8, Appx61-62 (addressing TKT argument). A decision is unlawfully arbitrary and capricious when it (a) "fails to consider an important aspect of the problem" (State Farm, 463 U.S. at 43; Sunpower Corp. v. United States, 179 F. Supp. 3d 1286, 1295 (Ct. Int'l Trade 2016)), or (b) treats "similar situations in dissimilar ways." Anderson v. U.S. Sec'y of Agric., 462 F. Supp. 2d 1333, 1339 (Ct. Int'l Trade 2006).

Commerce's decision path must "reasonably be discerned, … the required explanation must reasonably tie the contested determination to the statutory standard and to the record evidence by indicating what statutory interpretations the agency is adopting and what facts the agency is finding." CP Kelco v. United States, 949 F.3d 1348, 1356 (Fed. Cir. 2020); Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 US 281, 286 (1974). Commerce's exercise of its discretion must be reasonable in light of its statutory mandate to calculate accurate subsidy margins – Commerce abuses its discretion when its decision is "clearly unreasonable, arbitrary,

-4-

or fanciful." <u>NTN Bearing Corp. v. United States,</u> 74 F.3d 1204, 1208 (Fed. Cir. 1995).

"The enforcement of . . . deadlines is an exercise of Commerce's discretion, and should therefore be examined to ensure against abuse of discretion." <u>Kirovo Chepetsky Khimichesky Kombinat, JSC v. United States,</u> 58 F. Supp. 3d 1397, 1411 (Ct. Int'l Trade 2015). When considering whether Commerce's application of a non-statutory deadline in a given case is an abuse of discretion, Commerce's discretion "is bounded at the outer limits by the obligation to carry out its statutory duty of determining {CVD} margins as accurately as possible." <u>Dupont Teijin Films v. United States</u>, Slip Op. 13-11 at 13 (Ct. Int'l Trade 2013). An agency abuses its discretion where, inter alia, "the decision . . . represents an unreasonable judgment in weighing relevant factors." <u>Brenner v. Dept. of Veteran Affairs</u>, 990 F.3d 1313, 1324 (Fed. Cir 2021).

"Of course, this Court will not allow an agency, under the guise of lawful discretion, to contravene or ignore the intent of the legislature or the guiding purpose of the statute. Thus, in reviewing a Commerce CVD decision, the court must ensure that" Commerce "methodology is a reasonable means of assessing the net benefit received as a result of the illegal subsidy." <u>Ceramica Regiomontana v. United States,</u> 10 CIT 399, 405 (1986).

## II.    COMMERCE SHOULD ACCEPT TKT'S QUESTIONNAIRE

### A.    Commerce Should Have **Granted** TKT's Initial Two Extension Requests

TKT timely answered (and without extension request) Commerce's first three questionnaires on cross-owned affiliate companies, to facilitate this matter. Trade Court Opinion at 4, Appx58; Appx607, Appx719, Appx778, Appx830, Appx982, Appx1034, Appx2032, Appx2418. Based on those answers, Commerce said six companies must answer Commerce's Subsidy Questionnaire as to any government subsidies to TKT. Appx2195.[2]

Well before the deadline to answer the Subsidy Questionnaire, TKT counsel requested a two-week extension to answer, noting the huge amount of information requested, that the individuals involved were new to the CVD process, that all had to respect COVID travel and stay at home restrictions, precluding travel or in person meetings, the fact that six different entities had to respond, COVID furloughs of staff leaving short-staffed, where at the same time Commerce continued adding to the list of companies to answer, and that TKT was working flat out to answer. Appx882, Appx1814-1815, Appx1924, Appx2087, Appx2432-2433, Appx2426-2427, Appx2430, Appx2446, Appx2451-2457. Without explanation, Commerce only gave a week. Appx932. Then, again, well before that initially granted one-week extended

---

[2] At times, the Trade Court Opinion at 4, 10, 12 (Appx58, Appx64, Appx66) calls this Subsidy Questionnaire the First Supplemental Questionnaire.

-6-

date, TKT counsel requested a second extension to September 17, 2020, for the same reasons as indicated in the first extension request. Appx1091. Without explanation, Commerce only granted to September 15, 2020. Appx1142. Note that counsel filed the extension requests early when the circumstances so permitted, and it was clear an extension was needed. Appx2418.

Commerce's denial of the above full extension requests is not supported by substantial evidence. Commerce provides no support otherwise. Actually, proximate to the time of its rejection of the TKT's full extension requests above and thus questionnaire response, Commerce gave itself 4 months extension when Commerce needed time given the same stay at home COVID restrictions, an inconsistency the Trade Court finds unlawful. Calik Halat ve Tel Sonayi AS v. United States, Slip Op 22-12 at 24 and Slip Op 22-13 at 33 (Ct. Int'l Trade Feb. 15, 2022).

If full extension in the first two TKT extension requests to September 17 was granted, requests that no one disputes as timely and adequately explained, TKT's September 17 filed Subsidy Questionnaire response would have been timely and accepted, not rejected. The Trade Court Opinion and Commerce Decision Memorandum fail to mention, much less address, this fatal legal error in Commerce's rejection of TKT's Subsidy Questionnaire response.

## B. Commerce Should Have Accepted TKT's Third Extension Request

TKT counsel received the final, fully completed TKT questionnaire responses from TKT at 10:58AM. TKT counsel, experienced, felt this was received within the

time to meet the 5:00PM deadline. Commerce Decision Memorandum at 16, Appx205; Trade Court Opinion at 10-11, 14-15, Appx59-60, Appx64-65, Appx68-69.

But then unanticipated technical file issues emerged – *e.g.*, in the assimilation of the response, file corruption, difficulty creating the requisite searchable PDFs of foreign language documents, etc. Trade Court Opinion at 5-6, 11, Appx59-60, Appx65; Appx 1306, Appx1815. These unanticipated issues had not occurred as to received files from TKT for the first two filings that were timely filed.

While counsel may be experienced in CVD law, these were unanticipated computer document issues. When it became apparent that technical computer issues in the finalization of the received full questionnaire for filing that the 5:00PM deadline could not be met and that an extension was needed, TKT counsel immediately filed (at 3:50PM of the due date) on Commerce ACCESS for internet filings a stand-alone written third extension request for one more day to answer the Subsidy Questionnaire. Trade Court Opinion at 5 &10 (Appx59, Appx64). [3] The Trade Court Opinion at 4-6 (Appx58-60) correctly said that:

> The parties agree that {TKT} filed a third request for an extension of time on a timely basis. (emphasis added)

---

[3] ACCESS is Commerce's public website record where Commerce investigation documents and decisions appear. Trade Court Opinion at 5, 7, Appx59, Appx61; Commerce CVD Questionnaire at 2,6, Appx605, Appx615.

The Trade Court Opinion at 10-11 (Appx64-65) incorrectly says without support that TKT counsel tried to file before 5:00PM on September 15. TKT counsel did not begin to file the questionnaire response until 5:31AM September 16. Commerce Decision Memorandum at 15, Appx204; Trade Court Opinion at 14, Appx68.

Counsel sought to address unanticipated technical computer issues as to documents, that preceded then seeking to file them on Commerce ACCESS. Commerce ACCESS does not help with questionnaire response document preparation. No one says, much less supports, otherwise. The claim that TKT counsel did not call ACCESS (Trade Court Opinion at 14) on September 15 thus misses the mark.

More significant, the full extent of the problem was not known until after business hours on September 15, when Commerce ACCESS was closed. Appx59, Appx1815, Appx1816, Appx2419, Appx2427. TKT counsel did not start to file the submission until 5:31AM September 16. Trade Court Opinion at 14, Appx68; Appx1356-1358. There was no one to call at Commerce, including its ACCESS staff, as it was closed and would not open until 8:30AM, which was when the filing was due. Appx2427.

By TKT's filing of the extension request on Commerce ACCESS, the many involved Commerce officials immediately learned of the extension request. Commerce, Extension Of Time Limits, Final Rule, 78 Fed. Reg. 57,790, 57793 (Sept.

20, 2013) ("Extension Of Time Limits"). Commerce regulations do not say to do more than that (Trade Court Opinion at 7; Appx61) because Commerce ACCESS is designed to immediately alert all Commerce officials simultaneously (Extension Of Time Limits, at 57793), many of whom the respondent may not even know are working on the case at that point in time. No phone call can do that, which may be why Commerce regulations do not say to make a phone call, and rather state to file an extension request electronically on Commerce ACCESS for immediate notification to all.

Commerce regulation 19 CFR § 351.302 (c) states that "before the applicable time limit" to answer a Commerce request "expires, a party may request an extension" via filing a written request on Commerce's internet site ACCESS for filing documents. Any extension "request must be in writing, in a separate, stand-alone submission, filed consistent with § 351.303 {*e.g.*, on ACCESS}, and state the reasons for the request." In its Extension Of Time Limits, 78 Fed. Reg. at 57791-92, Commerce explains that its regulation 19 CFR § 351.302:

> considers that an extension request is untimely if it is filed after the applicable time limit expires. Therefore, we have determined that the term untimely in the final rule is defined as an extension request that is received after the applicable time limit expires

to answer the questionnaire. Similarly, the Commerce Questionnaire Cover Letter states (Appx604) that any extension request must "be communicated in writing to Commerce; otherwise the original deadline will apply."

-10-

As discussed above, following Commerce's regulation, TKT counsel did all the above outlined in Commerce's regulations to perfect a timely one-day final, third extension request, as soon as it was known that more time was needed, and how much – *i.e.*, at about 3:50 p.m. of the September 15, 2020 due date.

> Where the regulation
>
> is clear, no deference {to Commerce claims} is warranted. Deferring to Commerce's position "would be to permit the agency, under the guise of interpreting a regulation, to create *de facto* a new regulation." Christensen v. Harris Cty*.,* 529 U.S. 576, 588, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000) (unambiguous regulation could not be rewritten by agency under guise of interpreting regulation and judiciary owed no deference to agency interpretation).

Glycine & More, Inc. v. United States, 880 F.3d 1335, 1345 (Fed. Cir. Jan. 23, 2018); Hontex Enterprises, Inc. v. United States, Slip Op. 03-17 at 41 (Ct. Int'l Trade Feb. 13, 2003) (Commerce's "incompatible departure from the clear meaning of the regulation" is unlawful.)

Counsel was able to file TKT's several thousand-page questionnaire response by 10:11AM the next morning, one hour and forty-one minutes after Commerce's 8:30AM opening for business the next business day after the deadline, and before 5:00PM that day requested in the one-day extension request. Trade Court Opinion at 5, Appx59 (TKT "was unable to complete the entirety of the filing until 10.11am on September 16th, one hour and 41 minutes beyond the 8:30 am deadline."); Appx2418.

Two weeks later Commerce said (Appx1712) that:

-11-

Commerce was unable to respond to this {TKT extension} request. Therefore, in accordance with the <u>Extension of Time Limits</u> notice, where Commerce is unable to notify the party requesting an extension of the disposition of that request by 5:00 p.m., the submission would be due by the opening of business, i.e., 8:30 a.m., on the next work day. {we call this Next Day 8:30AM}

<u>Commerce Decision Memorandum</u> at 15, 16, 18, Appx204-205, Appx207; <u>Trade Court Opinion</u> at 10-11, Appx65-66. Commerce said that since the questionnaire response was filed at 10:10AM, and not 8:30AM, it was untimely and so rejected. Appx1712.[4]

The <u>Commerce Decision Memorandum</u> (at 17, Appx206) and the <u>Trade Court Opinion</u> (at 14; Appx68) say that TKT counsel did not attempt to contact Commerce. In fact, TKT counsel followed Commerce's regulation and questionnaire, which say to do an ACCESS filing to contact Commerce and does not say to make a telephone call. That makes sense as the ACCESS filing immediately notifies all concerned at Commerce, and thus is effectively also contacting Commerce. See above. Anyway, as Commerce admits above (Appx1712), no one was available at Commerce ("Commerce was unable to respond").

---

[4] Commerce also initially claimed TKT's Subsidy Questionnaire response was incomplete. Appx1712. TKT documented that claim was unsupported by substantial or any evidence. Appx1921-1922, Appx2030-2032, Appx2420-2421, Appx2437-2443. Commerce did not discuss, much less refute, that TKT reply, instead saying "Commerce is continuing to base its determination to reject TKS/TKT's initial questionnaire response as untimely based on the lateness of the submission, rather than the content of the" filing rendering its completeness "moot." <u>Commerce Decision Memorandum</u> at 20, Appx209; <u>Trade Court Opinion</u> at 15, Appx69 (Commerce did not rely on any claimed TKT "failure to provide a full version of the submission as a reason for its rejection.").

### C.    Commerce Fails To Apply Any Standard, Much Less A Supportable One, To Decide TKT Extension Requests

It is established that legal factors that must be considered as to whether a filing should be rejected as untimely are: (1) Commerce's interest in finality of its final (not preliminary) decision, (2) the burden on Commerce "in the investigation" at issue (not broadly) to consider the filing to calculate the CVD/AD margin, and (3) if information in the filing increases accuracy of calculated subsidy margins; Commerce's failure to consider the above factors as to whether to accept a filing is an unlawful abuse of discretion. NTN Bearing Corp. v. United States, 74 F.3d 1204, 1208 (Fed. Cir. 1995); Timken U.S. Corp. v. United States, 434 F.3d 1345 (Fed. Cir. 2006); Marmen Inc. v. United States, Slip Op. 21-148 at 15 (Ct. Intl Trade 2021); Grobest & I-Mei Indus. (Viet.) Co. v. United States, 815 F. Supp. 2d 1342, 1365 (Ct. Int'l Trade 2012).

The Commerce Decision Memorandum did not consider, much less discuss, any of these three factors on whether to fully accept any of TKT's three extension requests as to the Subsidy Questionnaire, rendering Commerce's action unlawful.

Consider each factor:

### 1.    Commerce Interest In Finality Of Its Investigation

This information in the Subsidy Questionnaire was submitted September 16, 2020, well before Commerce's final determination. See below. So, this factor is met to accept the questionnaire response.

2.    **The Burden "In The Investigation" To Consider Information**

Commerce never says that fully granting any of TKT's three extension requests would hinder its investigation to meet its statutory mandate to accurately calculate the subsidy margin in its investigation of Kazakh silicon metal. Sufficient time remained to complete the investigation and issue a final decision. At the time TKT submitted its Subsidy Questionnaire response within the period for which TKT requested an extension, Commerce's final decision was 158 to 258 days away (preliminary decision was 73 days away). Commerce Decision Memorandum at 2, Appx191; Appx2419, Appx2425, Appx2463.

Rather, the Commerce Final Determination says:

Commerce establishes deadlines so that it can conduct this (and its numerous other trade remedy proceedings) in an efficient manner within its statutory and regulatory deadlines. Therefore, it is critical that parties file documents by the established deadline, or timely request an extension of such a deadline such that Commerce can provide a considered response. Timely filings and timely extension requests contribute to Commerce's efficient administration of the numerous cases before it and the AD/CVD laws. Conversely, untimely filings and last-minute extension requests hinder the efficient conduct of our proceedings, and require that Commerce devote additional time and resources to addressing such untimely filings and last-minute requests. Additionally, although the burden associated with a single late-filed questionnaire response may be perceived as minimal, that burden is not minimal when aggregated across all proceedings. Accordingly, for the efficient conduct of its proceedings, it is critical that parties adhere to the deadlines established by Commerce.

Commerce does not say the above in other cases where there are claimed untimely or last-minute extension requests, and Commerce accepts the extension request and questionnaire. See below cites. That belies this claim. It is unlawfully

-14-

arbitrary and capricious to apply the above to TKT and not others. This claimed reason is also contrary to the above discussed court decisions which focus on Commerce's burden "in the investigation," not generally. A claim that Commerce can simply not decide matters and not satisfy the statutory mandate to calculate CVD/AD margins because it does not have time and resources to do so violates the CVD/AD statute. Zheijiang Native Produce & Animal By-Products Import & Export Corp., 637 F. Supp 2d 1260, 61-63 (Ct. Int'l Trade 2009); Appx1815, Appx1817.

Further, Commerce can and does decide extension requests after the deadline. See below. So, there is no such burden that Commerce claims above. In fact, here, Commerce decided TKT's one-day extension request two weeks after it was filed. See above.

More fundamentally, the ultimate source for the development of agency policy that affects rights is legislative, the Congress. West Virginia v. EPA, 142 S. Ct. 2587, 2609 (2022) ("We presume that Congress intends to make major policy decisions itself, not leave those decisions to agencies"); Whitman v. Am. Trucking Ass 'ns, 531 U.S. 457, 468 (2001) (Congress "does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions."); Julin Forest Industry Jinqiao Flooring Group Co. Ltd. vs. United States, Slip Op. 23-14 at 33-36 (Ct. Int'l Trade Feb. 9, 2023). Here, the statutory mandate is accurately calculating CVD/AD margins within the statutory deadlines set for an investigation. See above. Congress did not say that Commerce may elect to not meet its statutory obligations to save money or for its

convenience. Commerce provides no support for such an implicit assumption in its claim here that appears largely limited to TKT.

The Trade Court Opinion does not note, much less defend, this basis on which the contested Commerce decision rests.

3. **Whether Information Increases Accuracy Of The Calculated Subsidy Margin**

In rejecting the TKT Subsidy Questionnaire response, Commerce did not have information with which to calculate the subsidy margin and thus used adverse inferences not based on data as to the actual subsidy amounts. Accepting the TKT Subsidy Questionnaire response as to any actual subsidies received would necessarily have increased the accuracy of the calculated subsidy margin.

For the above reasons, the Subsidy Questionnaire Response should have been accepted as a matter of law.

———————

Indeed, Commerce admits that it is not applying any standard to decide extension requests. Commerce, Extension of Time Limits, 78 FR at 3369, said that:

> a standard under which untimely-filed {i.e., after the deadline} extension requests will be considered is not provided under the current regulation, and so the inclusion of a standard will provide clarity to parties appearing before the Department … If the Department maintained the current rule, then there would be no standard under which the Department would consider untimely-filed extension requests. This would not provide certainty to parties participating in AD and CVD proceedings, and would not address the administrative issues which the Department has encountered.



Here Commerce admits that it has no standard as to deciding extension requests, but has now added one as to extension requests filed <u>after</u> the deadline. There is still no Commerce standard as to extension requests filed <u>before</u> the deadline (like TKT's), and Commerce ignores the long-established court one discussed above. It is well-established that when an agency acts without standards, that itself is arbitrary and capricious.  <u>National Steel Corp. v. United States</u>, 913 F. Supp. 593, 595 (Ct. Int'l Trade 1996). The record of this case so illustrates. Such Commerce decision-making is unlawful.

**D.    The Commerce Regulation Violates The Statute**

Commerce's failure to fully grant any of TKT's timely extension requests and consequent rejection of TKT's filed questionnaire response violates Commerce Extension Of Time Limits regulation (78 Fed. Reg. at 57795). That rule states that, notwithstanding "Next Day 8:30AM," giving the respondent until 8:30AM the next day to make the filing, if Commerce fails to answer an extension request by the deadline, Commerce still "will continue to grant extensions of time limits to the extent that they are warranted and deadlines for the segment permit." <u>Id.</u> In other words, Commerce can decide extension requests made close to the deadline after the deadline, and does. See below.  Nor did Commerce assess if any of the requested extensions were warranted in full and whether time remaining in the investigation permitted granting them in full.

-17-

Further, in this spirit, Commerce states as to its <u>Extension Of Time Limits</u> (at 57795-96) that Commerce will not adopt rules that are "inflexible to permit" Commerce "to effectively and fairly administer the AD and CVD laws" – *i.e.*, Commerce will not adopt rules that unnecessarily hamstring/prevent Commerce to achieve its statutory mandate to calculate accurate subsidy (or dumping) margins. Commerce, <u>Modification of Regulation Regarding the Extension of Time Limits</u>, 78 Fed. Reg. 3367, 3370 (Dep't of Commerce Jan. 16, 2013).

But that is what Commerce's rejection of TKT's questionnaire response did, stating that, since Commerce did not decide TKT's extension request by the 5:00PM deadline, then Commerce is inflexibly boxed in by its regulation, where the deadline was inexorably 8:30AM the next day.

The <u>Trade Court Opinion</u> at 17, Appx71, said that under the <u>Extension Of Time Limits</u>, the above general fairness principles mandated by the statute do not apply, meaning that Commerce is not free to be flexible in the above regards and cannot achieve its above-stated overarching guiding principles to achieve the statutory mandate to accurately calculate the dumping margin. That position runs afoul of this Court's decisions – i.e., Commerce's exercise of discretion as to extension requests and timeliness of submissions (even late ones) must be reasonable considering the statutory mandate to calculate accurate CVD/AD subsidy/dumping margins within the statutory time limits of the particular investigation. <u>NTN Bearing Corp. v. United States</u>, 74 F.3d. 1204, 1207 (Fed. Cir. 1995); <u>Pro-Team Coil Nail Enterprise Inc. v.</u>

-18-

United States, 419 F. Supp. 3d 1319, 1332 (Ct. Int'l Trade 2019). "A regulation which is not required by statute … must be waived where failure to do so would amount to an abuse of discretion" as to the statutory mandate to accurately calculate CVD/AD margins. Timken U.S. Corp. v. United States, 434 F.3d 1345, 1353-54 (Fed. Cir. 2006). Failure to waive any regulation deadline here is an abuse of discretion. The Commerce artificial deadline here was not necessary to satisfy statutory obligations as to the statutory deadlines in the particular investigation to accurately calculate the CVD/AD margin. Id.

### E.    Commerce Speculation Is Unlawful

The Commerce Decision Memorandum (at 19, Appx208) and Trade Court Opinion at 18-19 (Appx72-73) speculate that TKT counsel "gambled unwisely" (term used) as to when it filed its extension request. Speculation is not substantial evidence to support a lawful determination. See above.

But TKT counsel did not gamble. There is no substantial evidence otherwise. Counsel filed its extension request as soon it became apparent that it could not meet the 5:00PM deadline. See above. Commerce Decision Memorandum and Trade Court Opinion provide no reason, much less support, to dispute that assessment, and indeed effectively support it when they call counsel experienced.

In addition, the Trade Court Opinion (at 14, Appx68, citing Commerce) say that TKT counsel is experienced in CVD and then, along with Commerce, makes the unsupported implicit assumption without explanation or substantial evidence

-19-

that experienced CVD counsel would be experienced in technical computer file corruption issues that it would come to see as progressed with the filing that it had not experienced before, discussed above. The reason for and timing of the third extension request was solely due to technical computer file corruption issues. See above. The Commerce Decision Memorandum (at 19, Appx208) instead erroneously focuses on the reasons indicated in the two prior TKT extension requests.

Further, the Trade Court Opinion and Commerce Decision Memorandum implicitly assume without support that if TKT counsel had filed the one-day extension request earlier, it would have been granted, even though Commerce did not fully grant any of TKT's extensions as to the time requested. See above. Commerce had already previously rejected TKT extension requests as to a deadline beyond September 15. See above.

Here, the Commerce Decision Memorandum (at 19, Appx208) seems to question TKT counsel's initial experienced judgement that it could meet the 5:00PM deadline when it received TKT's final, completed questionnaire response the morning of the deadline. But it offers no explanation or support for such seeming question.

Notably, in Oman Fasteners LLC v. United States, Slip Op. 23-17 at 5-9 (Ct. Int'l Trade February 2, 2023), experienced counsel in that case thought on receipt of the respondent's final questionnaire response 50 minutes before the 5:00PM deadline

was sufficient to file by the 5:00PM deadline. In response, Commerce "said counsel did not allow enough time because, as is often said on Wall Street, past performance is no guarantee of future results." Id. So, Commerce seems to be saying that experience doesn't matter. And yet Commerce and the Trade Court base their decision there and here on the involvement of experienced counsel. Commerce belies its own decision in that explaination. The Trade Court in Oman Fasteners was not impressed with Commerce's claims, reversing them.

In addition, at the time of the TKT 3:50PM extension request, Commerce advised not to begin filings after 4:00PM. Commerce, ACCESS, Handbook on Electronic Filing Procedures, Enforcement and Compliance, Version 3.9, August 31, 2020, Help Desk at 16 ("we do not recommend starting any filing after 4:00 p.m"). Appx1815, Appx2427. TKT's counsel actions reflect that Commerce advise based on Commerce experience. Later, based on Commerce's experience in many cases with many experienced counsel, Commerce has just now since changed its position to say not to begin filings after 12:00PM, as now indicated in Commerce ACCESS decisions in all cases. Going forward, TKT counsel is now following Commerce's only just now since revised experienced advice, which was announced as a best practice based on Commerce's newfound experience. Commerce's view of what experience means has changed in a significant way.

Finally, the statutory CVD standard applied to respondents "does not require perfection and recognizes that mistakes sometimes occur," and mistakes cannot be the

-21-

basis of adverse inferences, which are only permissible under the CVD statute if one did not act to the best of one's ability. Nippon Steel Corp. v. United States, 337 F. 3d 1373, 1374 & 1382 (Fed. Cir. 2003); Trade Court Opinion at 29-30 (Appx83-84); Commerce Decision Memorandum at 26 (Appx215). At best, there is no indication other than TKT counsel made a mistake as to timing of filing an extension request (not the case), but that itself does not justify adverse inference, per the above decision of this Court.

The Trade Court Opinion (at 14, Appx68) says, citing Commerce, that TKT counsel was experienced and "speculates" (its word) that Commerce was aware of the NextDay 8:30AM deadline. That misses the point. As discussed herein, it is not clear where Commerce and the Trade Court are going with the 'TKT counsel is experienced' point, as to supporting a lawful Commerce decision. Further, in the below cited Commerce decisions, counsel was experienced and yet Commerce granted an extension that it denied TKT, though the situations were similar. Finally, as the cites below indicate, Commerce has not really followed its above Next Day 8:30AM view, where experienced counsel would consider and know that.

## F.    Commerce Violates Its Practice

As discussed below, in denying all three TKT extension requests as to the full time requested in each and rejecting TKT's Subsidy Questionnaire, Commerce violates its own practice. As, the Trade Court holds, Commerce's "insist{ance} on technical perfection with the filing of its documents on its ACCESS system" is

010-9233-8739/1/AMERICAS

unreasonable and inconsistent with its own precedent, where Commerce "acknowledges that it has allowed for out of time extensions due to technical filing issues in the past despite the language of its regulations." Celik Halat Ve Tel Sonayi A.S. v. United States, 557 F. Supp 3d 1348, 1361 (Ct. Int'l Trade 2022). The Trade Court stresses that "No one who has confronted issues in using automated filing systems will dispute the unanticipated technical difficulties do sometimes occur." Id. at 1362.

Consider the following examples where Commerce accepted questionnaire responses in cases that are similar or less compelling than for acceptance of TKT's questionnaire response here:

- Respondent failed to make a filing by the deadline. The day after the deadline, the respondent claimed in an email undefined "technical issues," and said that it had made an "inadvertent mistake." Commerce gave the respondent two more days to make the filing. Commerce, Stainless Steel Flanges from India C-533-878, Jan. 26, 2023, Feb. 17, 2023, ACCESS barcode 4334269, 4343287.

- Respondent filed an extension request 39 minutes before the deadline, stating without more information technical difficulties as to finalizing the documents for filing, and issues known well earlier. Commerce granted extension 12 minutes later, 27 minutes before the deadline.

010-9233-8739/1/AMERICAS

Commerce, <u>Preserved Mushrooms from Poland</u> A-455-806, Feb. 2, 2023, ACCESS barcode 4336887, 4336898.

- Respondent missed deadline for questionnaire response. <mark>After</mark> deadline, Commerce on its own and without explanation extended deadline and accepted the questionnaire response. Commerce, <u>Stainless Steel Wire Rod from Korea</u> <mark>A-580-829,</mark> Dec. 29, 2022, Jan. 13, 2023, ACCESS barcode 4330993, 4325570.

- Respondent states without more that, "because of a problem encountered in filing a response," the respondent missed the deadline and without more explanation, did not request an extension until after the <mark>deadline,</mark> and then just by email. After the deadline, Commerce granted one day extension and accepted the questionnaire response. Commerce, <u>Gas-Powered Pressure Washers from Vietnam</u> A-552-008, February 10, 2023, ACCESS barcode 4341321.

- Respondent <mark>said that it had technical</mark> difficulties, not further explained. It requested an extension at 4:34PM of the deadline day. Commerce granted at 4:52PM. Commerce, <u>Utility Scale Wind Towers from Malaysia</u> C-557-822, Jan. 10, 2023, ACCESS barcode 4329323, 4329382.

- Respondent sent a 4:30PM email seeking an extension in the <mark>5:00PM</mark> deadline to file a questionnaire response. <mark>The extension request was</mark> filed

on Commerce ACCESS six days after the deadline. Commerce granted the extension and accepted the late questionnaire response. Commerce, <u>Ripe Olives from Spain</u> C-469-818), April 30, 2020, ACCESS barcode 3970287.

- Last minute extension request based on "many documents to upload," so another day was requested. That is "good cause" to grant, where Commerce answered in one hour 31 minutes, shortly before 5:00PM deadline for respondent to answer. Commerce, <u>Certain Pasta from Italy</u> C-475-819, Jan. 30, 2023, ACCESS barcode 4335527, 4335434.

- Respondent filed extension request at 4:37PM of deadline day, citing without much more "technical difficulties" in making the filing. The next day after the deadline, Commerce granted the extension. Commerce, <u>Hot Rolled Steel Flat Products from Korea</u> C-580-884, Feb. 23/24, 2023, ACCESS barcode 4345060, 4345176.

- Respondent filed extension request at 4:38PM for 5:00PM deadline, noting events that well preceded the deadline day and saying it needed more time to complete the full response. Commerce granted, seems after 5:00PM. Commerce, <u>Oil Country Tubular Goods from Russia</u>, A-821-833, Feb. 14/15, 2022, ACCESS barcode 4212296, 4212207.

- Respondent filed extension request at 3:37PM for 5:00PM deadline, claiming little more than "technical difficulties in finalizing and filing"

data files. Commerce granted an extension for the whole questionnaire

and accepted questionnaire filed after deadline, and did so after 5:00PM

deadline. Commerce, Crystalline Silicon Photovoltaic Cells from China

A-570-979, August 10, 2022, ACCESS barcode 4273305, 4273344.

Note the above decisions were under Commerce's latest regulations.

The Commerce Decision Memorandum (cmt. 1 at 6, Appx195) claims that this

Court's Dongtai Peak is on point, driving its decision as to TKT.  In Dongtai Peak,

the

- respondent filed an extension request five minutes before the deadline.

  After the deadline, Commerce accepted the extension request and

  untimely questionnaire response. Dongtai Peak Heavy Indus. v. United

  States, 777 F. 3d 1343, 1347 & 1352 (Fed. Cir. 2015). As noted,

  Commerce (Commerce Decision Memorandum, cmt. 1 at 6, Appx195)

  rests on this Court's Dongtai Peak decision for its decision as to TKT,

  saying it is "on point," but cites to the factually inapposite part (Dongtai

  Peak at 1347) where as to another questionnaire the same respondent

  filed an extension request two days after the deadline, based on reasons

  known well before the deadline, and even then did not thereafter file its

  questionnaire response within its requested extended time, but rather

  even later. Dongtai Peak (at 1351-52) emphasized that respondents must

file extension requests with Commerce <u>before</u> the deadline of the questionnaire response.

This Court in <u>Dongtai Peak</u> (at 1351) also said that the respondent requested the Commerce review and thus should have been prepared to answer the questionnaire earlier. In contrast, here, TKT did not request the CVD investigation. Appx499. Rather, here only Petitioner Mississippi Silicon requested the investigation. Appx499.

Moreover, in <u>Dongtai Peak</u> (at 1347, 1352), Commerce said that Commerce could not grant the above second extension request because of particular issues as to that respondent "in the investigation" as to whether sales were bona fide that required time to fully investigate, time which Commerce said was lacking by the time that the respondent submitted its questionnaire response, given the impending statutory deadline in the investigation. That is not TKT's case. See above.

In short, Commerce miscites this Court's <u>Dongtai Peak</u> decision to assert this Court says the opposite of what this Court said, where <u>Dongtai Peak</u> actually supports TKT. Yet, <u>Dongtai Peak</u> is "at the core of" Commerce's decision to reject TKT's questionnaire response. <u>Trade Court Opinion</u> at 18, Appx72.

-27-

In addition, as TKT noted before Commerce (Appx2434-2435), Commerce even grants extension requests after the deadline that only claim as the reason for the extension request:

- misunderstanding of Commerce ACCESS requirements. Commerce, Certain Steel Nails from Oman, Oct. 1, 2014 letter to respondent granting its Sept. 15, 2014 extension request.

- respondent not timely file a questionnaire response, given its misunderstanding of European Union privacy law that long preceded Commerce's issuance of its questionnaire. After the deadline, respondent requested extension and filed the questionnaire response. Commerce accepted. Commerce, Finished Carbon Steel Flanges from Italy, decision as to respondent's Feb. 22, 2019 request for reconsideration and extension March 5, 2019.

- respondent printer jams. Commerce, Carbon and Certain Alloy Steel Wire Rod from Mexico, Aug. 25, 2017, ACCESS barcode 3611780,3611722.

- confused paralegal. Commerce, Certain Steel Nails from Malaysia, Nov. 5, 2014, granting respondent untimely extension request.

- respondent deadline calendaring errors. Commerce, Cold-Rolled Steel Flat Products from Korea, Jan. 11, 2016 memorandum granting Jan. 5, 2016 extension request.

- respondent requested extension for the wrong questionnaire. Commerce, <u>Narrow Woven Ribbons with Woven Selvedge from Taiwan,</u> Feb. 27, 2015 letter granting respondent Feb. 18, 2015 extension request. ACCESS barcode 3260204,3261940-01.

- counsel "overlooked" a deadline due to unexplained "culmination of a number of factors," including inclement weather. Commerce, <u>Certain Softwood Lumber Products from Canada</u>, March 16, & 17, 2017, ACCESS barcode 3552802,3553216.

- deadline missed due to the "year-end holiday period," Commerce, <u>Certain Cold-Rolled Steel Flat Products from Korea</u>, Jan. 5 & 16, 2016 ACCESS barcode 3429991,3431804.

- deadline missed because counsel "inadvertently overlooked the specific 10:00AM deadline" due to the July 4th holiday, and also simultaneous other work by counsel, <u>Carbon and Certain Alloy Steel Wire Rod from the United Kingdom</u>, Jul. 7/10, 2017, ACCESS barcode 3590026, 3591490.

- counsel "overlooked" the 10AM filing deadline, Commerce, <u>Citric Acid and Certain Citrate Salts from Thailand</u>, Nov. 17, 2017, ACCESS barcode 3642674,3642978.

Finally, <u>Commerce Decision Memorandum</u> (at 19-20, Appx208-209) and <u>Trade Court Opinion at 20 (Appx74) state that</u> rejection of TKT's questionnaire

response is based on the fact that "the facts in <u>Bebitz (CVD)</u>" Slip Op. 20-26 (Ct. Int'l Trade March 2, 2020), <u>Bebitz Flanges Works Private Ltd. v. United States</u>, 433 F. Supp. 3d 1297, 1305 (2020) "parallel those in this {TKT} investigation nearly exactly …

- … Notably, Bebitz was represented by the same counsel" as TKT. But in <u>Bebitz CVD</u> (at 15, fn. 10), the Trade Court said that counsel should not be blamed for what was client Bebitz's own doing, not its lawyer. The <u>Trade Court Opinion</u> at 20 (Appx74) makes the same error.

- in <u>Bebitz CVD</u> at 4-8, 12, 14-17 (n. 14) & 19-20, the Trade Court emphasized that the respondent (a) from day one was not forthcoming with Commerce and was intentionally obtuse as to key investigation issues – e.g., failing to reveal cross-owned affiliates key to the CVD investigation; (b) was given "multiple opportunities" to answer the subsidy questionnaire over two months and did not do so, where (c) Commerce found at the time of its rejecting of the respondent's questionnaire response that only one month remained until Commerce's already extended preliminary CVD decision deadline, such that no more extension could be granted "in the investigation" and still meet statutory deadlines, and that (d) sufficient time and opportunity was given the respondent to respond. And beyond the above in the Commerce discussed companion <u>Bebitz (AD)</u> (CIT Slip Op 20-27), (e) after sixteen

-30-

respondent extension requests, with some after the deadline but Commerce granted, and eight Commerce supplemental questionnaires, the respondent still had not answered half of Commerce's initial questionnaire issued five months prior, information that had been repeatedly requested, with multiple opportunities for the respondent to provide the requested information, with serious respondent misstatement of the facts.

No Bebitz fact applies to TKT. See above. Yet Commerce, per above, says that it bases its decision to reject the TKT Subsidy Questionnaire on Bebitz as factually on point. The contested Commerce decision as to TKT claim that Bebitz must be shown for adverse inferences (per above) supports that adverse inferences are not supported for TKT. The Trade Court Opinion does not address the above as to Bebitz.

The list goes on. But the point is clear. Commerce practice is to accept questionnaires in situations similar to, indeed less compelling than, TKT's Subsidy Questionnaire. It is well-established that an "agency action is arbitrary" and thus unlawful "when the agency offers insufficient reasons for treating similar situations differently." SKF USA Inc. v. United States, 263 F. 3d. 1369, 1382 (Fed. Cir. 2001); Trade Court Opinion at 24, Appx78. "Consistency has long been a core interest of administrative law, and inconsistent treatment is inherently significant." DAK Americas LLC v. United States, 456 F. Supp. 2d 1340, 1355-56 (Ct. Int'l Trade 2020) (citing Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944)).

010-9233-8739/1/AMERICAS

The Commerce Decision Memorandum (at 18, Appx207) notes TKT cites (Appx2434-2435) "where Commerce accepted untimely submissions" in situations similar to TKT's. Commerce says this Court "confirmed that Commerce is not bound by its actions in prior proceedings, as each proceeding is a separate act of Commerce's authority that allows for different conclusions based on different facts in the record." Qingdao SeaLine Trading Co., Ltd. v. United States, 766 F.3d 1378, 1387 (Fed. Cir. 2014). But the Commerce Decision Memorandum ends its claim there and does not claim different facts in the TKT cited Commerce decisions indicating that TKT's Subsidy Questionnaire should be accepted, much less that any claimed differences make a difference. That is the Commerce Decision Memorandum's sole stated reason to reject precedent. Above are many on point Commerce cases where Commerce accepted respondent questionnaire response under circumstances even less compelling than TKT.

Effectively, as the above indicates, the Commerce decision as to TKT repudiates the principle that similar cases must be decided similarly, even though doing so is required to not be arbitrary and capricious. NLRB v. Wash. Star Co., 732 F.2d 974, 977 (D.C. Cir. 1984) (per curiam) ("The present sometimes-yes, sometimes-no, sometimes-maybe policy of {enforcing} due dates cannot, however, be squared with our obligation to preclude arbitrary and capricious management of the {agency}'s mandate."). The Trade Court Opinion (at 25, Appx79) makes the same legal error.

The Commerce Decision Memorandum also fails to note, much less address, that, in Qingdao SeaLine, this Court said that Commerce "explained the differences" between the records of the cases and "reasonably concluded" that there was a basis for different decisions, thus rendering it "not improper" to reach different decisions. Here, the Commerce Decision Memorandum did not.

To be sure, since briefing before the Trade Court and then the Trade Court Opinion, yet more Commerce decisions (cited above) contradict how the Commerce Decision Memorandum and the Trade Court Opinion treat TKT.

Finally, as indicated above, the Commerce Decision Memorandum (at 19, Appx208) claims that Dongtai Peak and Bebitz are exactly on point as to TKT, belying Commerce's claim that every case is different in some way, so it does not have to consider precedent. In any event, Dongtai Peak (the part Commerce cites) and Bebitz are not on point, especially compared to the cases TKT cites.

## G.    The Trade Court Opinion Unlawfully Affirms Commerce For Reasons Commerce Does Not Say

The Trade Court Opinion (at 15, Appx69) says TKT's third extension request should have more detail. The Commerce Decision Memorandum did not say that. It is "well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself." Motor Vehicle Mfrs. Ass 'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 50 (1983); Prime Time Corn. LLC v. United

<u>States</u>, 43 CIT n. 14, 396 F. Supp. 3d 1319, 1331 n.14 (Ct. Int'l Trade 2019) ("not for this court to provide a rationale supporting Commerce's determination.").

In fact, TKT's third (and prior) extension requests was comparable to other similarly situated extension requests that Commerce granted. Compare the <u>Trade Court Opinion</u> (at 10, Appx64) quote of the TKT third extension request to the above cites where Commerce granted an extension request.

Finally, this counsel, said to be an experienced counsel, and in that regard has filed many extension requests similar to here, would be surprised that after the record closed, the extension request is deemed insufficient, with a new "standard" for an appropriate extension request announced post hoc, at least just for this case, and an impermissible "gotcha policy" where no opportunity was given to address before the record closed. That is unlawful. <u>Böwe–Passat v. United States</u>, 17 CIT 335 (1993) (Commerce not raising unidentified deficiencies is impermissible "gotcha policy"). But <u>Trade Court Opinion</u> does that.

Notably, the Trade Court in <u>Oman Fasteners</u>, <u>supra</u> at 14, states experienced trade counsel would seem well advised under Commerce's Next Day 8:30AM approach to have a <u>boilerplate</u> (its word) extension request ready to file just before 5:00PM when hard pressed as to a Commerce deadline. Overall, the Trade Court in <u>Oman Fasteners</u> (at 14-16) seemed deeply troubled by Commerce's Next Day 8:30AM approach with its Commerce genesis based on an "off hand comment response with which has never been codified through a regulation or otherwise

-34-

reasonably communicated to the bar," beyond the fact that Commerce has not really followed it.  See above.

The Trade Court Opinion also seeks to ignore or rewrite the Commerce Final Decision to say that Commerce did not rely on Dongtai Peak and Bebitz. But Commerce Final Decision explicitly did. See above. Again, the Trade Court Opinion cannot rewrite a Commerce decision to affirm it. See above.

## III.    COMMERCE UNLAWFULLY ENDED THE INCENTIVE TO COOPERATE

The Government of the Republic of Kazakhstan fully cooperated, answering Commerce questionnaires. Appx1192, Appx2087, Appx2364, Appx2421-2422. Then, Commerce unlawfully rejected TKT's Subsidy Questionnaire. At that point, Commerce effectively made clear that no matter what the Kazakh Government did, Commerce would reach the same result – i.e., a 160% adverse inference CVD import duty margin on Kazakh silicon metal. Commerce's unlawful actions as to TKT eliminated any reason or incentive for the Kazakh Government to further cooperate. Appx2444-2445. Thus, the Kazakh Government did not answer Commerce's supplemental questionnaire to verify the Kazakh Government's prior questionnaire responses. Id.; Commerce Decision Memorandum at 2 & 4, Appx191, Appx93. For that reason too, Commerce imposed adverse inferences on Kazakhstan to determine the amount of subsidies per the CVD statute. Id.

-35-

But the sole purpose of adverse inferences is to incentivize cooperation with Commerce. Essar Steel Ltd. v. United States, 678 F.3d 1268, 1276 (Fed. Cir. 2012). Commerce undermined that incentive as to the Kazakh Government. Commerce cannot then impose adverse inferences on the Kazakh Government/Kazakhstan, as here the use of adverse inferences is doing the opposite of what intended. Olympic Adhesives v. US, Court No. 89-1367 (Fed. Cir. March 28, 1990); F.11i De Cecco Di Filippo Fara S. Martino S.p.A. v. United States, 21 CIT 1124, 980 F. Supp. 485 (1997).

Commerce has a statutory obligation to balance its statutory mandate to find an accurate subsidy margin with inducing compliance. F.11i De Cecco Di Filippo Fara S. Martino S.p.A. v. United States, 216 F.3d 1027, 1032 (Fed. Cir. 2000). An adverse inference may not be drawn merely from failure to respond, but rather only where it is reasonable for Commerce to expect a more forthcoming response under the specific circumstances. Nippon Steel Corp. v. United States, 337 F.3d 1373, 1383 (Fed. Cir. 2003). Again, Commerce eliminated any incentive or reason for the Kazakh Government to cooperate further. Adverse inferences here undermine both the statutory mandate to calculate an accurate subsidy margin and to encourage compliance.

Further, Commerce cannot *per se* impose adverse inferences on a respondent company for the actions of a third party, here a government. Clearon Corp. v. United

States, Slip Op. 20-141 (Ct. Int'l Trade Oct. 8, 2020); Guizhou Tyre Co. v. United

States, 415 F. Supp. 3d 1402, 1405 (Ct. Int'l Trade 2019).

In reply, Commerce says that:

an adverse inference in a CVD investigation may have "a collateral impact on a cooperating party," without being rendered "improper." Where, as here, an adverse inference made against the {government} "collaterally reaches" a cooperating company that is "within the {country}, benefitting directly from subsidies the {government} may be providing," then the adverse inference is permissible, because it "has the potential to encourage the {government} to cooperate so as not to hurt its overall industry."

Commerce Decision Memorandum at 50, Appx239 (citing a Trade Court

decision).

But here there is only one Kazakh silicon metal producer, TKT. Appx502-504,

Appx604, Appx2444. And, Commerce imposed a 160% adverse inferences CVD

duty against TKT. There is then no incentive for the Kazakh Government to cooperate

under such circumstances. Commerce again acts unsupported by any evidence, much

less substantial evidence, beyond also unlawfully precluding TKT from cooperating.

Commerce's unlawful adverse inferences against TKT then caused Commerce to

further use adverse inferences as to the Kazakh Government's response to such

Commerce unlawful action.  Neither Commerce nor the Trade Court address this

legal error.

## IV.    COMMERCE APPLIED AN UNLAWFUL ADVERSE, PUNITIVE CVD RATE

Commerce rejection of TKT's Subsidy Questionnaire is further unlawful

since grossly disproportionate to any minor, technical infraction – *i.e.*, an adverse

-37-

trade-stopping 160% CVD import cash deposit rate. Commerce Final Determination, 86 Fed. Reg. at 11726, Appx138. Commerce, Notice Of Intent To Rescind Administrative Review of the CVD Order On Silicon Metal from The Republic Of Kazakhstan, 12/3/20-12/31/2021 Review Period, C-834-811, June 22, 2022, ACCESS barcode 4253727 (Commerce proposes to end its first CVD administrative review of Kazakh/TKT silicon metal following the original investigation because TKT had no U.S. sales thereafter).

In Artisan Manufacturing Corp. v. United States, 978 F. Supp. 2d 1334, 1345 & 1348 (Ct. Int'l Trade 2014), the Trade Court found Commerce's rejection of a respondent questionnaire response as untimely an unlawful abuse of discretion. Artisan found that the respondent's missing a deadline and not timely requesting an extension (instead requesting after the deadline) is inconsequential and has no adverse impact on the investigation, since it was only a one-day delay and given time remaining in the particular investigation per statutory deadlines. Id. at 1345-1348. Artisan continued (at 1347) that rejection means a consequence that is "grossly disproportionate to the mistake" – i.e., imposition of the high adverse inference margin, and so an unlawful abuse of discretion.

Similarly, Celik Halat ve Tel Sanayi A.S. v United States, 557 F.Supp.3d 1348, 1361 (Ct. Int'l Trade 2022), held that "Commerce imposed a grossly disproportionate penalty for what essentially was a minor technical violation that had no discernible effort on the investigation," since the questionnaire response was

-38-

filed shortly after the deadline, where Commerce entirely rejected the response as untimely. In making its determination, the Trade Court said that:

> nothing in that {Commerce} regulation justified the Department's misuse of 19 U.S.C. § 1677e. … Commerce abused its discretion … imposing a draconian sanction for what essentially was a minor and technical violation that had no discernible effect on the investigation. Commerce is not free to apply its regulations in a way that exceeds its statutory authority.  Nor is it justifiable to do what it has done here, … to produce a manifestly unwarranted and unjust result.  In applying that rule and related regulations on the filing of, and rejection of, responses to requested information, Commerce must be mindful of the limitations on the exercise of its statutory and regulatory powers.

Id. at 1380-81.

Even when Commerce exercises its discretion to apply adverse inferences, the rate must be consistent with Commerce's obligation to calculate fair and accurate subsidy margins. Yangzhou Bestpak Gifts & Crafts Co., Ltd. v. United States, 716 F.3d 1370, 1379 (Fed. Cir. 2013). This Court holds that "the purpose of section 1677e(b) is to provide respondents with an incentive to cooperate, not to impose punitive, aberrational, or uncorroborated margins." F.11i De Cecco Di Filippo Fara S. Martino S.p.A. v. United States, 216 F.3d 1027, 1032 (Fed. Cir. 2000).  Appx2457.

"By requiring corroboration of adverse inference rates, Congress clearly intended that such rates should be reasonable and have some basis in reality." F.11i De Cecco Di Filippo Fara S. Martino S.p.A. v. United States, 216 F.3d 1027, 1034 (Fed. Cir. 2000). The CVD rate here is not corroborated. Appx2198.

## V.    CONCLUSIONS AND RELIEF SOUGHT

No substantial evidence supports that TKT received subsidies. Appx2197-2198, Appx2421. Further, TKT and Kazakhstan was denied meaningfully participation in the investigation (*i.e.,* to answer subsidy questionnaires). See above. Commerce used on adverse inferences, not actual facts, to calculate the subsidy import duty. A reasonable person would not deny the accused a right to answer allegations (here as to subsidies). Again, a negative final CVD determination should issue, per the above review standard. In any event, from an equitable standpoint, and this Court is also a court of equity, Mississippi Silicon has enjoyed four years of the unjust and unlawful trade stopping 160% CVD duties on Kazakhstan silicon metal that it strongly pushed for.

Alternatively (but erroneously), to bring itself into compliance with law, Commerce could issue an affirmative subsidy finding where no duties or cash deposits are imposed pending any later Commerce administrative review, a do-over of what should as a matter of law have been done in the original investigation but was not. At least that would end the unlawful 160% subsidy duty on Kazakh silicon metal versus continue it further by an investigation that should have properly been done four years ago. With approval of the Trade Court, Commerce has done this approach before, at least where in the original investigation there was substantial evidence of dumping/subsidies as to a particular country found via a lawful questionnaire process and verification as to an exporter (which again was not the case here), but not as to the

-40-

other exporters. <u>Small Business Telephones from Taiwan</u>, 43 Fed. Reg. 42,543, 42,550 (Dep't of Commerce Oct. 17, 1989), affirmed in <u>Auto Telecom Co., Ltd. v. United States</u>, 765 F. Supp. 1094 (Ct. Int'l Trade 1991). Here though, in this investigation, there is not even substantial evidence of any subsidies as to any exporter, none found by Commerce via a lawful questionnaire and verification procedure, as not done here. See above. Thus, again, as a matter of law, a negative final subsidy determination is warranted.

Finally, again alternatively and again erroneously, Commerce could accept TKT's Subsidy Questionnaire response and not use any adverse inferences and proceed to calculate a subsidy margin for TKT (if any). But there are three problems in doing so: (a) at the time of the statutory deadline for Commerce to decide in the original investigation, there was no substantial evidence of subsidies (see above) and thus a negative subsidy finding should issue; (b) this approach rewards Mississippi Silicon for pushing for the unlawful imposition of 160% subsidy duties on TKT/Kazakhstan for 4 years that stopped all Kazak/TKT silicon metal trade to the United States and means Commerce can unlawfully impose 160% duties on Kazakh silicon metal for years without consequence except harm to Kazakhstan/TKT; (c) this alternative just prolongs the 160% subsidy duty pending a belated Commerce investigation that could take many months.

We appreciate the Court's attention to this matter.

Very truly yours,

Peter Koenig
Counsel to TKT and Ministry

April 11, 2023

010-9233-8739/1/AMERICAS

## ADDENDUM TABLE OF CONTENTS

**Appx PageNo.**

**TRADE COURT JUDGMENT**                                    **Appx1**

**TRADE COURT DECISION**                                    **Appx54**

**COMMERCE FINAL FEDERAL REGISTER DECISION**                **Appx136**

**COMMERCE ISSUES AND DECISION MEMORANDUM**                 **Appx189**

**COMMERCE COUNTERVAILING DUTY ORDER**                      **Appx295**

**TRADE COURT JUDGMENT**

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| TAU-KEN TEMIR LLP, and<br>JSC NMC TAU-KEN SAMRUK,<br><br>              Plaintiffs,<br>    and<br><br>MINISTRY OF TRADE AND INTEGRATION OF<br>THE REPUBLIC OF KAZAKHSTAN,<br><br>              Plaintiff-Intervenor,<br><br>    v.<br><br>UNITED STATES,<br><br>              Defendant,<br><br>    and<br><br>GLOBE SPECIALTY METALS, INC., and<br>MISSISSIPPI SILICON LLC,<br><br>              Defendant-Intervenors. | Before: Leo M. Gordon, Judge<br><br>Court No. 21-00173 |

**JUDGMENT**

This action having been submitted for decision, and the court, after due deliberation, having rendered an opinion; now in conformity with that opinion, it is hereby

**ORDERED** that final affirmative determination by the U.S. Department of Commerce in the countervailing duty investigation of silicon metal from the Republic of Kazakhstan, see Silicon Metal from the Republic of Kazakhstan, 86 Fed. Reg. 11,725

Court No. 21-00173                                              Page 2

(Dep't of Commerce Feb. 26, 2021) (final affirm. determ.), and the accompanying Issues

and Decision Memorandum, C-834-811 (Dep't of Commerce Feb. 22, 2021), is sustained.


                                                    /s/ Leo M. Gordon
                                                Judge Leo M. Gordon


Dated: July 14, 2022
       New York, New York

TRADE COURT DECISION

.

.

Slip Op. 22-82

UNITED STATES COURT OF INTERNATIONAL TRADE

TAU-KEN TEMIR LLP, and
JSC NMC TAU-KEN SAMRUK,

                              Plaintiffs,

        and

MINISTRY OF TRADE AND INTEGRATION OF
THE REPUBLIC OF KAZAKHSTAN,

                              Plaintiff-Intervenor,          Before: Leo M. Gordon, Judge

        v.
                                                             Court No. 21-00173
UNITED STATES,

                              Defendant,

        and

GLOBE SPECIALTY METALS, INC., and
MISSISSIPPI SILICON LLC,

                              Defendant-Intervenors.

**OPINION**

[Commerce's Final Determination sustained.]

Dated: July 14, 2022

        Peter J. Koenig and Jeremy W. Dutra of Squire Patton Boggs LLP, of Washington, D.C., for Plaintiffs Tau-Ken Temir LLP and JSC NMC Tau-Ken Samruk, and Plaintiff-Intervenor Ministry of Trade and Integration of the Republic of Kazakhstan.

        Bret R. Vallacher, Trial Attorney, U.S. Department of Justice, Civil Division, Commercial Litigation Branch, Washington, D.C., for Defendant United States. On the brief were Brian M. Boynton, Principal Deputy Assistant Attorney General, Patricia M. McCarthy, Director, and L. Misha Preheim, Assistant Director. Of counsel was Jared M. Cynamon, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, D.C.

Adam H. Gordon, Jennifer M. Smith, Lauren N. Fraid, and Ping Gong of The Bristol Group PLLC, of Washington, D.C., for Defendant-Intervenors Globe Specialty Metals, Inc. and Mississippi Silicon LLC.

Gordon, Judge: This action involves the U.S. Department of Commerce's ("Commerce") final affirmative determination in the countervailing duty ("CVD") investigation of silicon metal from the Republic of Kazakhstan. See Silicon Metal from the Republic of Kazakhstan, 86 Fed. Reg. 11,725 (Dep't of Commerce Feb. 26, 2021) ("Final Determination"), and the accompanying Issues and Decision Memorandum, C-834-811 (Dep't of Commerce Feb. 22, 2021), https://enforcement.trade.gov/frn/summary/kazakhstan/2021-04032-1.pdf (last visited this date) ("Decision Memorandum").

Before the court is the USCIT Rule 56.2 motion for judgment on the agency record filed by Plaintiffs Tau-Ken Temir LLP ("TKT") and JSC NMC Tau-Ken Samruk ("TKS") (collectively "Plaintiffs" or "TKT/TKS"). See Pl. Tau-Ken Temir LLP et. al.'s Rule 56.2 Br. for J. upon the Agency R., ECF No. 33[1] ("Pls.' Br.")[2]; see also Def.'s Resp. to Pls.' Mots. for J. upon the Agency R., ECF No. 37 ("Def.'s Resp."); Def.-Intervenors' Resp. Br. in Opposition to Pls.' Rule 56.2 Mot. for J. upon the Agency R., ECF No. 38; Reply Br. of Pl. Tau-Ken Temir LLP et. al., ECF No. 39 ("Pls.' Reply"). The court has jurisdiction pursuant to Section 516A(a)(2)(B)(i) of the Tariff Act of 1930, as amended, 19 U.S.C.

---

[1] All citations to the parties' briefs and the agency record are to their confidential versions unless otherwise noted.

[2] Plaintiff-Intervenor, Ministry of Trade and Integration of the Republic of Kazakhstan, did not file its own USCIT Rule 56.2 motion, nor an opening or reply brief in its own right. Nevertheless, it appears to join and support Plaintiffs' motion, and briefs and arguments. See Pls.' Br. at 1; Pls.' Reply at 1.

§ 1516a(a)(2)(B)(i) (2018),[3] and 28 U.S.C. § 1581(c) (2018).  For the reasons set forth

below, the court sustains Commerce's Final Determination.

## I. Standard of Review

The court sustains Commerce's "determinations, findings, or conclusions" unless

they are "unsupported by substantial evidence on the record, or otherwise not

in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).  More specifically, when reviewing

agency determinations, findings, or conclusions for substantial evidence, the court

assesses whether the agency action is reasonable given the record as a whole.

Nippon Steel Corp. v. United States, 458 F.3d 1345, 1350–51 (Fed. Cir. 2006); see also

Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951) ("The substantiality

of evidence must take into account whatever in the record fairly detracts from its weight.").

Substantial evidence has been described as "such relevant evidence as a reasonable

mind might accept as adequate to support a conclusion."  DuPont Teijin Films USA v.

United States, 407 F.3d 1211, 1215 (Fed. Cir. 2005) (quoting Consol. Edison Co. v.

NLRB, 305 U.S. 197, 229 (1938)).  Substantial evidence has also been described

as "something less than the weight of the evidence, and the possibility of drawing

two inconsistent conclusions from the evidence does not prevent an administrative

agency's finding from being supported by substantial evidence."  Consolo v. Fed. Mar.

Comm'n, 383 U.S. 607, 620 (1966).  Fundamentally, though, "substantial evidence"

is best understood as a word formula connoting reasonableness review.  3 Charles H.

---

[3] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of
Title 19 of the U.S. Code, 2018 edition.

Koch, Jr. & Richard Murphy, <u>Administrative Law and Practice</u> § 9.24[1] (3d ed. 2022).

Therefore, when addressing a substantial evidence issue raised by a party, the court

analyzes whether the challenged agency action "was reasonable given the circumstances

presented by the whole record." 8A <u>West's Fed. Forms</u>, National Courts § 3.6 (5th ed.

2022).

## II. Background

In the underlying investigation, Commerce sought information via Section III of its

Initial Questionnaire regarding entities either cross-owned or affiliated with TKT and TKS,

the mandatory respondents. <u>See Decision Memorandum</u> at 15. TKT/TKS filed a timely

response to the affiliation portion of the Initial Questionnaire. <u>Id.</u> Commerce

subsequently sought supplemental information relative to Plaintiffs' response and

information regarding two other affiliated entities (collectively "First Supplemental

Questionnaire"). Acting on separate requests from TKT/TKS, Commerce twice extended

the filing deadline for Plaintiffs' response to the First Supplemental Questionnaire,

with an ultimate due date of September 15, 2021.[4] <u>Id.</u>

On September 15th, Plaintiffs' counsel ("Counsel") found that it was unable to meet

Commerce's 5:00 pm filing deadline for filing its response to the First Supplemental

Questionnaire because of technical/computer problems with the data supplied

---

[4] The September 15th deadline was for Plaintiffs' response to the First Supplemental
Questionnaire. Commerce made a further request for affiliation information for a third
entity with a filing deadline of September 25, 2021. <u>See Decision Memorandum</u> at 15.
That information request is not the subject of this action.

by Plaintiffs and with its submission to Commerce via the ACCESS system.[5] Id. at 6.
Faced with these problems, Counsel, at 3:50 pm, one hour and 10 minutes prior to the
5:00 pm filing deadline, filed a request for a third extension—this time for one day.
Commerce was unable to act on Plaintiffs' request before the close of business at 5:00 pm
on September 15th, so TKT/TKS received an automatic extension until 8:30 am on the
next work day, September 16th. Id. at 15 (citing Extension of Time Limits, 78 Fed. Reg.
57,790 (Dep't of Commerce Sept. 20, 2013) ("Final Rule") (modifying 19 C.F.R.
§ 351.302, regulation governing extension of time limits in antidumping and countervailing
duty proceedings)); see also 78 Fed. Reg. at 57,792 ("For submissions that are due
at 5:00 p.m., if the Department is not able to notify the party requesting the extension
of the disposition of the request by 5:00 p.m., then the submission would be due by the
opening of business (8:30 a.m.) on the next work day.")).

Throughout the evening on September 15th and the early morning
of September 16th, Counsel attempted to resolve its technical/computer problems and
file Plaintiffs' response to the First Supplemental Questionnaire, but was unable
to complete the entirety of the filing until 10:11 am on September 16th, one hour and
41 minutes beyond the 8:30 am deadline. Decision Memorandum at 16. Commerce then
denied Plaintiffs' request for an extension of time and rejected Plaintiffs' response
to Section III of the Initial Questionnaire as well as the First Supplemental Questionnaire
(collectively "Plaintiffs' Response") as untimely. See id. at 20–21 (citing Commerce's

---

[5] ACCESS is Commerce's electronic database and Internet filing system used by parties
participating in an antidumping or countervailing duty proceeding.

Rejection Letter, PR[6] 238 (Oct. 1, 2020) ("First Rejection Letter") and Commerce's Denial

of Second Request for Reconsideration, PR 319 (Nov. 19, 2020) ("Second Rejection

Letter")). As a result of Plaintiffs' failure to make a timely filing, Commerce relied on facts

otherwise available with adverse inferences ("AFA") in reaching its final determination

to countervail certain subsidies provided by the Government of Kazakhstan. Id. at 4.

Additionally, Commerce rejected Plaintiffs' argument that a conflict-of-interest claim

raised by Petitioners (Defendant-Intervenors in this action) interfered with Counsel's

ability to file a timely response on behalf of Plaintiffs. Id. at 32–33.

TKT/TKS now challenge Commerce's denial of Plaintiffs' extension request,

as well as Commerce's determination to reject Plaintiffs' Response, and Commerce's

resulting determination to use AFA. See Pls.' Br. at 4–22; 33–34. Plaintiffs also challenge

Commerce's refusal to take corrective action with respect to the conflict-of-interest claim

raised by Petitioners, who Plaintiffs maintain interfered with its ability to timely file

a response. See id. at 26–33.

### III. Discussion

#### A. Framework

19 C.F.R. Part 351 sets forth the procedures before Commerce in an antidumping

or countervailing duty proceeding, with Subpart C—§§ 351.301–351.313—governing

the submission of factual information, argument, and other material. Section 351.301

provides the time limits for the submission of factual information, while the rules for filing,

---

[6] "PR ___" refers to a document contained in the public version of the administrative record, which is found in ECF No. 22-2 unless otherwise noted.

including electronically in ACCESS, are contained in § 351.303. The latter regulation specifically requires that a filing "must be received successfully in its entirety" via ACCESS "by 5 p.m. Eastern Time on the due date." 19 C.F.R. § 351.303(b).

Prior to the expiration of any time limit established by Part 351, a party may request, in writing, an extension of time. Id. § 351.302(c); see also Final Rule, 78 Fed. Reg. at 57,790 ("Th[is] modification clarifies that parties may request an extension of time limits before any time limit established under Part 351 expires."). Upon receipt of a timely filed request for an extension, Commerce may, for good cause shown, extend a time limit, except where precluded by statute. Id. § 351.302(b); see also Final Rule, 78 Fed. Reg. at 57,791 ("This modification is … consistent with section 351.302(b), which provides that the Secretary may, for good cause, extend any time limit established under this part.").

Unless an extension is granted, Commerce will reject any untimely filed factual information, written argument, or other material with a written notice explaining the reasons for the rejection. Id. §§ 351.302(d)(2); 351.301(c)(1). Additionally, Commerce will not consider nor retain such information, argument, or other material in the official record of the subject proceeding. Id. § 351.302(d)(1)(i).

"Commerce has discretion both to set deadlines and to enforce those deadlines by rejecting untimely filings." Grobest & I-Mei Indus. (Vietnam) Co. v. United States, 36 CIT 98, 122, 815 F. Supp. 2d 1342, 1365 (2012) (citing NTN Bearing Corp. v. United States, 74 F.3d 1204, 1206–07 (Fed. Cir. 1995)). Agency decisions on acceptance or rejection of documents submitted for the record are reviewed for abuse of discretion. Id.; see also Maverick Tube Corp. v. United States, 39 CIT ___, ___, 107 F. Supp. 3d 1318,

1331 (2015) ("Strict enforcement of time limits and other requirements is neither arbitrary

nor an abuse of discretion when Commerce provides a reasoned explanation for its

decision."). "Judicial review of agency discretionary decisions … is supposed to be highly

deferential." 33 Fed. Prac. & Proc. Judicial Review § 8411 (2d ed. 2022).[7]

"An abuse of discretion occurs where the decision is based on an erroneous

interpretation of the law, on factual findings that are not supported by substantial

evidence, or represents an unreasonable judgment in weighing relevant factors."

Consol. Bearings Co. v. United States, 412 F.3d 1266, 1269 (Fed. Cir. 2005) (citation

omitted); see also Nat'l Wildlife Federation v. Nat'l Marine Fisheries Serv., 422 F. 3d 782,

798 (9th Cir. 2005) ("An abuse of discretion is 'a plain error, discretion exercised to an

end not justified by the evidence, a judgment that is clearly against the logic and effect

of the facts as are found.'" (citation omitted)).

## B. Denial of Extension Request and
## Rejection of TKT/TKS's Questionnaire Response

The parties agree that Plaintiffs filed a third request for an extension of time on a

timely basis, i.e., prior to the 5:00 pm deadline on September 15th, and that § 351.302(b)

imposes a "good cause" standard on a party seeking an extension of time. E.g., Pls.' Br.

at 6–7; Def.'s Resp. at 5, 7. Where the parties, however, diverge is on whether

---

[7] "To capture the notion that judicial review of agency discretion should be strongly
deferential, the Administrative Procedure Act (APA), along with many agency enabling
acts, instructs courts to set aside such determinations only if they are 'arbitrary,'
'capricious,' or amount to an 'abuse of discretion.' These three terms are essentially
synonymous." 33 Fed. Prac. & Proc. Judicial Review § 8411.

Commerce abused its discretion in denying Plaintiffs' extension request and rejecting the filing of Plaintiffs' Response as untimely.

As to whether Commerce unreasonably denied Plaintiffs' extension request, it appears that Plaintiffs fail to develop an argument demonstrating that Plaintiffs satisfied the "good cause" standard.  There is no language in either Plaintiffs' USCIT Rule 56.2 Brief or Reply Brief directly addressing how Commerce abused its discretion. See generally Pls.' Br. & Pls.' Reply (mentioning "good cause" only once, in a quotation from the Decision Memorandum, and developing no argument as to that standard). Under these circumstances, the court could deem this issue waived.  See United States v. Great Am. Ins. Co., 738 F. 3d 1320, 1328 (Fed. Cir. 2013) ("It is well established that arguments that are not appropriately developed in a party's briefing may be deemed waived.").; United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990 ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.  It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones.").

Giving Plaintiffs the benefit of the doubt, it may be that TKT/TKS combined arguments regarding "good cause" and the denial of the third extension request with arguments challenging Commerce's rejection of Plaintiffs' Response.  Assuming that is the case, Plaintiffs have not shown that Commerce abused its discretion in denying Plaintiffs' extension request.

Court No. 21-00173                                                    Page 10

Despite receiving full information from Plaintiffs in response to the First
Supplemental Questionnaire at approximately 11:00 am on September 15th, Counsel
believed it was possible to file the entirety of that submission prior to the 5:00 pm deadline.
Decision Memorandum at 16 (citing TKT/TKS's Administrative Case Brief at 6, PR 338
(Jan. 4, 2021); TKT/TKS's Request for Reconsideration of Acceptance of Questionnaire
Response at 2, PR 241 (Oct. 2, 2020) ("Request for Reconsideration")); see also
Extension of Time Request, PR 220 (Sept. 15, 2020) ("TKT/TKS's EOT Request")).
Similarly, Counsel indicated that it experienced technical/computer problems when
initially attempting to file on ACCESS; yet again, it continued to believe that these
problems were fixable before the 5:00 pm filing deadline on September 15th. Id. (citing
Request for Reconsideration). However, later that afternoon, Counsel determined that
meeting the filing deadline was not possible, so it filed a request for a one-day extension,
until 5:00 pm on September 16th.[8] See TKT/TKS's EOT Request. As noted previously,
Commerce was unable to notify Plaintiffs of the disposition of its request for an extension
prior to 5:00 pm that day. Consequently, pursuant to § 351.103(b) and the Final Rule,

_____

[8] The substance of Plaintiffs' request was:

Tau-Ken Temir LLP (TKT) requests a one day extension from today
September 15, 2020 to tomorrow September 16, to answer the subsidy
questionnaire, including as to cross-owned companies. They have worked
flat out to get this done. We have now received full response but are some
technical/computer issues to resolve to file it. The prior extension requests
indicate the need for time to answer the questionnaire.

TKT/TKS's EOT Request.

Plaintiffs received an automatic extension until 8:30 am on the next work day, September 16th. See Decision Memorandum at 15.

In an effort to buttress Plaintiffs' extension request, Counsel, on September 17th, provided Commerce with an "illustrative" example of the technical/computer problems it experienced in the form of two emails from access@trade.gov, one sent at 3:46 pm on September 15th, and the other sent at 7:02 am on September 16th, indicating that the documents that Counsel had attempted to file were rejected because of problems with embedded hyperlinks. See TKT/TKS's EOT Request; Request for Reconsideration; TKT/TKS's Comments on Filing Issues, PR 224 (Sept. 17, 2020). Counsel further explained that it faced other technical/computer issues, including corrupted files and difficulty in converting Russian language documents into searchable PDF format that were not resolvable by the 5:00 pm deadline on September 15th. See Request for Reconsideration.

After considering Plaintiffs' extension request, including Counsel's supplemental submissions, Commerce concluded that Plaintiffs' filings "failed to meet the requirements of 19 CFR § 351.303, which stipulate[s] that the submission must be filed **in its, entirety** by 5:00 p.m. on the due date specified or … [pursuant to the Final Rule], by 8:30 a.m. on the following work day," and rejected TKT/TKS's September 16th submission as untimely. See First Rejection Letter ("In accordance with 19 C.F.R. 351.303(b)(1), an electronically filed document must be received successfully in its entirety …."). Commerce reasoned that it had been "unable to respond to [TKT/TKS's] request" for an

extension and that TKT/TKS had not filed its response "in its entirety"[9] as required by the

regulation before the automatic extension deadline of 8:30 am on the next work day

pursuant to the Final Rule. Id.

Commerce further explained that the Final Rule emphasized "the need

for extension requests to be submitted before the last minute," and that the exception set

forth in the Final Rule would not "excuse the untimely filing of a submission for which

Commerce received a last-minute extension request which [Commerce] did not have time

to evaluate." Decision Memorandum at 18. Commerce also advised TKT/TKS that

Commerce would neither consider nor retain a copy of Plaintiffs' Response in accordance

with 19 C.F.R. § 351.104(a)(2)(iii). See id. In rejecting Plaintiffs' submission, it is

reasonably discernible that Commerce denied Plaintiffs' extension request for lack

of "good cause." See id. at 21 (noting that "Commerce's rejection of TKS/TKT's response

from the record and the explanatory letters issued to TKS/TKT explaining this action

represent a clear and direct response to TKS/TKT's September 15, 2020, extension

request.")

Counsel's subsequent request for reconsideration explained the work done to file

Plaintiffs' response to the First Supplemental Questionnaire, including specifically

addressing the problem with "missing" parts of certain BPI exhibits (actually one computer

file) for which a public version was submitted. Counsel stated that one file, a TKS BPI

file, was inadvertently uploaded twice instead of the relevant TKT BPI file, noting

---

[9] In particular, Commerce noted that Plaintiffs had failed to file the business proprietary
versions of certain exhibits before the deadline.

that Commerce "remedies such situations by requesting the BPI version via
a supplemental questionnaire." See Request for Reconsideration. Plaintiffs' Request
for Reconsideration (and the case for acceptance of Plaintiffs' Response)
was supplemented in two conference calls between Counsel and Commerce.
See Decision Memorandum at 53 ("In October, we twice held meetings or conference
calls with TKS/TKT's counsel to discuss its rejected submissions, as well as TKS/TKT's
request that Commerce terminate the investigation, first with the Director of the office
handling this investigation, and then with the Assistant Secretary of Enforcement &
Compliance.").

Commerce thereafter denied Plaintiffs' request for reconsideration and reaffirmed
its denial of Plaintiffs' extension request and rejection of Plaintiffs' Response as untimely.
See Second Rejection Letter; see also Decision Memorandum at 21. In so doing,
Commerce addressed Plaintiffs' difficulty in responding because of "'extremely tight
deadlines.'" Second Rejection Letter (quoting Request for Reconsideration). Commerce
commented that:

> TKT was aware that it need not wait until deadlines were
> extremely tight to request an extension. TKT had twice
> previously requested extensions for submitting its
> questionnaire response during this investigation, the first time
> on August 25, 2020, six days before the actual due date, and
> then later on September 9, 2020, one full day before the
> extended due date. In both instances, TKT cited difficulties in
> assembling its response due to personnel issues and
> Covid-19, and Commerce was able to accommodate TKT's
> requests by providing additional time. With respect to the
> latter request, while Commerce provided an extension on the
> same day as the request, we note that the request was made

> early in the morning, not one hour prior to the close of
> business.

Id. at 2. Additionally, Commerce rejected TKT/TKS's characterization of the Final Rule "as a pre-COVID-19 relic." Id. Commerce highlighted that "[t]o the extent that Commerce chooses to modify its rules and procedures to accommodate the pandemic, it is capable of doing so." Id. (citing, e.g., Temporary Rule Modifying AD/CVD Service Requirements Due to COVID-19; Extension of Effective Period, 85 Fed. Reg. 41,363 (July 20, 2020)). However, Commerce did not modify the requirements for an extension of time in the Final Rule, nor indicate that those requirements were no longer in effect because of COVID. Id.

Commerce re-emphasized many of these same considerations in the Final Determination. Commerce specifically noted that Counsel was well aware of the 8:30 am deadline on September 16th as evidenced by the fact that "it began submission of its supplemental questionnaire response at 5:31 am [that morning], and continued filing its submission through 10:10 am …." Decision Memorandum at 15. Commerce stated that despite Plaintiffs' numerous "difficulties," "the fact remains that [TKT/TKS] was represented by experienced counsel, and Commerce had already granted multiple extensions as a result of these issues." Id. at 16. Commerce explained that TKT/TKS made "the minimum effort to ensure that Commerce had notice of [Counsel's] ongoing computer/technical issues," highlighting that Counsel "did not attempt to contact either the official in charge of the investigation or the ACCESS help desk before the close of business" on September 15th. Id. at 16–17. Commerce also explained that

if "difficulties" prevented an electronic filing by the deadline—which may have been
the situation in this proceeding—Plaintiffs were required, pursuant to the instructions
in the Initial Questionnaire, to contact Commerce officials and "submit a full written
explanation of the reasons {the recipient is} unable to file the document electronically."
Id. at 17. The inference here is that Plaintiffs' 5-line barebones extension request,
see supra at fn. 8, did not satisfy the requirement for "a full written explanation."

As to "missing" parts of Plaintiffs' exhibits, Commerce clarified that "the absence
of portions of the BPI submission only supplemented the fact that the submission was not
filed in its entirety prior to the stated 5:00 p.m. deadline or the 8:30 a.m. deadline provided
for in the Final Rule." Decision Memorandum at 21. As Commerce explained:

> To be clear, our highlighting of [TKT/TKS's] deficient response
> had as much to do with the untimeliness of the accompanying
> public version than any documents missing from the BPI
> version of the submission. Moreover, in the Preliminary
> Determination, we did not rely on [TKT/TKS's] failure
> to provide a full version of the submission as a reason for its
> rejection; in fact, we did not reference it at all. We stated only
> that '[TKT/TKS's] failure to provide the requested information
> in a timely manner means that the necessary information
> is not available on the record, and [TKT/TKS] has significantly
> impede this proceeding.'

Id.

### C. Application of the Final Rule

TKT/TKS contend that its submission was timely despite completing the electronic
submission at 10:11 am, one hour and 41 minutes after the rollover 8:30 am deadline.
Pls.' Br. at 7–25. Plaintiffs argue that, because the extension request was filed prior to the
5:00 pm deadline on September 15th, the request was timely under the Final Rule, and

Case 1:21-cv-00173-LMG Document 48 Filed 07/14/22 Page 821 / Filed 04/14/2023 (75 of 156)
Case 22-2222004 Document 3072 Page 821 / Filed 04/14/2023

as a consequence, Commerce was required to accept the response, even though not
submitted in its entirety until after the passage of the 8:30 am deadline
on September 16th. See Pls.' Br. at 4–9. In particular, Plaintiffs maintain that "Commerce
should have considered and accepted [Plaintiffs' supplemental] questionnaire response"
because TKT/TKS "filed the extension request before the deadline and then filed
the response before the [end of the] requested" deadline of 5:00 pm on September 16th.
Id. at 15.

The timeliness of TKT/TKS's extension request does not dictate Commerce's
decision on it. The Final Rule makes clear that:

> Parties should be aware that the likelihood of the Department
> granting an extension will decrease the closer the extension
> request is filed to the applicable time limit because
> the Department must have time to consider the extension
> request and decide on its disposition. Parties should not
> assume that they will receive an extension of a time limit
> if they have not received a response from the Department.
> For submissions that are due at 5:00 p.m., if the Department
> is not able to notify the party requesting the extension of the
> disposition of the request by 5:00 p.m., then the submission
> would be due by the opening of business (8:30 a.m.) on the
> next work day.

Final Rule, 78 Fed. Reg. at 57,792.

TKT/TKS nevertheless argue that one of the purposes behind the Final Rule
supports its position, namely that "Commerce will not adopt rules that are 'inflexible
to permit' Commerce 'to effectively and fairly administer the AD and CVD laws.'" Pls.' Br.
at 8 (quoting Modification of Regulation Regarding the Extension of Time Limits, 78 Fed.
Reg. 3,367, 3,370 (Jan. 16, 2013)). Plaintiffs misapprehend Commerce's rationale for the

<u>Final Rule</u>.  As Commerce explained, the objective of the modification was "to clarify" that parties may request an extension of time before the expiration of any time limit provided for in Part 351, not just the time limits for submissions made under 19 C.F.R. § 351.301.  78 Fed. Reg. at 3,368; 78 Fed. Reg. at 57,791.  It also sets forth the "specific circumstances under which [Commerce] will consider an untimely-filed extension request."  78 Fed. Reg. at 3,368; 78 Fed. Reg. at 57,791.  Commerce further explained that it was making the modification to address last-minute extension requests that "often resulted in confusion among parties, difficulties in [Commerce's] organization of its work, and undue expenditures of …resources, which impede … [Commerce's] ability to conduct AD and CVD proceedings in a timely and orderly manner."  78 Fed. Reg. at 57,791.  The language relied upon by TKT/TKS does not accurately characterize those objectives.[10]

TKT/TKS had ample notice of the consequences of failing to timely file.  The Initial Questionnaire issued to TKT/TKS clearly stated that "Commerce will not accept any requested information submitted after the established deadlines."  <u>See</u> Commerce's Letter, "Countervailing Duty Investigation of Silicon Metal from the Republic of Kazakhstan: Supplemental Questionnaire," PR 33 at 1; Commerce's Letter, "Investigation of Silicon Metal from the Republic of Kazakhstan: Countervailing Duty

_____

[10] It appears that Plaintiffs have taken the quoted material out of context.  That material is found in a section of the initial Federal Register notice entitled <u>Description of Any Significant Alternatives to the Proposed Rule That Accomplish the Stated Objectives of Applicable Statutes and That Minimize any Significant Economic Impact of the Proposed Rule on Small Entities</u>, and reflects Commerce's rejection of an alternative proposal regarding untimely extension requests in favor of the language ultimately adopted in the <u>Final Rule</u>.

Questionnaire," PR 27 at 3. The Final Rule also put TKT/TKS and Counsel on notice
of the decreasing likelihood of receiving an extension of time the closer the extension
request was to the deadline. See Final Rule, 78 Fed. Reg. at 57,792 ("Parties should not
assume that they will receive an extension of a time limit if they have not received
a response from the Department."). In the absence of a response from Commerce,
Counsel knew or should have known that it had an "automatic extension" until 8:30 am
on the next work day in accordance with the Final Rule. See id.

At the core of the parties' dispute are differing interpretations of Dongtai Peak
Honey Indus. v. United States, 777 F.3d 1343 (Fed. Cir. 2015) ("Dongtai Peak"), which
involved an untimely extension request along with the recitation of technical difficulties
and the fact that respondent's counsel represented an overseas client. Dongtai Peak,
777 F.3d at 1351–52. The main question there was what prevented the respondent
from filing an extension request earlier. Id. (emphasizing that "all of the causes of delay
noted in the April 19 Letter were known to Appellant prior to the April 17th deadline, and
did not prevent the company from filing an extension request before that date").

Here, similarly, it is unclear why Plaintiffs did not file an extension request earlier.
Despite receiving the completed response from Plaintiffs at 10:58 am on September 15th
(roughly six hours before the 5:00 pm deadline), Counsel nevertheless did not request
an extension of time, concluding instead that it would be possible to complete submission
of the response to Commerce by the 5:00 pm deadline. See Decision Memorandum
at 16, 19 ("Nonetheless, on the final due date for the questionnaire response, TKS/TKT
failed to submit a similarly-early additional extension request, concluding on its own

that just over six hours was enough time for its counsel to receive and submit the documents via ACCESS."). While Counsel emphasized difficulties in communicating with Plaintiffs, noting "the inexperience of [Plaintiffs'] personnel in responding to such questionnaires, and issues related to COVID-19," none of that excused TKT/TKS from making a timely filing of Plaintiffs' response to the initial supplemental questionnaire. As Commerce noted, "these factors did not prevent TKS/TKT from filing previous additional extension requests early enough for Commerce to respond." Decision Memorandum at 19.    Commerce concluded that, given the circumstances in the underlying proceeding, the decision by Counsel to attempt to file Plaintiffs' response in its entirety without earlier requesting an additional extension of time constituted an unwise gamble that did not justify granting the subsequent last-minute request. Id.

TKT/TKS contend that Commerce's rejection of Plaintiffs' Response was an abuse of discretion akin to that found in Artisan Mfg. Corp. v. United States, 38 CIT ___, 978 F. Supp. 2d 1334 (2014) (holding that Commerce abused discretion in rejecting questionnaire response filing submitted less than 24 hours after deadline where "[s]uch a brief period could not have delayed the investigation in any meaningful way"). See Pls.' Br. at 20–22.    Commerce found TKT/TKS's reliance on Artisan to be misplaced, emphasizing that Artisan predated both the Final Rule, which specifically clarifies Commerce's policy regarding extension requests, as well as guidance from the U.S. Court of Appeals for the Federal Circuit in Dongtai Peak. See Decision Memorandum at 18–21.

TKT/TKS also argue that Commerce "made no effort to meet its statutory mandate to calculate accurately the subsidy margin." See Pls.' Br. at 9; id. at 19–20 (maintaining

that Commerce failed to balance the interests of "accuracy and fairness" against the "interest in finality"). Defendant argues to the contrary that Commerce did not abuse its discretion in prioritizing the need for finality over Commerce's obligation to determine the most accurate CVD margin. See Def.'s Resp. at 13 (citing Bebitz Flanges Works Private Ltd. v. United States, 44 CIT ___, ___, 433 F. Supp. 3d 1297, 1305 (2020) ("Bebitz CVD")). In Bebitz CVD, the respondent filed a fourth extension request 20 minutes before the 5:00 pm deadline. See 44 CIT at ___, 433 F. Supp. 3d at 1302. Commerce did not respond by 5:00 pm, so the filing deadline automatically rolled over to 8:30 am the next work day. Id. The Bebitz CVD plaintiff-respondent missed the 8:30 am deadline the following day and instead filed its response at 10:24 am. See id. The Bebitz CVD court was not persuaded that Commerce unreasonably denied the extension request and that Bebitz's untimely filing must be accepted, emphasizing that it is not for the respondent "to establish Commerce's deadlines or dictate to Commerce whether and when Commerce actually needs the requested information." Id. 44 CIT at ___, 433 F. Supp. 3d at 1305 (citing Dongtai Peak, 777 F.3d at 1352). The court explained that the applicable regulation, § 351.302(b), provides Commerce with discretion on "whether to grant or deny an extension request," and that the plaintiff-respondent failed to demonstrate that Commerce abused its discretion. See id. 44 CIT at ___, 433 F. Supp. 2d at 1305–06. The circumstances here are parallel to those in Bebitz CVD, and the court sees no reason to differ in the outcome, particularly in light of the multiple extensions already granted to TKT/TKS.[11]

---

[11] The court notes that Counsel here also represented plaintiff-respondent in Bebitz CVD.

Court No. 21-00173                                                    Page 21

A court "cannot set aside application of a proper administrative procedure because

it believes that properly excluded evidence would yield a more accurate result if the

evidence were considered."     PSC VSMPO, 688 F.3d at 761.     The Statement

of Administrative Action ("SAA") accompanying the Uruguay Round Agreements Act

explains that the purpose of the adverse facts available provision is "to ensure that

the party does not obtain a more favorable result by failing to cooperate than if it had

cooperated fully."  SAA, H.R. Doc. No. 103-316, 870, reprinted in 1994 U.S.C.C.A.N.

4040, 4199 (1994).   Congress "intended for an adverse facts available rate to be

a reasonably accurate estimate of the respondent's actual rate, albeit with some built-in

increase intended as a deterrent to non-compliance." F.lli De Cecco Di Filippo Fara S.

Martino S.p.A. v. United States, 216 F.3d 1027, 1032 (Fed. Cir. 2000).   Commerce

reasonably determined that, under the facts of this case, Plaintiffs failed to act to the best

of their ability and that the use of facts available with an adverse inference was warranted.

The record demonstrates that TKT/TKS did not put forth a maximum effort

to provide Commerce with the requested information by the deadline, that Plaintiffs

did not follow instructions in the Initial Questionnaire to contact Commerce officials

in case of difficulty filing a submission, nor did Plaintiffs file a response by 8:30 am

the following work day pursuant to the Final Rule.  Counsel's explanation here is vague

and conclusory.[12]  Counsel submitted no affidavits from its staff or Plaintiffs detailing

---

[12]  See, e.g., TKT/TKS's EOT Request ("They have worked flat out to get this done.
We have now received full response but are some technical/computer issues to resolve
to file it.   The prior extension requests indicate the need for time to answer the
questionnaire."); TKT/TKS's Comments on Filing Issues ("as to our September 15, 2017
(footnote continued)

the technical or other difficulties experienced or the efforts undertaken in "preparing"
TKT/TKS's documents for filing with ACCESS or attempts to reach Commerce.

The court agrees with Commerce that Plaintiffs' reliance on <u>Artisan</u> is misplaced.
Plaintiffs offer little to support their position, other than asserting that <u>Dongtai Peak</u> and
<u>Bebitz CVD</u> run contrary to Commerce's determination.     Given that Plaintiffs fail
to develop how Commerce abused its discretion here, <u>see</u> Pls.' Reply at 5, the court finds
that Plaintiffs' argument on this point is meritless.   Accordingly, the court cannot agree
with Plaintiffs that Commerce's decisions to deny the September 15th extension request
and reject Plaintiffs' Response constituted an abuse of discretion.

### D. Due Process Claim

Plaintiffs also argue that, under <u>Dongtai Peak</u>, "TKT's due process rights were
violated by Commerce rejecting TKT's extension request for doing exactly as Commerce
told TKT to do." Pls.' Br. at 16 (emphasizing that "(a) TKT filed its extension request
before the deadline and in writing (in ACCESS), doing exactly as Commerce instructed;
and (b) Commerce had not informed TKT to do otherwise than exactly what TKT did.").
The court does not agree.   The Court of Appeals held that "Commerce's rejection
of untimely-filed factual information does not violate a respondent's due process rights
when the respondent had notice of the deadline and an opportunity to reply."
<u>Dongtai Peak</u>, 777 F.3d at 1353; <u>see also</u> <u>PSC VSMPO–Avisma Corp. v. United States</u>,

_____

extension request to answer the subsidy questionnaire (which we did in three parts),
attached illustrates technical filing issues that we were facing as to the huge filing and
continuing to deal with.") TKT Request to Terminate Investigation, PR 240 (Oct. 2, 2020)
("Petitioner claims, loudly made, consumed many, many multiples of the 1.5 hours of all
concerned in the TKT questionnaire response process."); Request for Reconsideration.

688 F.3d 751, 761–62 (Fed. Cir. 2012) (respondent had opportunity to put forth evidence supporting proposed accounting methodology but failed to do so, and therefore respondent was not deprived of due process). TKT/TKS knew the deadline, and that the deadline was previously extended—not once, but three times—and failed to respond accordingly.  See Decision Memorandum at 19 ("As the CAFC noted in Dongtai Peak with respect to the need for fairness and accuracy, Commerce's rejection of an untimely-filed questionnaire response does not violate any due process rights of a respondent such as TKS/TKT, because the respondent had notice of the deadline and the opportunity to respond to the Initial Questionnaire in a timely manner, or file an earlier request for an extension.    The Initial Questionnaire emphasized the importance of submitting the response in a timely manner and highlighted that the consequences for failing to do so might result in the application of AFA.  As such, TKS/TKT was afforded notice regarding the consequences of its decisions." (footnotes omitted)).

### E. Time to Complete Investigation

TKT/TKS nonetheless contends that its extension request provided sufficient time for Commerce to recognize that a filing was made, consider the request through proper channels, and draft, file, and put on the record a disposition prior to 5:00 pm.  Pls.' Br. at 15–16, 22–25.  Plaintiffs specifically argue that granting counsel's one-day extension request would not have hindered Commerce's investigation because there was still some time before Commerce's next deadline.  Id. at 9–10, 18.  Additionally, Plaintiffs maintain that Commerce "violate[d] its own precedent" because it has, in the past, granted extension requests later than TKT/TKS's 3:50 pm request.  Id.  Defendant maintains

Case 1:21-cv-00173-LMG Document 48 Filed 07/14/22 Page 22 of 32
Case 22-2204 Document 30-2 Page 929 Filed 04/11/2023

that Commerce does not "automatically" grant extension requests.  Def.'s Resp. at 7 (citing 19 C.F.R. § 351.302(b)).  While Commerce has discretion in enforcing time limits, that discretion is not unbounded.  See SKF USA Inc. v. United States, 263 F.3d 1369, 1382 (Fed. Cir. 2001) ("an agency action is arbitrary when the agency offers insufficient reasons for treating similar situations differently"); see also Cerro Flow Prod., LLC v. United States, 38 CIT ___, ___, 2014 WL 3539386 at *6 (2014) ("Commerce must treat similarly situated parties consistently").  Furthermore, "[s]trict enforcement of time limits and other requirements is neither arbitrary nor an abuse of discretion when Commerce provides a reasoned explanation for its decision." Maverick Tube Corp. v. United States, 39 CIT ___, ___, 107 F. Supp. 3d 1318, 1331 (2015).  Here, Commerce has provided such reasons, and the denial of Plaintiffs' extension request and the rejection of Plaintiffs' incomplete and untimely submission were within Commerce's discretion.

Plaintiffs highlight that Commerce has granted extension of time requests, even certain untimely requests, in numerous circumstances.  See Pls.' Br. at 22–24 (listing examples of Commerce granting extension of time requests including in Ripe Olives from Spain, C-469-818 (Dep't of Commerce Apr. 30, 2020) ("Ripe Olives")).  Plaintiffs' argument, however, ignores any factual distinctions between those prior proceedings and the underlying investigation.  For instance, in Ripe Olives, the submitting party had already uploaded most of its submission, experienced technical issues with one attachment, had promptly contacted Commerce personnel about the problem, and, importantly, was able to file before 8:30 am the next work day.  See id.; see also Bebitz Flanges Works Private Ltd. v. United States, 44 CIT ___, ___, 433 F. Supp. 3d 1309,

1324 n.6 (2020) (explaining that various cases "in which the court rejected Commerce's use of its discretion in connection with rejecting information from respondents," also cited by Plaintiffs here, were inapposite). Plaintiffs would like the court to conclude that Ripe Olives and other prior proceedings where Commerce granted extension of time requests stand for the proposition that because Commerce "can" grant an extension in certain scenarios, it "must" grant them in others, and that the timing of the filing is the only dispositive factor. See Pls.' Br. at 22–25. Plaintiffs provide no authority for its position. Accordingly, the court finds Plaintiffs' arguments relying on Commerce's granting of extension requests in other proceedings unpersuasive. In fact, the only conclusion that can be drawn from Commerce's prior determinations is that Commerce has an administrative "practice" to treat extensions on a case-by-case basis.

### F. Conflict-of-Interest Claim

Plaintiffs next challenge Commerce's determination that a conflict-of-interest claim raised by Petitioners during the underlying proceeding did not interfere with Counsel's ability to submit Plaintiffs' response to the First Supplemental Questionnaire via ACCESS. Pls.' Br. at 26–32. Plaintiffs maintain that Counsel submitted a letter including two decisions of Commerce plus a copy of a transcript before the U.S. International Trade Commission ("ITC") involving the same petitioners as here in support of its interference argument. See TKT/TKS's Letter Re: Hearings & Decisions, PR 257 (Oct. 28, 2020). Plaintiffs argue that the ITC transcript is evidence of bad faith on the part of Petitioners regarding Counsel's alleged conflict-of-interest, which claim was meant to distract Plaintiffs from filing a timely response with Commerce. See Pls.' Br. at 26–32.

Court No. 21-00173                                                          Page 26

On September 8th, Petitioners (which included Mississippi Silicon LLC) requested that Commerce disqualify and require the immediate withdrawal of Counsel because of a conflict-of-interest. See Request to Disqualify, PR 45 (Sept. 8, 2020). Petitioners alleged that a direct and ongoing conflict-of-interest existed because Counsel had previously represented Mississippi Silicon LLC in a 2017 investigation before the ITC, also involving silicon metal from Kazakhstan. Id. Ultimately, Commerce determined that no ongoing conflict-of-interest existed. See Decision Memorandum at 27 (citing Disqualification Memorandum, PR 247 (Oct. 6, 2020)).

TKT/TKS argue that Mississippi Silicon's conflict-of-interest claim lacked "even colorable merit," and thus, Petitioners "necessarily had some other intent, where the only one possible intent seems to be a litigious one to disrupt TKT's ability to participate in the questionnaire process." Pls.' Br. at 27–29. Plaintiffs argue that Mississippi Silicon's actions, in raising the conflict-of-interest claim, succeeded in disrupting Counsel's ability to meet the September 15th deadline. Id. at 30–32.

Regardless of the claim by Counsel as to the motive/intent of Petitioners, the issue here is whether substantial evidence on the record supports Commerce's determination. TKT/TKS placed no information on the record regarding an abuse of process by Petitioners.    Indeed, Commerce found "no evidence that petitioner's allegation of a conflict-of-interest interfered with the respondent's ability to respond … in a timely manner."    Decision Memorandum at 31.    In reaching its determination, Commerce explained that:

> TKS/TKT did not reference any additional burden placed upon
> it by the petitioners' submission of the previous day, nor any
> uncertainty regarding the role of counsel vis-à-vis TKS/TKT.
> Nor did TKS/TKT claim that the petitioners' submission had
> any deleterious effect on its ability to timely submit its
> response to the Initial Questionnaire on the revised due date,
> September 15, 2020.    Further, following Commerce's
> rejection of TKS/TKT's initial questionnaire response
> as untimely, TKS/TKT similarly failed to argue that
> the petitioners interfered in its response preparation process
> as part of its October 2, 2020, reconsideration request. In that
> letter, TKS/TKT merely notes that its counsel only received
> the complete questionnaire response at 10:58 a.m. on the
> date the submission was due. Thus, the record does not
> support TKS/TKT's contentions.

Id. at 32 (footnotes omitted).  Given the record and Commerce's explanation, Plaintiffs'

argument lacks merit.

### G. Application of Adverse Facts Available

### 1. Framework

In an investigation or review, "the burden of creating an adequate record lies

with interested parties." QVD Food Co. v. United States, 658 F.3d 1318, 1324 (Fed. Cir.

2011).   If Commerce determines that "necessary information is not available

on the record" or "an interested party or any other person … withholds information that

has been requested" by Commerce," "fails to provide such information by the deadlines

… or in the form and manner requested," "significantly impedes a proceeding,"

or "provides such information but the information cannot be verified," then Commerce

is permitted to use "facts otherwise available" in making its determinations.  19 U.S.C.

§ 1677e(a); see 19 C.F.R. § 351.308 (providing for "[d]eterminations on the basis

of the facts available"). The purpose of "facts otherwise available" is to fill "gaps" in the

administrative record.    Nippon Steel Corp. v. United States, 337 F.3d 1373, 1381

(Fed. Cir. 2003) ("Nippon Steel II").

Additionally, "if an interested party 'fail[s] to cooperate by not acting to the best of

its ability to comply with a request for information,' then Commerce 'may use an inference

that is adverse to the interests of that party in selecting from among the facts otherwise

available,' commonly referred to as AFA."    Deacero S.A.P.I. de C.V. v. United States,

996 F.3d 1283, 1295–96 (Fed. Cir. 2021) (quoting 19 U.S.C. § 1677e(b)); see 19 C.F.R.

§ 351.308 (similar).

### 2. Information Gap

Commerce's rejection of Plaintiffs' Response resulted in eliminating from the

record the entirety of that response on affiliation.  See supra.  As a result, there was a gap

of necessary information in the record of the underlying proceeding.    Given the

circumstances presented, Commerce found that necessary information was not on the

record, and as a consequence, resorted to facts available pursuant to 19 U.S.C. § 1677e.

See Decision Memorandum at 15–21, 25.  Commerce determined that:

> TKS/TKT did not put forth the "maximum effort" required of it.
> TKS/TKT retained and was represented by experienced trade
> counsel throughout the entirety of this proceeding, and,
> therefore, had the ability to understand Commerce's requests
> for information at the time such requests were issued.
> In addition, it was TKS/TKT's responsibility to provide
> complete and accurate information to Commerce so that
> we could analyze and determine the amount of any benefits
> received under the programs being investigated. The "failure
> to provide information" in a timely manner lies with TKS/TKT.
> As the CAFC held in Maverick Tube, [857 F.3d 1353, 1360–61
> (Fed. Cir. 2017),] it is the responsibility of Commerce, and not
> the responsibility of a respondent, to analyze and determine

Court No. 21-00173                                                    Page 29

> if a benefit exists, and if it does, to determine the amount
> of benefit received. Moreover, given TKS/TKT's retention
> of experience counsel, TKS/TKT's inability to comply with the
> instructions in the Initial Questionnaire to contact Commerce
> officials in case of difficulty filing a submission, to file
> an extension request early enough to consider it, or to file
> a complete response by 8:30 a.m. the following business day
> in accordance with the Final Rule is inexplicable, and
> evidence of the respondent's failure to act to the best of its
> ability.

Id. at 26–27 (footnote omitted).

### 3. Adverse Inference

Plaintiffs do not challenge Commerce's decision to resort to facts available, only Commerce's decision to use an adverse inference in its selection of facts available. See Pls.' Br. at 33–34. TKT/TKS argue that, given the circumstances of this proceeding, an adverse inference may not be drawn from failing to provide a questionnaire response, and that "more is required." See Pls.' Br. at 33 (relying on Nippon Steel Corp. v. United States, 34 CIT ___, ___, 118 F. Supp. 2d 1366, 1377 (2000) ("Nippon Steel I"). The problem for Plaintiffs here is that they seem to misapprehend the applicable precedent regarding facts available. To avoid AFA, interested parties must "do the maximum [they are] able to do." Nippon Steel II, 337 F.3d at 1382. This standard "does not require perfection and recognizes that mistakes sometimes occur," but "it does not condone inattentiveness, carelessness, or inadequate record keeping." Id. In reversing Nippon Steel I, the Court of Appeals noted that:

> Compliance with the 'best of its ability' standard is determined
> by assessing whether respondent has put forth its maximum
> effort to provide Commerce with full and complete answers
> to all inquiries in an investigation. While the standard does

> not require perfection and recognizes that mistakes
> sometimes occur, it does not condone inattentiveness [or]
> carelessness …

Nippon Steel II, 337 F.3d at 1382.  The Court also explained that "[w]hile intentional conduct, such as deliberate concealment or inaccurate reporting," may show "a failure to cooperate, the statute does not contain an intent element."  Id. at 1383.

Plaintiffs also argue that Commerce should not "impose adverse inferences on a respondent company for the actions of its government." Pls.' Br. at 34 (citing Clearon Corp. v. United States, 44 CIT ___, ___, 474 F. Supp. 3d 1339, 1343–44 (2020); Guizhou Tyre Co. v. United States, 43 CIT ___, ___, 415 F. Supp. 3d 1402, 1403 (2019)). Again, TKT/TKS's reliance on these decisions is misplaced.  In those matters, it was the respective governmental entity that did not cooperate or withheld requested information, not the private party respondents.  The non-cooperation in both cases complicated the examination of the particular subsidy program in issue, one that was outside the purview of the underlying investigation.  Furthermore, the focus of those actions was on indicia in the record that the cooperating respondents did not use the program, as well as Commerce's inadequate explanation of why it could not verify that fact despite the foreign government's failure to provide the requested information.  See Clearon, 44 CIT at ___, 474 F. Supp. 3d at 1349–54; Guizhou Tyre, 43 CIT at ___, 415 F. Supp. 3d at 1403–05.

Here, it was the private party respondent, not the government, that failed to provide necessary information "by the deadlines … or in the form and manner requested," 19 U.S.C. § 1677e(a).  Commerce explained that its CVD analysis requires certain

information, part from the foreign government relating to the contribution and specificity aspects of that analysis, and part from the private party respondents that produce and/or export the goods in question, including whether a benefit was received.  See Decision Memorandum at 46.    That information was not filed in its entirety by Plaintiffs. Accordingly, the court cannot agree with Plaintiffs that Commerce improperly "impose[d] adverse inferences on a respondent company for the actions of its government." See Pls.' Br. at 34.

Plaintiffs also argue since there is "only one Kazakh silicon metal producer" that fact somehow implies that an adverse inference cannot be applied.  See Pls.' Br. at 34. TKT/TKS provides no authority for this proposition; nevertheless, Plaintiffs suggest that the imposition of AFA on TKT/TKS collaterally affects the Government of Kazakhstan's willingness to cooperate in the future because the Government of Kazakhstan has no incentive to participate if the end result is AFA regardless of its cooperation.    Pls.' Reply at 7–8.    That policy argument fails to demonstrate how Commerce's determination was unsupported by substantial evidence.  Therefore, Commerce's determination to apply adverse inferences was reasonable.

Court No. 21-00173                                              Page 32

### III. Conclusion

For the above reasons, TKT/TKS's motion for judgment on the agency record is denied.  Judgment will be entered accordingly.


                                        _____/s/ Leo M. Gordon_____
                                           Judge Leo M. Gordon


Dated: July 14, 2022
       New York, New York

COMMERCE FEDERAL REGISTER DECISION

**Federal Register** / Vol. 86, No. 37 / Friday, February 26, 2021 / Notices

11725

**FOR FURTHER INFORMATION CONTACT:**
David Goldberger, AD/CVD Operations Office II, Enforcement and Compliance, International Trade Administration, U.S. Department of Commerce, 1401 Constitution Avenue NW, Washington, DC 20230; telephone: (202) 482–4136.

**SUPPLEMENTARY INFORMATION:** On December 11, 2020, Commerce published in the **Federal Register** the notice of the final determination of sales at LTFV of PC strand from Turkey and seven other countries.[1] In the *Final Determinations,* Commerce inadvertently failed to publish the adjusted cash deposit rates for the Turkey LTFV investigation after accounting for export subsidies in the companion countervailing duty investigation. The adjusted rates, along with the dumping margins, are included in the table below:

| Exporter/producer | Dumping margin (percent) | Cash deposit rate [2] |
|---|---|---|
| Turkey: | | |
| Celik Halat ve Tel Sanayi A.S ........................................................................................................... | 53.65 | 44.60 |
| Güney Çelik Hasir ve Demir ............................................................................................................. | 53.65 | 44.60 |
| All Others ...................................................................................................................................... | 53.65 | 44.60 |

We are hereby correcting the *Final Determinations* to include the adjusted cash deposit rates listed above. Commerce intends to issue instructions to Customs and Border Protection (CBP) to correct the cash deposit rates applicable to entries of PC strand from Turkey which were entered, or withdrawn from warehouse, for consumption during the period December 11, 2020 through January 31, 2021 (*i.e.,* the day before the date of publication of the antidumping duty order in the **Federal Register,** which included the adjusted cash deposit rate).[3] Commerce also intends to issue instructions to CBP to authorize refunds of cash deposits, if requested by the importer. The refund amount will be calculated by determining the difference between the amount of cash deposits paid as a result of the application of the rates listed in the *Final Determinations* and the amount due as a result of the application of the corrected final determination rate.

This notice serves as a correction and is published in accordance with section 777(i) of the Tariff Act of 1930, as amended.

Dated: February 22, 2021.
James Maeder,
*Deputy Assistant Secretary for Antidumping and Countervailing Duty Operations.*
[FR Doc. 2021–03999 Filed 2–25–21; 8:45 am]
**BILLING CODE 3510–DS–P**

---

**DEPARTMENT OF COMMERCE**

**International Trade Administration**

**[C–834–811]**

**Silicon Metal From the Republic of Kazakhstan: Final Affirmative Countervailing Duty Determination**

**AGENCY:** Enforcement and Compliance, International Trade Administration, Department of Commerce.

**SUMMARY:** The Department of Commerce (Commerce) determines that countervailable subsidies are being provided to producers and exporters of silicon metal from the Republic of Kazakhstan (Kazakhstan).

**DATES:** Applicable February 26, 2021.

**FOR FURTHER INFORMATION CONTACT:**
Justin Neuman, AD/CVD Operations, Office V, Enforcement and Compliance, International Trade Administration, U.S. Department of Commerce, 1401 Constitution Avenue NW, Washington, DC 20230; telephone: (202) 482–0486.

**SUPPLEMENTARY INFORMATION:**

**Background**

On December 3, 2020, Commerce published the *Preliminary Determination* of this countervailing duty (CVD) investigation, which also aligned the final determination of this CVD investigation with the final determinations in the companion antidumping duty investigations of silicon metal from Bosnia and Herzegovina and Iceland.[1] A summary of the events that occurred since Commerce published the *Preliminary Determination,* as well as a full discussion of the issues raised by parties for this final determination, may be found in the Issues and Decision Memorandum.[2] The Issues and Decision Memorandum is a public document and is on file electronically via Enforcement and Compliance's Antidumping and Countervailing Duty Centralized Electronic Service System (ACCESS). ACCESS is available to registered users at *http://access.trade.gov.* In addition, a complete version of the Issues and Decision Memorandum can be accessed directly at *http://enforcement.trade.gov/ frn/.* The signed and electronic versions of the Issues and Decision Memorandum are identical in content.

**Period of Investigation**

The period of investigation is January 1, 2019, through December 31, 2019.

---

[1] *See Prestressed Concrete Steel Wire Strand from Argentina, Colombia, Egypt, the Netherlands, Saudi Arabia, Taiwan, the Republic of Turkey, and the United Arab Emirates: Final Affirmative Determinations of Sales at Less Than Fair Value and Final Affirmative Critical Circumstances Determinations, in Part,* 85 FR 80001 (December 11, 2020) (*Final Determinations*).

[2] The cash deposit rates for Celik Halat ve Tel Sanayi A.S.. Güney Çelik Hasir ve Demir (Güney Çelik), and the companies covered by the "All Others" rate are equal to the petition rate (53.65 percent) adjusted for the lowest rate of export subsidies found for any company in the most recently-completed segment in the companion countervailing duty proceeding, *i.e,* Güney Çelik's

total export subsidies rate of 9.05 percent. *See Prestressed Concrete Steel Wire Strand from the Republic of Turkey: Final Affirmative Countervailing Duty Determination and Final Negative Critical Circumstances Determination,* 85 FR 80005 (December 11, 2020), and accompanying Issues and Decision Memorandum at 12–16; and *Prestressed Concrete Steel Wire from the Republic of Turkey: Preliminary Affirmative Countervailing Duty Determination, Preliminary Affirmative Critical Circumstances Determination, in Part,* 85 FR 59287 (September 21, 2020), and accompanying Preliminary Decision Memorandum at 18–20, 25–27, and 31–33.

[3] *See Prestressed Concrete Steel Wire Strand from Argentina, Colombia, Egypt, the Netherlands, Saudi*

*Arabia, Taiwan, the Republic of Turkey, and the United Arab Emirates: Antidumping Duty Orders,* 86 FR 7703, 7704 (February 1, 2021).

[1] *See Silicon Metal from the Republic of Kazakhstan: Preliminary Affirmative Countervailing Duty Determination, and Alignment of Final Determination with Final Antidumping Duty Determination,* 85 FR 78122 (December 3, 2020) (*Preliminary Determination*), and accompanying Preliminary Decision Memorandum.

[2] *See* Memorandum, "Issues and Decision Memorandum for the Final Determination of the Countervailing Duty Investigation of Silicon Metal from the Republic of Kazakhstan," dated concurrently with, and hereby adopted by, this notice (Issues and Decision Memorandum).

## Scope of the Investigation

The product covered by this investigation is silicon metal from Kazakhstan. For a full description of the scope of this investigation, *see* the "Scope of the Investigation" in Appendix I.

## Scope Comments

As stated in the *Preliminary Determination,* no interested parties commented on the scope of the investigation as it appeared in the *Initiation Notice.*[3] Accordingly, the scope of the investigation remains the same as it appeared in the *Initiation Notice. See* Appendix I of this notice.

## Analysis of Subsidy Programs and Comments Received

The subsidy programs under investigation and the issues raised in the case and rebuttal briefs by parties in this investigation are discussed in the Issues and Decision Memorandum. A list of the issues raised by parties is attached to this notice at Appendix II.

## Methodology

Commerce conducted this investigation in accordance with section 701 of the Tariff Act of 1930, as amended (the Act). For each of the subsidy programs found countervailable, Commerce determines that there is a subsidy, *i.e.,* a financial contribution by an "authority" that gives rise to a benefit to the recipient, and that the subsidy is specific.[4] For a full description of the methodology underlying our final determination, *see* the Issues and Decision Memorandum.

Commerce notes that, in making these findings, it relied on facts available and, because it finds that one or more respondents did not act to the best of their ability to respond to Commerce's requests for information, it drew an adverse inference where appropriate in selecting from among the facts otherwise available.[5] For further information, *see* "Use of Facts Otherwise Available and Adverse Inferences" in the Issues and Decision Memorandum.

## Verification

Commerce was unable to conduct on-site verification of the information

relied upon in making its final determination in this investigation. However, we attempted to take additional steps in lieu of an on-site verification to verify the information relied upon in making this final determination, in accordance with section 782(i) of the Act.[6]

Pursuant to section 776(a)(2)(D) of the Act, in situations where information has been provided but the information cannot be verified in accordance with section 782(i) of the Act, Commerce may use "facts otherwise available" on the record in reaching the applicable determination. Accordingly, because Commerce was unable to verify certain information, and because that inability to verify information, or gather information in lieu of an on-site verification, was a result of a respondent failing to act to the best of its ability, in accordance with section 776(b) of the Act, we have applied an adverse inference in using facts otherwise available, in making our final determination.[7]

## Changes Since the Preliminary Determination

Based on our review and analysis of the comments received from parties and the results of verification, we made certain changes to the subsidy rate calculations. For a discussion of these changes, *see* the Issues and Decision Memorandum.

## All-Others Rate

As discussed in the *Preliminary Determination,* Commerce based the selection of the all-others rate on the countervailable subsidy rate established for the mandatory respondents in accordance with section 705(c)(5)(A)(ii) of the Act.[8] Because we are adjusting the final subsidy rate applicable to the mandatory respondents, we are making similar changes to the all-others rate as well.[9]

## Final Determination

In accordance with section 705(c)(1)(B)(i)(I) of the Act, Commerce determines that the following estimated countervailable subsidy rates exist:

| Company | Subsidy rate (percent) |
|---|---|
| Tau-Ken Temir LLP and JSC NMC Tau-Ken Samruk[10] .. | 160.00 |
| All Others ............................. | 160.00 |

## Disclosure

Normally, Commerce discloses to interested parties the calculations performed in connection with a final determination within five days of the public announcement or, where there is no public announcement, within five days of the date of publication of the notice of final determination in the **Federal Register,** in accordance with 19 CFR 351.224(b). However, because Commerce applied adverse facts available (AFA) to the individually-examined company Tau-Ken Temir LLP/JSC NMC Tau-Ken Samruk in this investigation, in accordance with section 776 of the Act, and the applied AFA rate is based solely on information provided by the Government of Kazakhstan, there are no calculations to disclose.

## Continuation of Suspension of Liquidation

As a result of our *Preliminary Determination* and pursuant to sections 703(d)(1)(B) and (d)(2) of the Act, Commerce instructed U.S. Customs and Border Protection to suspend liquidation of entries of subject merchandise from Kazakhstan that were entered, or withdrawn from warehouse, for consumption on or after December 3, 2020, the date of publication of the *Preliminary Determination* in the Federal Register.

If the U.S. International Trade Commission (ITC) issues a final affirmative injury determination, we will issue a CVD order and require a cash deposit of estimated countervailing duties for entries of subject merchandise in the amounts indicated above, in accordance with section 706(a) of the Act. If the ITC determines that material injury, or threat of material injury, does not exist, this proceeding will be terminated, and all estimated duties deposited or securities posted as a result of the suspension of liquidation will be refunded or canceled.

## ITC Notification

In accordance with section 705(d) of the Act, Commerce will notify the ITC of its final affirmative determination that countervailable subsidies are being provided to producers and exporters of

---

[3] *See Silicon Metal from the Republic of Kazakhstan: Initiation of Countervailing Duty Investigation,* 85 FR 45173 (July 27, 2020) (*Initiation Notice*); *see also Preliminary Determination,* 85 FR at 78122.

[4] *See* sections 771(5)(B) and (D) of the Act regarding financial contribution; section 771(5)(E) of the Act regarding benefit; and section 771(5A) of the Act regarding specificity.

[5] *See* sections 776(a) and (b) of the Act.

[6] *See* Commerce's Letter, "Countervailing Duty Investigation of Silicon Metal from the Republic of Kazakhstan: Supplemental Questionnaire in Lieu of Verification," dated December 7, 2020.

[7] *See* Issues and Decision Memorandum at Comments 8 and 11.

[8] *See Preliminary Determination,* 85 FR at 78122–23.

[9] *See* Issues and Decision Memorandum at Comment 11.

[10] As discussed in the Preliminary Decision Memorandum, Commerce has found the following companies to be cross-owned with Tau-Ken Temir LLP and JSC NMC Tau-Ken Samruk: Silicon Metal

LLP, Metallurgical Combine KazSilicon LLP, National Welfare Fund "Samruk-Kazyna" JSC, "Ekibastuz GRES–2 station" JSC, and JSC KEGOC.

silicon metal from Kazakhstan. As Commerce's final determination is affirmative, in accordance with section 705(b) of the Act, the ITC will determine, within 45 days, whether the domestic industry in the United States is materially injured or threatened with material injury. In addition, we are making available to the ITC all non-privileged and nonproprietary information related to this investigation. We will allow the ITC access to all privileged and business proprietary information in our files, provided the ITC confirms that it will not disclose such information, either publicly or under an administrative protective order (APO), without the written consent of the Assistant Secretary for Enforcement and Compliance.

## Notification Regarding Administrative Protective Orders

In the event that the ITC issues a final negative injury determination, this notice will serve as the only reminder to parties subject to the APO of their responsibility concerning the destruction of proprietary information disclosed under APO in accordance with 19 CFR 351.305(a)(3). Timely written notification of the return/destruction of APO materials or conversion to judicial protective order is hereby requested. Failure to comply with the regulations and terms of an APO is a violation which is subject to sanction.

## Notification to Interested Parties

This determination is issued and published pursuant to sections 705(d) and 777(i) of the Act, and 19 CFR 351.210(c).

Dated: February 22, 2021.

James Maeder,
*Deputy Assistant Secretary for Antidumping and Countervailing Duty Operations.*

## Appendix I

### Scope of the Investigation

The scope of this investigation covers all forms and sizes of silicon metal, including silicon metal powder. Silicon metal contains at least 85.00 percent but less than 99.99 percent silicon, and less than 4.00 percent iron, by actual weight. Semiconductor grade silicon (merchandise containing at least 99.99 percent silicon by actual weight and classifiable under Harmonized Tariff Schedule of the United States (HTSUS) subheading 2804.61.0000) is excluded from the scope of this investigation.

Silicon metal is currently classifiable under subheadings 2804.69.1000 and 2804.69.5000 of the HTSUS. While the HTSUS numbers are provided for convenience and customs purposes, the written description of the scope remains dispositive.

## Appendix II

### List of Topics Discussed in the Issues and Decision Memorandum

I. Summary
II. Background
III. Period of Investigation
IV. Use of Facts Otherwise Available and Adverse Inferences
V. Subsidies Valuation
VI. Analysis of Programs
VII. Analysis of Comments
  *Comment 1:* Whether the Company Respondents' Initial Questionnaire Response Should be Accepted
  *Comment 2:* Whether the Administrative Procedures Act (APA) Supports Accepting the Company Respondents' Questionnaire Response
  *Comment 3:* Whether Commerce Should Apply Facts Available (FA) Rather Than Adverse Facts Available (AFA) in Establishing the Countervailing Duty (CVD) Rate
  *Comment 4:* Whether the Petitioners' Allegations of a Conflict-of-Interest Warrant the Application of FA Rather Than AFA
  *Comment 5:* Whether Petitioners' Allegations of a Conflict-of-Interest Create an Actionable Violation of Antitrust Laws
  *Comment 6:* Whether the Petitioners' Alleged Violation of a Confidentiality Agreement Warrants the Application of FA Rather Than AFA
  *Comment 7:* Whether the AFA Rate Applied in the Preliminary Determination Is Warranted
  *Comment 8:* Whether Commerce Should Rely on Information Provided by the Government of Kazakhstan in Determining the Countervailability of Programs
  *Comment 9:* Whether Commerce Is Required To Exhaust Administrative Remedies
  *Comment 10:* Whether Commerce Imposed Provisional Measures Without Adequate Consideration
  *Comment 11:* Whether Commerce Should Find That Two Additional Programs Are Countervailable
VIII. Recommendation

[FR Doc. 2021–04032 Filed 2–25–21; 8:45 am]

**BILLING CODE 3510–DS–P**

---

## DEPARTMENT OF COMMERCE

### National Oceanic and Atmospheric Administration

[RTID 0648–XA863]

### Schedules for Atlantic Shark Identification Workshops and Protected Species Safe Handling, Release, and Identification Workshops

**AGENCY:** National Marine Fisheries Service (NMFS), National Oceanic and Atmospheric Administration (NOAA), Commerce.

**ACTION:** Notice of public workshops.

**SUMMARY:** Free Atlantic Shark Identification Workshops and Safe Handling, Release, and Identification Workshops will be held in April, May, and June of 2021. Certain fishermen and shark dealers are required to attend a workshop to meet regulatory requirements and to maintain valid permits. Specifically, the Atlantic Shark Identification Workshop is mandatory for all federally permitted Atlantic shark dealers. The Safe Handling, Release, and Identification Workshop is mandatory for vessel owners and operators who use bottom longline, pelagic longline, or gillnet gear, and who have also been issued shark or swordfish limited access permits. Additional free workshops will be conducted during 2021 and will be announced in a future notice.

**DATES:** The Atlantic Shark Identification Workshops will be held on April 16, May 6, and June 17, 2021. The Safe Handling, Release, and Identification Workshops will be held on April 2, April 23, May 6, May 19, June 2, and June 29, 2021. See **SUPPLEMENTARY INFORMATION** for further details.

**ADDRESSES:** The Atlantic Shark Identification Workshops will be held in Philadelphia, PA; Fort Lauderdale, FL; and Boston, MA. The Safe Handling, Release, and Identification Workshops will be held in Palm Coast, FL; Warwick, RI; Kenner, LA; Kitty Hawk, NC; Panama City, FL; and Philadelphia, PA. See **SUPPLEMENTARY INFORMATION** for further details on workshop locations.

**FOR FURTHER INFORMATION CONTACT:** Rick Pearson by phone: (727) 824–5399, or by email at *rick.a.pearson@noaa.gov.*

**SUPPLEMENTARY INFORMATION:** The workshop schedules, registration information, and a list of frequently asked questions regarding the Atlantic Shark Identification and Safe Handling, Release, and Identification workshops are posted online at: *https://www.fisheries.noaa.gov/atlantic-highly-migratory-species/atlantic-shark-identification-workshops* and *https://www.fisheries.noaa.gov/atlantic-highly-migratory-species/safe-handling-release-and-identification-workshops.*

### Atlantic Shark Identification Workshops

Since January 1, 2008, Atlantic shark dealers have been prohibited from receiving, purchasing, trading, or bartering for Atlantic sharks unless a valid Atlantic Shark Identification Workshop certificate is on the premises of each business listed under the shark dealer permit that first receives Atlantic sharks (71 FR 58057; October 2, 2006). Dealers who attend and successfully complete a workshop are issued a

COMMERCE ISSUES AND DECISION MEMORANDUM

Barcode:4091341-01 C-834-811 INV

UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

C-834-811
Investigation
POI: 1/1/2019 – 12/31/2019
**Public Document**
E&C/OV: JMN

February 22, 2021

**MEMORANDUM TO:**     James Maeder
                       Deputy Assistant Secretary
                         for Antidumping and Countervailing Duty Operations

**FROM:**              Shawn Thompson
                       Director, Office V
                       Antidumping and Countervailing Duty Operations

**SUBJECT:**           Issues and Decision Memorandum for the Final Determination of
                       the Countervailing Duty Investigation of Silicon Metal from the
                       Republic of Kazakhstan

---

## I.   SUMMARY

The Department of Commerce (Commerce) determines that countervailable subsidies are being provided to producers of silicon metal from the Republic of Kazakhstan (Kazakhstan), as provided in section 705 of the Tariff Act of 1930, as amended (the Act). Below is the complete list of issues in this investigation for which we received comments from interested parties:

Comment 1:  Whether the Company Respondents' Initial Questionnaire Response Should be Accepted
Comment 2:  Whether the Administrative Procedures Act (APA) Supports Accepting the Company Respondents' Questionnaire Response
Comment 3:  Whether Commerce Should Apply Facts Available (FA) Rather than Adverse Facts Available (AFA) in Establishing the Countervailing Duty (CVD) Rate
Comment 4:  Whether the Petitioners' Allegations of a Conflict-of-Interest Warrant the Application of FA Rather than AFA
Comment 5:  Whether Petitioners' Allegations of a Conflict-of-Interest Create an Actionable Violation of Antitrust Laws
Comment 6:  Whether the Petitioners' Alleged Violation of a Confidentiality Agreement Warrants the Application of FA Rather than AFA
Comment 7:  Whether the AFA Rate Applied in the Preliminary Determination is Warranted
Comment 8:  Whether Commerce Should Rely on Information Provided by the Government of Kazakhstan (GOK) in Determining the Countervailability of Programs
Comment 9:  Whether Commerce is Required to Exhaust Administrative Remedies



Case 1:21-cv-00173-LMG   Document 23-5   Filed 06/01/21   Page 2 of 56
Case: 22-2204   Document: 30-2   Page: 114   Filed: 04/14/2023   (98 of 156)

Barcode:4091341-01 C-834-811 INV - Investigation -

Comment 10:   Whether Commerce Imposed Provisional Measures Without Adequate
Consideration

Comment 11:   Whether Commerce Should Find that Two Additional Programs Are
Countervailable

## II.   BACKGROUND

The mandatory company respondents in this investigation are JSC NMC Tape u-Ken Samruk
(TKS) and Tau-Ken Temir LLP (TKT).[1]  On December 3, 2020, Commerce published the
*Preliminary Determination* in this investigation and aligned this final CVD determination with
the final determinations in the antidumping duty (AD) investigations of silicon metal from
Bosnia and Herzegovina and Iceland, in accordance with section 705(a)(1) of the Act and 19
CFR 351.210(b)(4)(i).[2]

During the course of this investigation, travel restrictions were imposed that prevented
Commerce personnel from conducting on-site verification.  In lieu of on-site verification,
Commerce sent a supplemental questionnaire to the GOK to collect additional or supporting
documentation related to information that it had already submitted to the record.[3]  However, the
GOK did not respond to the ILV Questionnaire.

We invited parties to comment on the *Preliminary Determination*.[4]  In December 2020, we
received a timely-filed case brief from the GOK.[5]  In January 2021, we received timely-filed
case briefs from Globe Specialty Metals, Inc. (Globe) and Mississippi Silicon LLC (collectively,
the petitioners) and TKS/TKT, as well as timely-filed rebuttal briefs from the petitioners and the
GOK.[6]  In February 2021, Commerce held a public hearing.

## III.   PERIOD OF INVESTIGATION

The period of investigation (POI) is January 1, 2019, through December 31, 2019.

---

[1] As discussed in the *Preliminary Determination*, Commerce found TKS and TKT to be cross-owned entities who
are also cross-owned with the following companies:  National Welfare Fund "Samruk-Kazyna" JSC (Samruk-
Kazyna), Silicon Metal LLP (SM), Metallurgical Combine KazSilicon LLP (KazSilicon), JSC "Samruk-Energy"
(Samruk-Energy), "Ekibastuz GRES-2 station" JSC (GRES-2), and JSC KEGOC (KEGOC).  We refer to these
companies collectively as TKS/TKT. *See Silicon Metal from the Republic of Kazakhstan:  Preliminary Affirmative
Countervailing Duty Determination, and Alignment of Final Determination with Final Antidumping Duty
Determination*, 85 FR 78122 (December 3, 2020) (*Preliminary Determination*), and accompanying Preliminary
Decision Memorandum (PDM).
[2] *Id.*
[3] *See* Commerce's Letter, "Countervailing Duty Investigation of Silicon Metal from the Republic of Kazakhstan:
Supplemental Questionnaire in Lieu of Verification," dated December 7, 2020 (ILV Questionnaire).
[4] *See* Memorandum, "Countervailing Duty Investigation of Silicon Metal from the Republic of Kazakhstan:
Briefing Schedule," dated December 17, 2020; *see also* Memorandum, "Countervailing Duty Investigation of
Silicon Metal from the Republic of Kazakhstan:  Extension of Briefing Schedule," dated December 23, 2020.
[5] *See* the GOK's Letter, "Silicon Metal from Kazakhstan," dated December 28, 2020 (GOK's Case Brief).
[6] *See* Petitioners' Letter, "Silicon Metal from the Republic of Kazakhstan:  Petitioners' Case Brief," dated January 4,
2021 (Petitioners' Case Brief); TKS/TKT's Case Brief, "Silicon Metal From Kazakhstan," dated January 5, 2021
(TKS/TKT's Case Brief); the GOK's Letter, "Silicon Metal from Kazakhstan - REBUTTAL BRIEF," dated January
11, 2021; and Petitioners' Letter, "Silicon Metal from the Republic of Kazakhstan:  Petitioners' Rebuttal Brief,"
dated January 14, 2021 (Petitioners' Rebuttal Brief).

## IV.    USE OF FACTS OTHERWISE AVAILABLE AND ADVERSE INFERENCES

Section 776(a)(1) and (2) of the Act provides that Commerce shall, subject to section 782(d) of the Act, apply "facts otherwise available" if necessary information is not on the record or if an interested party or any other person (A) withholds information that has been requested; (B) fails to provide information within the deadlines established or in the form and manner requested by Commerce, subject to section 782(c)(1) and (e) of the Act; (C) significantly impedes a proceeding; or (D) provides information that cannot be verified, as provided by section 782(i) of the Act.

Under section 782(c)(1) of the Act, if an interested party, "promptly after receiving a request from {Commerce} for information, notifies {Commerce} that such party is unable to submit the information requested in the requested form and manner," then Commerce shall consider the ability of the interested party and may modify the requirements to avoid imposing an unreasonable burden on that party.

In accordance with section 782(d) of the Act, if we determine that a response to a request for information does not comply with the request, Commerce shall promptly inform the party submitting the response of the nature of the deficiency and shall, to the extent practicable, provide that party with an opportunity to remedy or explain the deficiency. If that party submits further information that continues to be unsatisfactory or such information is not submitted within the applicable time limits, Commerce may, subject to section 782(e) of the Act, disregard all or part of the original and subsequent responses, as appropriate.

Section 782(e) of the Act states that Commerce shall not decline to consider information that is submitted by an interested party and is necessary to the determination, but does not meet all of the applicable requirements established by the administering authority, if (1) the information is submitted by the established deadline, (2) the information can be verified, (3) the information is not so incomplete that it cannot serve as a reliable basis for reaching the applicable determination, (4) the interested party has demonstrated that it acted to the best of its ability, and (5) the information can be used without undue difficulties.

### A.    The GOK

In the *Preliminary Determination*, we relied on information provided by the GOK to preliminarily determine that one of the eight programs under investigation, the Provision of Electricity for Less than Adequate Remuneration (LTAR), was *de facto* specific because the metallurgical industry is a disproportionate user of electricity in Kazakhstan.[7] We also relied on information provided by the GOK to preliminarily determine that two additional programs, Provision of Water for LTAR and Provision of Drainage System Services for LTAR, were not countervailable because the Saryarka special economic zone (SEZ), where TKS/TKT is located, did not provide water or drainage services to companies located in the zone.

Consistent with section 782(i) of the Act, on December 7, 2020, we issued the ILV Questionnaire to the GOK in order to verify the information upon which we relied in the

---

[7] *See Preliminary Determination* PDM at 16.

Case 1:21-cv-00173-LMG   Document 23-5   Filed 06/01/21   Page 4 of 56
Case: 22-2204   Document: 30-2   Page: 65   Filed: 04/14/2023   (100 of 156)

Barcode:4091341-01 C-834-811 INV - Investigation -

*Preliminary Determination*.[8] As we only relied on information provided by the GOK in the *Preliminary Determination* with respect to these three programs, our ILV Questionnaire was in turn limited to these programs as well. Nonetheless, the GOK did not respond to our ILV Questionnaire.

Section 782(i)(1) of the Act requires that Commerce verify all information relied upon in making a final determination in an investigation. By not providing a response to Commerce's ILV Questionnaire, the GOK has significantly impeded this proceeding with regard to the allegation that TKS/TKT received electricity, water, and drainage services for LTAR, failed to provide information within the deadlines established or in the form and manner requested by Commerce, and provided information which could not be verified. Consequently, pursuant to sections 776(a)(2)(B)-(D) of the Act, we are relying on facts otherwise available regarding specificity and financial contribution for the water and drainage service programs for the final determination, and for specificity as it relates to the provision of electricity for LTAR.

In selecting from among the facts available, we find that an adverse inference is warranted, pursuant to section 776(b) of the Act, because the requested information was in the GOK's possession and the GOK failed to provide it in a timely response to Commerce's ILV Questionnaire. Therefore, we find that the GOK failed to cooperate to the best of its ability to comply with Commerce's requests for necessary information in this investigation. Consequently, pursuant to section 776(b) of the Act, we find that these three programs are specific pursuant to section 771(5A)(D)(iv) of the Act because they are limited to companies located in SEZs, and that the provision of water and drainage services constitute a financial contribution under section 771(5)(D)(iii) of the Act.

## B.   TKS/TKT

Commerce relied on "facts otherwise available," including AFA, to find that TKS/TKT used each program under investigation in the *Preliminary Determination*.[9] We are adopting our methodology from the *Preliminary Determination* in this final determination. However, as described above, in addition to our findings from the *Preliminary Determination*, for this final determination Commerce is finding that two additional programs under investigation are countervailable, based on our finding that the application of AFA is warranted in finding that the Provision of Water for LTAR and Provision of Drainage System Services for LTAR programs provided a financial contribution and are specific.[10] For further discussion, *see* Comments 3, 8, and 11 below.

---

[8] *See* ILV Questionnaire.
[9] *See Preliminary Determination* PDM at 4-9.
[10] *See* Comment 11.

## V.     SUBSIDIES VALUATION INFORMATION

### A.     Allocation Period

Interested parties raised no issues in their case briefs regarding the allocation period set forth in the *Preliminary Determination.*  Therefore, we have made no changes to this period for the final determination.  For a description of the allocation period, *see* the *Preliminary Determination.*[11]

### B.     Attribution of Subsides

Interested parties raised no issues in their case briefs regarding the attribution of subsidies as described in the *Preliminary Determination.*  Therefore, we have made no changes for the final determination.  For further discussion, *see* the *Preliminary Determination.*[12]

## VI.     ANALYSIS OF PROGRAMS

### A.     Programs Determined to Be Countervailable

Except where noted, we made no changes to the methodology used to calculate the subsidy rates for the following programs in the *Preliminary Determination.*  The final program rates are as follows:

1.  Corporate Income Tax Exemption:  20 percent *ad valorem*

2.  Property Tax Exemption:  20 percent *ad valorem*

3.  Land Tax and Land Use Fee Exemption:  20 percent *ad valorem*

4.  Customs Duty Exemption:  20 percent *ad valorem*

5.  Provision of Electricity for LTAR:  20 percent *ad valorem*

6.  Provision of Water for LTAR:[13]  20 percent *ad valorem*

7.  Provision of Drainage System Services for LTAR:[14]  20 percent *ad valorem*

8.  Debt Forgiveness:  20 percent *ad valorem*

---

[11] *See Preliminary Determination* PDM at 9.
[12] *Id.* at 9-10.
[13] This program was not countervailed in the *Preliminary Determination.*  *See* Comment 11.
[14] This program was not countervailed in the *Preliminary Determination.*  *See* Comment 11.

## VII.   ANALYSIS OF COMMENTS

### Comment 1: Whether the Company Respondents' Initial Questionnaire Response Should be Accepted

The deadline for Section III of TKS/TKT's initial questionnaire response was on September 15, 2020. Shortly before 5 p.m. on that date, TKS/TKT requested that Commerce grant it an extension of one additional business day. Commerce did not respond to this request, and TKS/TKT submitted a portion of its response on the morning of September 16, 2020. Because this filing was received after 8:30 a.m., Commerce rejected it as untimely, pursuant to 19 CFR 351.302(b).

*TKS/TKT's Comments:*[15]
- Commerce should accept TKS/TKT's initial questionnaire response. TKS/TKT complied with the requirements of 19 CFR 351.302 by making a timely extension request, filing its request as soon as it was known that more time was required, and citing the technical issues encountered in filing the questionnaire response. Commerce has still not responded to this extension request, which Commerce may do at any time in accordance with 19 CFR 351.302(b).
- TKS/TKT's counsel was unable to submit TKS/TKT's response in Commerce's electronic filing system, ACCESS, by the deadline due to technical/computer issues in the files he received, which were not resolved by the 5:00 p.m. deadline. In particular, the files had imbedded information or were corrupt, and counsel had difficulty making Russian searchable in PDFs, all of which resulted in rejection of the submission by ACCESS.
- Counsel immediately filed on ACCESS, at 3:50 p.m., a stand-alone written one-day extension request, allowing Commerce officials to learn of the extension request before the 5:00 p.m. deadline. Commerce's ACCESS Manual informs parties not to begin filings after 4:00 p.m., the only clear time a benchmark is given in this regard. Commerce officials grant one-day extension requests under those circumstances and even far closer to 5:00 p.m. (*e.g.*, 4:30 p.m.).
- The technical issues with the filing could not be resolved until early the next business day, resulting in a 10:10 a.m. filing on September 16, 2020. Filing by 8:30 a.m. was not possible, as Commerce's rejection notification indicates that a party may contact ACCESS for help. However, this was not possible after hours, and the ACCESS team was unavailable until next business day.
- Commerce's ACCESS rejection notification states that there may be other document issues without listing them, causing filers to cease submitting more documents until the situation can be fully understood and resolved.
- Commerce's suggestion that the extension request should be made as soon as the need for an extension is apparent is not legal or supportable. The *Final Rule* states that Commerce "will continue to grant extensions of time limits to the extent that they are warranted and

---

[15] *See* TKS/TKT's Brief at 8-14, 17-26.

deadlines for the segment permit."[16] At the time the final extension request was made, the preliminary determination was still 73 days away.

- Commerce's *Final Rule* is pre-COVID-19. With COVID-19, Commerce has made accommodations for deadlines as many law firms are subject to key staff furloughs and work restrictions. For example, Commerce disallowed physical manual filings, and it was only at the time developing a workaround for them.

- The *Final Rule* states that Commerce will not adopt rules that are "inflexible to permit" Commerce "to effectively and fairly administer the AD and CVD laws."[17] Commerce "may not decide a critical legal and factual issue by resorting to an irrebuttable presumption as a substitute for engaging in reasoned decision making and basing its findings on record evidence."[18] Commerce impermissibly inflexibly applied the *Final Rule* as an irrebuttable presumption.

- The *Final Rule* is merely a discussion, not a regulation, and such discussions are routinely rejected by the reviewing courts when such regulations unnecessarily prevent Commerce from achieving its statutory mandate to calculate accurately subsidy (or dumping) rates.[19]

- Commerce provides no statement or support beyond the impermissible *per se* next day 8:30 a.m. deadline as to why it should not accept TKT's timely one-day extension request and still meet statutory deadlines. This is particularly valid given that Commerce extended the preliminary determination by 60 days. In other CVD cases, Commerce has granted multiple extensions of comparable length or more, evidencing that Commerce had time remaining in the investigation to grant TKS/TKT's request for a one-day extension.[20]

- Commerce has the inherent authority under the regulations to accept a questionnaire response at any point, including the authority to consider and accept TKS/TKT's still not decided and timely filed one-day extension request.[21] A claim that Commerce can simply

---

[16] *See* TKS/TKT's Brief at 12 (citing *Extension of Time Limits*, 78 FR 57790, 57795 (September 20, 2013) (*Final Rule*).

[17] *Id.* at 13, (citing *Final Rule*, 78 FR at 57795-96).

[18] *Id.* (citing *NLRB v. St. Francis Hosp.*, 601 F. 2d 404, 416 (9th Cir. 1979); Charles I Koch, *Administrative Law and Practice* § 6.43 (Supp. 1992); and Jacob A. Stein et. al., *Administrative Law* § 24.04 (1994)).

[19] *Id.* (citing *NTN Bearing Corp. v. United States*, 74 F. 3d 1204, 1207 (Fed. Cir. 1995) (*NTN Bearing*); *Pro-Team Coil Nail Enter., Inc. v. United States*, No. 18-00027, 2019 WL 7167536, at 9–10 (CIT 2019); *U.S. Magnesium LLC v. United States*, 895 F. Supp. 2d 1319, 1325 (CIT 2013) ("In determining whether Commerce's rejection of an untimely submission amounts to an abuse of discretion, this Court considers whether the interests of accuracy and fairness outweigh the burden placed on {Commerce} and the interest in finality"); *Wuhu Fenglian Co., Ltd. v. United States*, 836 F. Supp. 2d 1398, 1404-05 (CIT 2012); *Fine Furniture (Shanghai) Ltd. v. United States*, 865 F. Supp. 2d 1254, 1267 (CIT 2012) (*Fine Furniture I*); and *Dupont Teijin Films v. United States*, Slip Op. 13-111 at 5 (CIT 2013).

[20] *Id.* (citing Commerce Memoranda, "Phosphate Fertilizers from Morocco," dated September 15, 2020 (barcode 4026926-01); "Certain Vertical Shaft Engines Between 225cc and 999cc, and Parts Thereof from China (A-570-119)," dated December 31, 2020 (barcode 4070614-01); and *Jiangsu Senmao Bamboo & Wood Indus. Co. v. United States*, 322 F. Supp. 3d 1308, 1323-25 (CIT 2018)).

[21] *Id.* at 14 (citing *Artisan Manufacturing Corp. v. United States*, 978 F.Supp.2d 1334, 1338 & 1344-45 (CIT 2014); *Usinor Sacilor v. United States*, 872 F. Supp. 1000, 1008 (CIT 1994) (*Artisan*) (When deciding if Commerce abused its discretion in rejecting information submitted after the deadline, it should consider the interests of accuracy to

not decide matters because it does not have the time and resources to do so violates the Act and congressional intent.[22]

- Commerce has accepted questionnaire responses under similar circumstances. For example, in the CVD investigation of *Ripe Olives from Spain*, Commerce decided an extension request filed at 4:30 p.m. of the deadline date.

- While TKS/TKT's one-day extension request was timely, Commerce accepts even untimely extension requests,[23] including those that cite printer issues, confused paralegals, counsel calendar errors, misunderstanding of ACCESS requirements, requesting extensions for the wrong documents, and refusal to file due to privacy laws. Commerce's disparate treatment of different companies with respect to extension requests, without explanation, is unlawfully arbitrary and capricious.[24]

- Commerce has approved last minute oral one-day extension requests that are not even allowed by its regulations. Therefore, Commerce should consider and specifically decide a properly filed written extension request per its regulations, such as that filed by TKS/TKT.

- There is extensive court precedent finding unlawful Commerce's rejection of untimely questionnaire responses. The courts are "guided first by the remedial, and not punitive, purpose of" CVD/AD trade law and the AD/CVD statute's goal to determine margins "as accurately as possible."[25] The courts weigh "the burden imposed upon the agency by accepting the late submission," "the need for finality at the final results stage,"[26] and the interests of accuracy and fairness.

- In *Artisan*, the CIT held that Commerce's rejection of a respondent's questionnaire response as untimely was an abuse of discretion,[27] finding that counsel's missing of a deadline and failure to timely request an extension was "inconsequential" and would not have had any "adverse consequences for the investigation" given it was only a one-day delay.[28] The consequences of Commerce's rejection of TKS/TKT's response are grossly disproportionate, given the cash deposit rate of 120 percent established in the *Preliminary*

---

calculate the actual CVD/AD margin and fairness, and the burden imposed upon the agency from accepting the late submission); *Grobest & I-Mei Indus. (Viet.) Co. v. United States*, 815 F. Supp. 2d 1342, 1367 (CIT 2012) (*Grobest*) (Under the statutory scheme, even a questionnaire response filed after the deadline cannot be rejected, where "rejection of the respondent's submission as untimely appears to have worked a substantial hardship upon that company and resulted in an inaccurate dumping {subsidy}margin," especially where there was no significant burden on Commerce and the company worked diligently to correct the problem); *Hebei Metals and Minerals Imp. & Exp. Co. v. United States*, Slip Op. 04-88 at 10 (CIT 2004); *NTN Bearing*, 74 F.3d. at 1207; *Timken Corp. v. United States*, 434 F.3d 1345, 1353-54 (Fed. Cir. 2006); *Nippon Steel*, Slip Op. 01-52 at 13 (CIT 2001) (*Nippon Steel 2001*); *Chapparal Steel Co. v. United States*, 901 F. 2d 1097, 1103-04 (Fed. Cir. 1990); and *Usinor Sacilor v. United States*, 872 F. Supp. 2d 1000, 1008 (CIT 1994)).

[22] *Id.* at 15 (citing *Zhejiang Native Produce & Animal By–Products Import & Export Corp*, 637 F. Supp. 2d 1260, 61-63 (CIT 2009)).

[23] *Id.* at 17 (citing, *inter alia*, *Antidumping Duty Investigation of Certain Amorphous Silica Fabric From the People's Republic of China: Final Affirmative Determination of Sales at Less-Than-Fair Value, and Final Affirmative Determination of Critical Circumstances*, 82 FR 8399 (January 25, 2017), and accompanying Issues and Decision Memorandum (IDM) at 25).

[24] *Id.* at 18 (citing *SKF USA, Inc. v. United States*, 263 F.3d 1369, 1382 (Fed. Cir. 2001); and *Goodluck India Ltd. v. United States*, 393 F. Supp. 3d 1352, 1358 (CIT 2019)).

[25] *Id.* at 18 (citing *Grobest*, 815 F. Supp. 2d at 1365).

[26] *Id.*

[27] *Id.* at 19 (citing *Artisan*, 978 F. Supp. 2d at 1345).

[28] *Id.* (citing *Artisan*, 978 F. Supp. 2d at 1348).

*Determination*.[29] Commerce's exercise of discretion must be reasonable in light of its statutory obligations to calculate accurate AD/CVD margins within the statutory time limits.[30]

- In *NTN Bearing*, the CIT stated that a "regulation which is not required by statute… must be waived where failure to do so would amount to an abuse of discretion."[31] Commerce's failure to waive any deadline here is an abuse of discretion, as the deadline is not necessary to satisfy statutory obligations.

- Commerce and the petitioners claim that certain information was missing from TKS/TKT's subsidy questionnaire response. However, Commerce cannot make this claim because it completely removed the questionnaire response filed by TKS/TKT from the record. Commerce may not refer to that response or make decisions based on information not on the record. Otherwise Commerce violates its own regulations as well as the statutory requirement that decisions be based on substantial evidence and makes decisions that would preclude judicial review.

- TKS/TKT's filed questionnaire response was missing, at best, only five percent of the total pages, which occurred because counsel worked through much of the night to meet the deadline, and he inadvertently double filed the proprietary version of a TKS exhibit instead of a TKT exhibit on ACCESS. In any event, any information claimed to be missing was covered by the other submitted financials and reconciliations in the questionnaire response as well as the submitted public version of the document. Commerce could easily have requested the business proprietary information (BPI) version of the file.

- Given Commerce's factual claim that information is missing from the record, 19 CFR 351.301(4) entitles TKS/TKT with an opportunity to rebut Commerce's claim, which it did in its letters dated October 5 and 13, 2020.[32]

- If Commerce erroneously maintains its unsupported claim that certain information was missing from the TKS/TKT questionnaire response, then by statute and court precedent, that questionnaire response is wholly in the record for that purpose. It is arbitrary and capricious for Commerce to cherry pick from documents and choose portions thereof to carve out a record of its choosing.

- Section 516A(b)(2) of the Act states that "the record… shall consist of all information presented to or obtained by" Commerce "during the course of the administrative proceeding." Commerce's regulations at 19 CFR 351.104(a) state that the official record of an AD/CVD proceeding includes "all factual information, written argument, or other material developed by, presented to, or obtained by the Secretary during the course of a proceeding that pertains to a proceeding." Once Commerce allows a particular piece of information from a document on the record for any purpose, it must put the entire document on the record at least for that purpose or issue. Otherwise, no one, including a reviewing court, knows if the actual record supports the claim.

---

[29] *Id.* (citing *Artisan*, 978 F. Supp. 2d at 1349).

[30] *Id.* (citing *NTN Bearing*, 74 F.3d. at 1207).

[31] *Id.* at 19-20 (citing *NTN Bearing*, 74 F.3d. at 1207).

[32] *Id.* at 22 (citing TKS/TKT's Letter, "Silicon Metal from Kazakhstan," dated October 5, 2020; and TKS/TKT's Letter, "Silicon Metal from Kazakhstan," dated October 13, 2020).

- Commerce is "not free to prescribe what inferences from the evidence it will accept and reject, but must draw all those inferences that the evidence fairly demands,"[33] *i.e.*, the entire actual record. Courts reject AD/CVD agency analysis where the agency "did not fully analyze the issue … {t}he absence of information necessary for a thorough analysis" renders a determination unsupported by substantial evidence.[34]
- Deficiencies in an initial questionnaire response are not a standalone reason to reject it as untimely, as section 782(d) of the Act mandates an opportunity to remedy deficiencies. Commerce remedies deficient questionnaire responses by requesting the missing part.
- After fully completing its filing, TKS/TKT cannot just unilaterally submit more information. Commerce should issue a supplemental questionnaire as to TKS/TKT's questionnaire response if there is concern that it was deficient.
- Finally, when evaluating TKS/TKT's arguments, there are a number of mitigating factors that Commerce should consider, including:
  - TKS/TKT timely filed the first two affiliation questionnaire responses, without requesting any extension;
  - COVID-19 hindered TKS/TKT's efforts, as needed staff could not be in the office or were on furlough including at its counsel's firm;
  - TKS/TKT individuals answering Commerce's questionnaire are new to the U.S. CVD process;
  - TKS/TKT timely offered ways to Commerce to simplify the questionnaire response process to make it manageable. The petitioners and Commerce rejected all proposals and offered no alternative;
  - The petitioners' conflict of interest claims (*see* Comments 4 and 5) handicapped TKS/TKT's questionnaire response efforts and consumed the limited time available to meet the questionnaire deadline. TKS/TKT was also awaiting a response from Commerce with respect to those claims, which did not come before the questionnaire response deadline;
  - TKS/TKT's counsel did not receive the final questionnaire response until 10:58 a.m. on the September 15 due date. It was not possible for TKS/TKT to provide the information sooner. However, on receipt, TKS/TKT's counsel initially felt that it was still possible to meet the 5:00 p.m. deadline without burdening Commerce with an extension request;
  - Since Commerce had not responded to TKS/TKT's timely one-day extension request, counsel worked through much of the night to resolve technical document issues, and rushed to file the response by 10:11 a.m. the next morning; and
  - TKS/TKT was unfamiliar with Commerce's rules, did not know if it even had counsel, and was searching for answers on its own.

---

[33] *Id.* at 23 (citing *Pohang Iron & Steel Co. v. United States*, No. 98-04-00906, 1999 WL 970743 at 11 (CIT 1999) (quoting *Allentown Mack Sales & Serv. v. NLRB*, 522 U.S. 359, 378 (CIT 1998))).
[34] *Id.* (citing *USX Corp. v. United States*, 655 F. Supp. 487, 492 & 498 (CIT 1987)).

Case: 1:21-cv-00173-LMG Document 36-2 Page: 63 Filed: 06/04/21 Page 119 of 156
Case: 22-2204 Document 22-5 Page: 63 Filed: 04/11/2023 (107 of 156)

Barcode:4091341-01 C-834-811 INV - Investigation -

*GOK's Comments:*[35]
- Commerce did not provide TKS/TKT with a chance to submit information.
- The provision of a response after a deadline should not be deemed to hold back the progress of the investigation.
- In *Nippon Steel 2001*, the CIT held that a 10-day delay in Nippon Steel's response to the questionnaire, even after a preliminary determination, "was not so big to impede the progress of the investigation."[36]
- Commerce cannot impose "draconian measures," such as the rejection of a questionnaire response, for relatively minor violations that do not affect Commerce's ability to fulfill its statutory mandate to accurately calculate a subsidy rate.[37]

*Petitioners' Rebuttal:*[38]
- TKS /TKT's questionnaire response was untimely because it was not received successfully by Commerce by the deadline on September 15, 2020, or by 8:30 a.m. on September 16, 2020. Therefore, Commerce properly rejected TKS/TKT's initial subsidy questionnaire response as untimely.
- Commerce's regulations at 19 CFR 351.303(b)(1) require that "{a}n electronically filed document must be received successfully in its entirety by the Department's electronic records system, ACCESS, by 5 p.m. Eastern Time {(ET)} on the due date." and its regulations at 19 CFR 351.301(c)(1) states that Commerce "will reject any untimely filed… questionnaire responses."
- Consistent with the regulations, Commerce's Initial Questionnaire explicitly required that "{a}n electronically filed document must be received successfully in its entirety by ACCESS by 5:00 p.m. ET on the due date, unless an earlier time is specified."[39] The questionnaire also set out the consequences of failing to submit the questionnaires response as instructed.[40]
- TKS/TKT received two extensions, totaling 15 additional days, to submit its initial questionnaire response.[41] Despite receiving significant additional time to prepare and submit its questionnaire response, TKS/TKT still failed to timely file this response. Instead, TKS/TKT filed a third extension request at 3:50 p.m., approximately one hour before the 5 p.m. deadline, to which Commerce was unable to respond before the deadline passed.[42]
- Commerce has explicitly addressed last-minute extension request scenarios in the *Final Rule*, which was adopted after Commerce "frequently encountered the situation in which

[35] *See* GOK's Case Brief at 4.
[36] *Id.* (citing *Nippon Steel 2001*, Slip Op. 01-52 at 13).
[37] *Id.* (citing *Artisan* and *Grobest*).
[38] *See* Petitioners' Rebuttal Brief at 5-19.
[39] *Id.* at 6 (citing Commerce's Letter, "Investigation of Silicon Metal from the Republic of Kazakhstan: Countervailing Duty Questionnaire," dated July 23, 2020 (Initial Questionnaire)).
[40] *Id.*
[41] *Id.* at 7 (citing Memorandum, "Silicon Metal from the Republic of Kazakhstan: Extension of Time to Submit Section III Questionnaire Response," dated August 27, 2020 (First TKS/TKT Extension); and Memorandum, "Silicon Metal from the Republic of Kazakhstan: Extension of Time to Submit Initial Section III Questionnaire Response and KazSilicon Questionnaire Response," dated September 9, 2020 (Second TKS/TKT Extension)).
[42] *Id.* (citing TKS/TKT's Letter, "Silicon Metal from Kazakhstan," dated September 15, 2020 (Third TKS/TKT Extension Request)).

a party filed an extension request so close to the time limit that {Commerce} did not have the opportunity to respond to the request before the time limit expires."[43] According to the *Final Rule*, "{f}or submissions that are due at 5:00 p.m., if {Commerce} is not able to notify the party requesting the extension of the disposition of the request by 5:00 p.m., then the submission would be due by the opening of business (8:30 a.m.) on the next work day."[44]

- The CIT has rejected TKS/TKT's argument that the record lacks proof that the questionnaire response was missing any information.  In *Bebitz (AD)*, the CIT held that "{m}erely acknowledging the procedural history of Commerce's investigation" by referencing the rejection of untimely and incomplete submissions "does not equate to an unfair use of information to which {the respondent} was unable to respond."[45]  Rather, Commerce's own regulation "requires {that Commerce} exclude untimely material from consideration in its investigation."[46]

- Even if Commerce had retained TKS/TKT's initial questionnaire response for the sole purpose of showing that information was missing, there would be no basis for Commerce to consider the response on the merits.

- That TKS/TKT's questionnaire response was missing information is not in dispute, as TKS/TKT admits to "inadvertently double attaching a BPI TKS exhibit document instead of a TKT BPI exhibit document."[47]  Thus, TKS/TKT never filed the BPI portion of its initial response that would have contained TKT's financial reports, tax reports, and registrations.  In any event, TKS/TKT's claim that only five percent of the pages of TKT's subsidy questionnaire response were missing[48] is inapposite, as each submission must be filed in its entirety pursuant to 19 CFR 351.303(b)(1).

- The missing confidential data from TKS/TKT's financial and tax reports would have included information that is critical to Commerce's subsidy analysis, such as information regarding potential benefits from subsidies, sales data, and information necessary for verification and reconciliation of other information on the record.  Further, without having the missing BPI documents available for review, it is impossible for Commerce to confirm TKS/TKT's claim that the missing information was covered by other submitted information and the public versions.

- Even assuming that TKS/TKT's initial failure to provide the exhibit was inadvertent, TKS/TKT's persistent refusal to file the exhibit after realizing its error has been deliberate.  Commerce should reject TKS/TKT's contention that it could not submit the missing information without a request from Commerce.

- Commerce was not required to provide TKS/TKT with an opportunity to provide the missing information under section 782 of the Act after it had already properly rejected the untimely filing.

- TKS/TKT's last minute extension request does not justify or require acceptance of TKS/TKT's untimely filed and incomplete initial questionnaire response.

---

[43] *Id.* at 8 (citing *Final Rule*, 78 FR at 57791).

[44] *Id.* (citing *Final Rule*, 78 FR at 57792).

[45] *Id.* at 9-10 (citing *Bebitz Flanges Works Pvt. Ltd. v. United States*, 433 F. Supp. 3d 1309, 1328 n.7 (CIT 2020) (*Bebitz (AD)*)).

[46] *Id.* at 10 (citing *Bebitz (AD)*, 433 F. Supp. 3d at 1328).

[47] *Id.* (citing TKS/TKT's Brief at 21).

[48] *Id.*

- As both the *Final Rule* and the Initial Questionnaire make clear, the predicate for an extension is Commerce's actual granting of the extension, not a mere extension request. The mere act of filing an extension request before the deadline does not justify or require Commerce's acceptance of TKS/TKT's late questionnaire response.

- Assuming an extension is automatic just by filing a request is contrary to the rule and would render Commerce's deadlines and rules meaningless. The *Final Rule* expressly warns that parties "should be aware that the likelihood of {Commerce} granting an extension will decrease the closer the extension request is filed to the applicable time limit because {Commerce} must have time to consider the extension request and decide on its disposition."[49] The *Final Rule* further warns that parties "should not assume that they will receive an extension of a time limit if they have not received a response from {Commerce}."[50] Similarly, the Initial Questionnaire also warns that any extension request "will be communicated in writing by Commerce; otherwise the original deadline will apply."[51]

- Despite receiving such advance notice that Commerce would have had to act to grant any extension before the deadline expired, TKS/TKT waited until 3:50 p.m., approximately one hour before the deadline, to submit its extension request. If TKS/TKT did not receive the final part of the questionnaire response until 10:58 a.m. on the deadline date, TKS/TKT's counsel knew that it did not have complete information as of that time and could have submitted an extension request earlier in the day or on a previous day. TKS/TKT's counsel could have also requested an earlier extension due to the COVID-19-related issues discussed in its brief. Thus, TKS/TKT's decision not to file an extension request until late on the day the response was due must have been either a deliberate strategic choice or a significant error in judgment by TKS/TKT or its counsel.

- As TKS/TKT filed the extension request too late for Commerce to consider it, the resulting deadline for the questionnaire response became 8:30 a.m. on the next business day, per the *Final Rule*. Commerce had no obligation to reach a decision on TKS/TKT's last-minute extension request after the deadline had passed.

- TKS/TKT's alleged technical filing issues do not justify its failure to timely file a complete questionnaire response. The rejection email TKS/TKT received from ACCESS provided links to a step-by-step guide on removing unauthorized links from a submission, a simple process that takes mere moments to complete. Neither TKS/TKT nor its counsel are new to ACCESS and therefore must have some level of familiarity with the electronic filing process.

- The Initial Questionnaire instructed TKS/TKT to "promptly notify the officials in charge and submit a full written explanation of the reasons you are unable to file the document electronically."[52] Yet there is no indication on the record that TKS/TKT made any effort to contact the ACCESS Help Desk, the analyst working on the case, or any member of the Commerce team on September 15, 2020, or early in the morning of September 16, 2020, once the technical issues occurred.

- Commerce's rejection of TKS/TKT's untimely and incomplete questionnaire response was consistent with established precedent. The U.S. Court of Appeals for the Federal

---

[49] *Id.* at 12 (citing *Final Rule*, 78 FR at 57792).
[50] *Id.*
[51] *Id.* at 13 (citing Initial Questionnaire, Cover Letter at 3).
[52] *Id.* at 15 (citing Initial Questionnaire, Section I, at 5).

13

Circuit (CAFC) has recognized that "the burden of creating an adequate record lies with interested parties and not with Commerce."[53] The CIT has similarly recognized "the fundamental tenet that respondents must timely prepare an accurate and complete record in response to questions plainly asked by Commerce."[54] TKS/TKT failed to meet its burden by failing to file a timely and complete questionnaire response here.

- Commerce has broad discretion to set and enforce time limits in its proceedings, as the CAFC "has made clear Commerce's rejection of untimely-filed factual information does not violate a respondent's due process rights when the respondent had notice of the deadline and an opportunity to reply."[55] The CIT has further confirmed that "Commerce is not required to provide good cause or justification for rejecting untimely submissions and proceeding as if respondent has not provided requested information."[56] TKS/TKT had notice of the deadline and the consequences for not meeting the deadline, as well as an opportunity to comply. Its failure to do so means that Commerce properly rejected TKS/TKT's untimely filed questionnaire response and may proceed as if TKS/TKT has not provided the requested information.

- In *Bebitz (CVD)*, the CIT upheld Commerce's rejection of an untimely questionnaire response by the same counsel representing TKS/TKT in this proceeding, where an additional extension request had been filed shortly before the filing deadline, and where counsel began the submission of a supplemental questionnaire response at 10:24 a.m. the following morning.[57] Significantly, the CIT found that Commerce did not abuse its discretion by prioritizing the need for finality over the agency's obligation to determine the most accurate CVD margin where, as here, Commerce granted the respondent multiple extensions and had advised the respondent of the potential consequences of failing to meet the agency's deadlines in the initial questionnaire.[58]

- The CIT has already noted that the cases that TKS/TKT and the GOK cite to support their argument that Commerce should accept TKS/TKT's untimely and incomplete filing "are inapposite."[59] The CIT's decision in *Nippon Steel 2003* was reversed by the CAFC,[60] while *Artisan* and *Grobest* "were issued prior to the Federal Circuit's precedential decision in *Dongtai Peak*."[61]

- In *Artisan*, the CIT found that Commerce had abused its discretion "in the particular circumstances of th{at} investigation" in rejecting a questionnaire response that was filed at 9:00 a.m. the morning after the filing deadline was missed "{d}ue to an inadvertent lapse" by counsel and where Commerce was ambiguous in communicating its policy on time extensions, which sent a "mixed message" to respondents.[62] The questionnaire response at issue in *Artisan* was due in April 2012, and the final determination in the underlying investigation was made in February 2013. Thus, this case predated the *Final*

---

[53] *Id.* at 16 (citing *Nan Ya Plastics Corp. v. United States*, 810 F.3d 1333, 1337-38 (Fed. Cir. 2016)).
[54] *Id.* (citing *Bebitz (AD)*, 433 F. Supp. 3d at 1321).
[55] *Id.* (citing *Dongtai Peak Honey Indus. v. United States*, 777 F.3d 1343, 1353 (Fed. Cir. 2015) (*Dongtai Peak*)).
[56] *Id.* (citing *Bebitz (AD)*, 433 F. Supp. 3d at 1327 (quoting *Dongtai Peak*, 777 F.3d at 1352))).
[57] *Id.* at 17 (citing *Bebitz (CVD)*, 433 F. Supp. 3d at 1302, 1305-07).
[58] *Id.* (citing *Bebitz (CVD)*, 433 F. Supp. 3d at 1305-06).
[59] *Id.* at 18 (citing *Bebitz (AD)*, 433 F. Supp. 3d at 1324 n.6 (addressing the cases cited at *TKT Comment* at 14-15 n.11 and *GOK Case brief* at 2).
[60] *Id.* (citing *Nippon Steel 2003*, 337 F.3d at 1377, 1382-84; and *Bebitz (AD)*, 433 F. Supp. 3d at 1324 n.6).
[61] *Id.* (citing *ArcelorMittal USA LLC v. United States*, 399 F. Supp. 3d 1271, 1281 (CIT 2019)).
[62] *Id.* (citing *Artisan* 978 F. Supp. 2d at 1339, 1344-45, 1347-48).

*Rule*, which was released in September 2013 and which clarified Commerce's policy on time extensions.

- *Artisan* is further distinguished from the current investigation because TKS/TKT disregarded Commerce's clearly communicated policy on deadlines, time extensions, and the consequences for failing to file a timely questionnaire response.

**Commerce's Position:** We disagree with TKS/TKT that Commerce should reconsider its decision to reject the initial questionnaire response as untimely and remove that response from the record. As we noted in the *Preliminary Determination*, Commerce issued the Initial Questionnaire to the GOK, and in turn to TKS/TKT, on July 23, 2020. The Initial Questionnaire provided the standard time for respondents to submit the final portion of their response, 37 days, plus two additional days to account for a weekend.

On August 6, 2020, TKS/TKT filed a timely response to the affiliation portion of the questionnaire. Subsequently, on August 12, 2020, we informed TKS/TKT that it should provide full questionnaire responses for two additional companies with which it is affiliated: GRES-2 and KEGOC,[63] with these responses due concurrently with the responses of TKS/TKT. On August 27, 2020, we extended the deadline for these responses at the request of TKS/TKT until September 10, 2020.[64] As part of a second supplemental questionnaire, on September 1, 2020, we also requested a full questionnaire response on behalf of KazSilicon, to be filed on September 15, 2020.[65] On September 9, 2020, we again extended the deadlines at the request of TKS/TKT, until September 15, 2020 for all questionnaire responses except the KazSilicon response, for which we provided a later due date of September 25, 2020.[66]

Shortly before the deadline of 5:00 p.m. on September 15, 2020, at 3:50 p.m., Commerce received a third request for an extension from TKS/TKT.[67] Due to the proximity of the extension request to the actual deadline, Commerce was unable to respond to the extension request by the deadline. If Commerce is unable to notify a party requesting an extension of the disposition of that request by 5:00 p.m. on the due date, then, in accordance with the *Final Rule*, the submission is due by 8:30 a.m. on the next working day.[68] In this case, because the extension request was filed shortly before the deadline, Commerce did not have sufficient time to consider the request and decide on its disposition. Therefore, the deadline then became 8:30 a.m., September 16, 2020. TKS/TKT was apparently aware of this fact, as it began the submission of its supplemental questionnaire response at 5:31 a.m. September 16, 2020, and continued filing its submission through 10:10 a.m. that morning.[69]

---

[63] *See* Commerce's Letter, "Countervailing Duty Investigation of Silicon Metal from the Republic of Kazakhstan: Supplemental Questionnaire," dated August 12, 2020 (First Affiliation Supplemental Questionnaire).
[64] *See* First TKS/TKT Extension.
[65] *See* Commerce's Letter, "Countervailing Duty Investigation of Silicon Metal from the Republic of Kazakhstan: Supplemental Questionnaire," dated September 1, 2020 (Second Affiliation Supplemental Questionnaire).
[66] *See* Second TKS/TKT Extension.
[67] *See* Third TKS/TKT Extension Request.
[68] *See* Final Rule, 78 FR at 57792.
[69] *See* Commerce's Letter, "Countervailing Duty Investigation of Silicon Metal from the Republic of Kazakhstan: Rejection and Removal of Submission from the Record," dated October 1, 2020 (First Rejection Letter).

Because TKS/TKT did not meet the revised deadline of 8:30 a.m. on September 16, 2020, Commerce rejected the TKS/TKT's response as untimely pursuant to 19 CFR 351.302(d).[70]  In our letter to TKS/TKT explaining the reason for the rejection of the response, Commerce stated that:

> {A}t approximately 3:50 p.m. on September 15, 2020, citing technical issues, you requested a one day extension of time to submit your response, but that Commerce was unable to respond to this request.  Therefore, in accordance with the {*Final Rule*}, where Commerce is unable to notify the party requesting an extension of the disposition of that request by 5:00 p.m., the submission would be due by the opening of business, *i.e.*, 8:30 a.m., on the next work day.

> Nonetheless, between 5:31 a.m. and 10:10 a.m., on September 16, 2020, you filed the business proprietary and public versions of TKT's Section III response as multiple separate submissions on ACCESS.  These filings fail to meet the requirements of 19 CFR 351.303, which stipulate that the submission must be filed **in its entirety** by 5:00 p.m. on the due date specified, or applying the rule found in the *Extension of Time Limits* notice, by 8:30 a.m. on the following work day.[71]  (Emphasis in original).

TKS/TKT argues that it was not possible to provide the responses sooner, and it provides a litany of reasons why this was so.  However, Commerce provided TKS/TKT with multiple extensions in order to submit its responses in a timely manner, extending the original 39-day deadline by more than two weeks.  Although TKS/TKT explains many of its difficulties as arising from its own officials' unfamiliarity with the questionnaire process, the difficulties arising from COVID-19 preventing in-person meetings, and computer/technical issues, the fact remains that TKS/TKT was represented by experienced counsel, and Commerce had already granted multiple extensions as a result of these issues.

Further, the Initial Questionnaire explained the consequences of failing to respond to the initial questionnaire in accordance with the stated deadlines.[72]  TKS/TKT claims that, despite only providing its completed response to its counsel at 10:58 a.m., it still considered it possible to file the response in its entirety before the 5:00 p.m. deadline.[73]  It is apparent that this was an error in judgment for which TKS/TKT and its counsel are responsible, as they delayed their request for an extension of additional time until 3:50 p.m., at which point Commerce had just over an hour to notice that an extension request had been filed and to affirmatively respond to it.  Because TKS/TKT's counsel did not attempt to contact either the official in charge of the investigation or the ACCESS help desk before the close of business -- when Commerce employees were available to assist in the resolution of any technical problems or to discuss the necessity of the

---

[70] *Id.*; *see also* Memorandum, "Rejection of Untimely Filed Response," dated October 1, 2020.
[71] *See* First Rejection Letter.  We reiterated most of these facts in a second letter to TKS/TKT when asked to reconsider our initial decision.  *See* Commerce's Letter, "Countervailing Duty Investigation of Silicon Metal from the Republic of Kazakhstan," dated November 19, 2020 (Second Rejection Letter).
[72] *See* Initial Questionnaire at Cover Letter; *see also* First TKS/TKT Extension and Second TKS/TKT Extension.
[73] *See* TKS/TKT's Brief at 6; *see also* TKS/TKT's Letter, "Silicon Metal From Kazakhstan," dated October 2, 2020 (TKS/TKT's Request for Reconsideration), at 2.

extension request – no one at Commerce was aware that the request had been filed until well after the deadline for the response had already passed.

TKS/TKT further argues that issues with Commerce's own ACCESS system, as well as the impossibility of filing a physical copy, made it impossible to resolve technical issues related to the filing of its response within the time allotted. However, it is apparent from TKS/TKT's own statements that it failed to make more than the minimum effort to ensure that Commerce had notice of its ongoing computer/technical issues.[74] TKS/TKT merely argues that it ceased filing its response based on rejection notifications from ACCESS, and that COVID-19 prevented TKS/TKT, in the alternative, from making a physical filing. However, we note that the Initial Questionnaire instructs recipients to contact Commerce officials at least 72 hours prior to attempting a file a response without using ACCESS,[75] and to "promptly notify the officials in charge and submit a full written explanation of the reasons {the recipient is} unable to file the document electronically."[76] TKS/TKT does not even claim to have promptly notified any Commerce officials of its difficulties regarding filing, instead waiting until just over one hour before the deadline to submit its last-minute extension request.[77]

TKS/TKT has further argued that accepting its untimely questionnaire response would not hinder the investigation. In TKS/TKT's view, the timing of its questionnaire response, combined with the postponed preliminary determination, provided more than enough time for Commerce to continue to conduct its investigation. We are not persuaded by this argument. Commerce establishes deadlines so that it can conduct this (and its numerous other trade remedy proceedings) in an efficient manner within its statutory and regulatory deadlines. Therefore, it is critical that parties file documents by the established deadline, or timely request an extension of such a deadline such that Commerce can provide a considered response. Timely filings and timely extension requests contribute to Commerce's efficient administration of the numerous cases before it and the AD/CVD laws. Conversely, untimely filings and last-minute extension requests hinder the efficient conduct of our proceedings, and require that Commerce devote additional time and resources to addressing such untimely filings and last-minute requests. Additionally, although the burden associated with a single late-filed questionnaire response may be perceived as minimal, that burden is not minimal when aggregated across all proceedings. Accordingly, for the efficient conduct of its proceedings, it is critical that parties adhere to the deadlines established by Commerce.

The *Final Rule* addresses the situation where a party filed a timely extension request prior to 5:00 p.m. on the day the submission is due and Commerce did not respond to the extension request by 5:00 p.m. on the day the submission is due:

> Parties should be aware that the likelihood of the Department granting an extension will decrease the closer the extension request is filed to the applicable time limit because the Department must have time to consider the extension request and decide on its disposition. Parties should not

---

[74] *See* TKS/TKT's Brief at 10; *see also* TKS/TKT's Request for Reconsideration at 2.
[75] *See* Initial Questionnaire, Cover Letter at 2.
[76] *Id.*, Section I at 5.
[77] *See* Third TKS/TKT Extension Request.

assume that they will receive an extension of a time limit if they have not
received a response from the Department.  For submissions that are due at
5:00 p.m., if the Department is not able to notify the party requesting the
extension of the disposition of the request by 5:00 p.m., then the
submission would be due by the opening of business (8:30 a.m.) on the
next work day.  *See* 19 CFR 351.103(b).[78]

The purpose of this excerpt is to ensure that Commerce's inability to respond to an extension
request filed in close proximity to a submission deadline cannot be interpreted as Commerce
implicitly granting an extension.  Under this rule, the submission must be made prior to opening
of business the following day.  Commerce does not automatically grant extension requests
precisely because it must evaluate whether, among other things, granting such a request will
hinder Commerce's ability to administer the cases before it.  The language emphasizes, rather
than diminishes, Commerce's reluctance to allow parties to self-grant extensions, while also
putting parties on notice that the likelihood of an extension being granted decreases the closer
such a request is made to the deadline.  The language emphasizes the need for extension requests
to be submitted before the last minute.  Therefore, we are not persuaded that this language should
excuse the untimely filing of a submission for which Commerce received a last-minute extension
request which we did not have time to evaluate.  Moreover, we do not agree with TKS/TKT's
characterization of the *Final Rule* as a pre-COVID-19 relic.  To the extent that Commerce
chooses to modify its rules and procedures to accommodate the pandemic, it is capable of doing
so.[79]  We have not attempted to do so with the *Final Rule*, nor have we in any way indicated that
it is no longer in effect.  Finally, while TKS/TKT cites to several instances in the past where
Commerce has accepted untimely submissions, the CAFC has confirmed that Commerce is not
bound by its actions in prior proceedings, as each proceeding "is a separate act of Commerce's
authority that allows for different conclusions based on different facts in the record."[80]

TKS/TKT argues that several court cases support its contention that Commerce's discretion to
reject untimely filed submissions is limited such that the interests of accurately calculating an
AD/CVD margin must outweigh the need for timely submitted information, or such that a
rejection of a submission would cause substantial hardship to a respondent.  However, the CIT
has held that the cases cited by TKS/TKT as precedent for reversing our decision, namely,
*Artisan*, *Grobest*, and *NTN Bearing* are inapposite.[81]  Instead, the facts of this investigation are
very similar to those in *Dongtai Peak*, which set new precedent regarding the acceptance of late
submissions.  In *Dongtai Peak*, the CAFC concluded that Commerce properly exercised its
discretion in rejecting the respondent's untimely-filed extension requests and untimely-filed
supplemental questionnaire response despite the respondent's claim that it encountered
debilitating computer system malfunctions and difficulties in overseas communication between
the rurally-located respondent and its U.S.-based counsel.[82]  The CAFC also concluded that
Commerce reasonably determined that the respondent was capable of at least submitting an
extension request on time, but simply failed to do so and, therefore, found that good cause did

[78] *See Final Rule*, 78 FR at 57792.
[79] *See, e.g.*, *Temporary Rule Modifying AD/CVD Service Requirements Due to COVID-19; Extension of Effective Period*, 85 FR 41363 (July 10, 2020).
[80] *See Qingdao SeaLine Trading Co., Ltd. v. United States*, 766 F.3d 1378, 1387 (Fed. Cir. 2014).
[81] *See Bebitz (AD)*, 433 F. Supp. 3d at fn 6.
[82] *See Dongtai Peak*, 777 F.3d at 1350.

not exist to extend the deadline retroactively.[83] As in *Dongtai Peak*, TKS/TKT's extension requests indicate that TKS/TKT was aware of its communication difficulties, the inexperience of its personnel in responding to such questionnaires, and issues related to COVID-19; however, these factors did not prevent TKS/TKT from filing previous additional extension requests early enough for Commerce to respond. Nonetheless, on the final due date for the questionnaire response, TKS/TKT failed to submit a similarly-early additional extension request, concluding on its own that just over six hours was enough time for its counsel to receive and submit the documents via ACCESS. In this regard, TKS/TKT and its counsel gambled unwisely, as their responses contained numerous "Unauthorized Comment Type(s)" that prevented their acceptance in the ACCESS system,[84] despite the presence of experienced counsel.

As in *Dongtai Peak*, the untimely-filed response contained vital information.[85] The Initial Questionnaire requests crucial information regarding the use of subsidy programs under investigation, the financial status of the companies under investigation, and information related to sales by the companies that is used in the calculation of subsidy rates.[86] As the CAFC noted in *Dongtai Peak* with respect to the need for fairness and accuracy, Commerce's rejection of an untimely-filed questionnaire response does not violate any due process rights of a respondent such as TKS/TKT, because the respondent had notice of the deadline and the opportunity to respond to the Initial Questionnaire in a timely manner, or file an earlier request for an extension.[87] The Initial Questionnaire emphasized the importance of submitting the response in a timely manner, and highlighted that the consequences for failing to do so might result in the application of AFA.[88] As such, TKS/TKT was afforded notice regarding the consequences of its decisions.

Since *Dongtai Peak*, more recent decisions by the CIT support Commerce's findings in this investigation regarding our decision to reject TKS/TKT's untimely-filed questionnaire response and to apply AFA in establishing the final CVD rate. For instance, the facts in *Bebitz (CVD)* parallel those in this investigation nearly exactly: a respondent in the CVD investigation of *Stainless Steel Flanges from India* was required to provide a questionnaire response to Commerce.[89] After receiving two extensions, and having one extension request rejected, the respondent, Bebitz Flanges Works Private Limited (Bebitz), requested an additional and final extension to submit its questionnaire response, just 20 minutes before the deadline for submission.[90] As in this investigation, Commerce was unable to respond to the final extension request due to it not having sufficient time to consider the request prior to the deadline. Bebitz ultimately filed its questionnaire response the next day, beginning at 10:24 a.m.[91] Notably, Bebitz was represented by the same counsel as TKS/TKT in this proceeding.

---

[83] *Id.*, 777 F.3d at 1352.

[84] *See* TKS/TKT's Letter, "Silicon Metal From Kazakhstan," dated September 17, 2020, at 4-5 (TKS/TKT's Technical Issues Letter).

[85] *See Dongtai Peak*, 777 F.3d at 1352.

[86] *See* Initial Questionnaire, Section III.

[87] *See Dongtai Peak*, 777 F.3d at 1352.

[88] *See* Initial Questionnaire, Cover Letter.

[89] *See Bebitz (CVD)*, 433 F. Supp. 3d at 1300.

[90] *Id.*, 433 F. Supp. 3d at 1302.

[91] *See Stainless Steel Flanges From India: Final Affirmative Countervailing Duty Determination and Final Affirmative Determination of Critical Circumstances*, 83 FR 40748 (August 16, 2018), and accompanying IDM at 13.

Case: 22-2204  Document: 36-2  Page: 128  Filed: 04/11/2023  (116 of 156)
Case 1:21-cv-00173-bMG  Document 22-5  Filed 06/04/21  Page 22 of 56

Barcode:4091341-01 C-834-811 INV - Investigation -

The CIT noted that Commerce, in its rejection letter to Bebitz, explained that, because it was unable to respond to Bebitz's final extension request, that the response was thereby due no later than 8:30 a.m. the following business day, a deadline which Bebitz failed to meet.[92] Following an affirmative determination based on AFA, the CIT addressed Bebitz's arguments that Commerce should have accepted the untimely questionnaire response and calculated a subsidy rate using the information therein, as Bebitz argued that "Commerce should have accepted its submission because the need for an accurate CVD rate outweighs the need to strictly adhere to the statutory deadlines for the investigation."[93] The CIT agreed with Commerce that it had provided sufficient time to provide a timely response given the multiple extensions already provided to the respondent, and that it had advised Bebitz of the potential consequences of failing to meet Commerce's deadlines as part of its initial questionnaire.[94] The CIT cited Bebitz's failure to comply with Commerce's instructions, which resulted in Commerce's rejection of the untimely submission, while also criticizing Bebitz's claim that Commerce was required to accept its untimely filing on the basis that there was sufficient time for Commerce to consider the information therein before the preliminary determination.[95] The CIT stated specifically that "{i}t is not for Bebitz 'to establish Commerce's deadlines or dictate to Commerce whether and when Commerce actually needs the requested information.'"[96] The CIT found that Bebitz failed "to establish that Commerce abused its discretion or otherwise acted unlawfully in denying Bebitz's request for additional extensions," particularly where Commerce had already provided multiple extensions, while also noting that Commerce has substantial discretion pursuant to 19 CFR 351.302(b) to grant or deny an extension request.[97]

As in *Bebitz (CVD)*, in this investigation Commerce provided multiple extensions to TKS/TKT, and explained in the Initial Questionnaire the potential consequences of not meeting the deadlines established therein. Given the opportunities and warnings provided to TKS/TKT, Commerce did not abuse its discretion or otherwise act unlawfully in rejecting TKS/TKT's untimely-filed questionnaire response. Moreover, the CIT did not view the 8:30 a.m. deadline established in the *Final Rule* as a "mere discussion,"[98] as TKS/TKT described it, instead considering the 8:30 a.m. deadline as described in the *Final Rule* as part of the legal framework in which extension requests exist.[99] As such, we continue to decline to revisit our decision to reject TKS/TKT's untimely questionnaire response.

Regarding TKS/TKT's argument that Commerce may not rely on the incompleteness of its response when deciding this issue, we find that this argument is moot. As we explained in detail above, Commerce is continuing to base its determination to reject TKS/TKT's initial questionnaire response as untimely based on the lateness of the submission, rather than the content of the BPI version of the response. As noted in the First Rejection Letter, we rejected TKS/TKT's initial questionnaire response because "the initial questionnaire was not filed in its

---

[92] *See Bebitz (CVD)*, 433 F. Supp. at 1302.
[93] *Id.*, 433 F. Supp. at 1304.
[94] *Id.*
[95] *Id.*, 433 F. Supp. at 1305.
[96] *Id.* (citing *Dongtai Peak*, 777 F.3d at 1352).
[97] *Id.*, 433 F. Supp. at 1305-06.
[98] *See* TKS/TKT's Brief at 2.
[99] *See Bebitz (CVD)*, 433 F. Supp. 3d at 1304.

Case 1:21-cv-00173-bMG Document 36-2 Page 129 Filed 06/01/21 Page 129 of 156 (117 of 156)
Case: 22-2204 Document: 36-2 Page: 129 Filed: 04/14/2023

Barcode:4091341-01 C-834-811 INV - Investigation -

entirety by the time and date specified, or in accordance with the exception outlined in the {*Final Rule*}."[100] The First Rejection Letter makes clear that the absence of portions of the BPI submission only supplemented the fact that the submission was not filed in its entirety prior to either the stated 5:00 p.m. deadline or the 8:30 a.m. deadline provided for in the *Final Rule*. We noted in that letter that TKS/TKT's BPI submission was missing the business proprietary versions of Exhibits III-A-1 through III-A-8, and the beginning portion of Exhibit III-A-9, while the public versions of these particular files themselves were also untimely , again demonstrating that the questionnaire response was not filed "in its entirety" by the deadline, in accordance with 19 CFR 351.303(b)(1).[101] To be clear, our highlighting of TKS/TKT's deficient response had as much to do with the untimeliness of the accompanying public version than any documents missing from the BPI version of the submission. Moreover, in the *Preliminary Determination*, we did not rely on TKS/TKT's failure to provide a full version of the submission as a reason for its rejection; in fact, we did not reference it at all. We stated only that "TKS/TKT's failure to provide the requested information in a timely manner means that necessary information is not available on the record, and TKS/TKT has significantly impeded this proceeding."[102] As a consequence, TKS/TKT's claim is misplaced, as is its argument that Commerce could have requested that TKS/TKT submit the missing information as part of a deficiency questionnaire.

Finally, we disagree with TKS/TKT's characterization that Commerce has not decided the merits of TKS/TKT's extension request. Commerce's rejection of TKS/TKT's response from the record and the explanatory letters issued to TKS/TKT explaining this action represent a clear and direct response to TKS/TKT's September 15, 2020, extension request.[103]

### Comment 2: Whether the APA Supports Accepting the Company Respondents' Questionnaire Response

*TKS/TKT's Comments:*[104]

- The APA supports accepting TKS/TKT's questionnaire response. Because Commerce did not adopt the *Final Rule* as a regulation, the 8:30 a.m. deadline is not found in Commerce's regulations.
- Commerce's regulations at 19 CFR 351.302(b) cover extension requests filed after the deadline, which is not applicable to TKS/TKT's request, which was filed before the deadline. Commerce's regulations at 19 CFR 351.301(a) allow extensions of any deadline at any time and for any amount of time warranted.
- In *Glycine & More*, the CAFC found that Commerce's *2011 Notice*[105] regarding deadlines for withdrawing a request for an administrative review "represented an incompatible departure from the clear meaning of the {actual wording of the} regulation."[106] Commerce cannot rewrite its own regulations *via* a *Federal Register*

---

[100] *See* First Rejection Letter at 1-2.
[101] *Id.* at 1.
[102] *See Preliminary Determination* PDM at 6.
[103] *See* First Rejection Letter and Second Rejection Letter.
[104] *See* TKS/TKT's Brief at 15-17.
[105] *See Antidumping or Countervailing Duty Order, Finding, or Suspended Investigation; Opportunity To Request Administrative Review,* 76 FR 45773 (August 1, 2011) (*2011 Notice*).
[106] *See* TKS/TKT's Brief at 15 (citing *Glycine & More, Inc. v. United States,* 880 F.3d 1335, 1345 (Fed. Cir. 2018) (*Glycine & More*)).

notice. Allowing Commerce to do so "would be to permit the agency, under the guise of interpreting a regulation, to create *de facto* a new regulation."[107]

- If Commerce wishes to rewrite or amend a regulation, "such a regulation intended to have the force of law must be adopted with notice-and-comment rulemaking, which was absent here."[108]
- The CAFC affirmed in *Glycine & More* that, as the *2011 Notice* was intended to effectively rewrite the substantive meaning of the actual wording of the regulation without going through the necessary notice-and-comment rulemaking, it had no legal standing, and provided no basis upon which Commerce could make a decision. Further, the CAFC held that the only legally applicable standard with respect to deadlines for withdrawing a request for an administrative review was the one set out in 19 CFR 351.213(d)(1).
- In this investigation, Commerce's refusal to except TKS/TKT's questionnaire response is contrary to Commerce's actual regulations and the APA when it treats the *Final Rule* as a regulation.
- Further, the courts have found unlawful attempts by Commerce to apply undefined tests.[109] The *Final Rule* does not specifically state the time when it applies, in contrast to Commerce's other explicit time deadlines.

*Petitioners' Rebuttal:*[110]
- Although the grace period defined in the *Final Rule* is not codified in Commerce's regulations, the *Final Rule* was issued pursuant to the notice-and-comment rulemaking procedure required under the APA.
- TKS/TKT appears to confuse the *Final Rule* with the unrelated *2011 Notice* at issue in *Glycine & More* and *Diamond Sawblades*.[111]
- TKS/TKT failed to file its initial subsidy questionnaire response "in its entirety" by 8:30 a.m. on September 16, 2020, the next work day. Instead, TKS/TKT filed two parts of the BPI version of its response, and, with the exception of the narrative, all sections of the public version, after 8:30 a.m. on September 16, 2020.
- In its letter to TKS/TKT, Commerce noted that TKS/TKT did not complete the filing process "until 10:10 a.m., well after the grace period provided for in the {*Final Rule*}."[112]

**Commerce's Position:** We disagree with TKS/TKT that Commerce's *Final Rule* is not compliant with the APA. TKS/TKT relies on the CAFC's decision in *Glycine & More* for its assertion that Commerce cannot alter the meaning of its regulations without a proper notice-and-comment opportunity. In *Glycine & More*, the CAFC addressed the viability of the *2011 Notice*, which promulgated a rule that conflicted with the plain meaning of the regulation. The CAFC noted that the *2011 Notice* "represented an incompatible departure from the clear meaning of the regulation" and that the *2011 Notice* "was not simply an interpretive statement regarding the

[107] *Id.* at 16 (citing *Christensen v. Harris Cty.*, 529 US 576, 588 (2000) (*Christensen*)).
[108] *Id.* (citing *Christensen*, 529 US at 587-88).
[109] *Id.* at 17 (citing *National Steel Corp. v. United States*, 913 F. Supp. 593, 595 (CIT 1996)).
[110] *See* Petitioners' Rebuttal Brief at 8-9.
[111] *Id.* at 8 (citing *Diamond Sawblades Manufacturers' Coalition v. United States*, 301 F. Supp. 3d 1326, 1357 (CIT 2018) (*Diamond Sawblades*)).
[112] *Id.* at 9 (citing Second Rejection Letter).

ambiguity in the regulation or a general statement of policy."[113]  Notably, however, the CAFC stated "{i}f Commerce wished to rewrite or amend the regulation, such a regulation intended to have the force of law must be adopted with notice-and-comment rulemaking, which was absent here."[114]

The CAFC's holding in *Glycine & More* is not applicable to the *Final Rule*.  The *Final Rule* was the publication of Commerce's revision of its rule regarding requests for the extension of specific time limits applicable to submissions in AD/CVD proceedings, 19 CFR 351.302(c).  Importantly, the *Final Rule* was subject to the notice-and-comment requirements of the APA.  Specifically, Commerce published a *Federal Register* notice discussing its proposed rule change and requested comments from parties.[115]  Thus, in the *Final Rule* itself, Commerce noted that parties commented on how Commerce will treat untimely extension requests.[116]  As a result, Commerce clarified its position on the revised regulation, and provided further guidance on how the regulation would be interpreted regarding extension requests that are submitted so close to the deadline that Commerce is not able to respond to them, noting that "{p}arties should be aware that the likelihood of {Commerce} granting an extension will decrease the closer the extension request is filed to the applicable time limit because {Commerce} must have time to consider the extension request and decide on its disposition."[117]  The *Final Rule* gives further notice to parties that "if {Commerce} is not able to notify the party requesting the extension of the disposition of the request by 5:00 p.m., then the submission would be due by the opening of business (8:30 a.m.) on the next work day."[118]  Because the *Final Rule* was compliant with the APA, we find that TKS/TKT's arguments to the contrary are without merit.

## Comment 3:  Whether Commerce Should Apply FA Rather than AFA in Establishing the Countervailing Duty Rate

Following Commerce's decision to reject TKS/TKT's initial questionnaire response as untimely (*see* Comments 1 and 2), in the *Preliminary Determination* Commerce found that the application of AFA was warranted based on TKS/TKT's failure to provide the requested information within its control in a timely manner and because TKS/TKT had significantly impeded this proceeding.

*TKS/TKT's Comments:*[119]
- Adverse inferences are only permitted where there is substantial evidence that the respondent did not act to the best of its ability to answer.  In *Nippon Steel 2003*, the CAFC stated that "an adverse inference may not be drawn merely from a failure to respond... only under circumstances in which it is reasonable for {Commerce} to expect that more forthcoming responses should have been made; *i.e.*, under circumstances in which it is reasonable to conclude that less than full cooperation has been shown."[120]

---

[113] *See Glycine & More*, 880 F.3d at 1345.
[114] *Id.*
[115] *See Modification of Regulation Regarding the Extension of Time Limits*, 78 FR 3367 (January 16, 2013).
[116] *See Final Rule*, 58 FR at 57792.
[117] *Id.*
[118] *Id.*
[119] *See* TKS/TKT's Brief at 28.
[120] *Id.* (citing *Nippon Steel 2003*, 373 F.3d at 1381).

Case 1:21-cv-00173-LMG   Document 30-2   Filed 06/04/21   Page 24 of 56
Case: 22-2204   Document: 30-2   Page: 88   Filed: 04/14/2023   (120 of 156)

Barcode:4091341-01 C-834-811 INV - Investigation -

- Even if Commerce rejects a submission as untimely, the courts and Act state that "more is required... before an adverse inference may be drawn."[121]  Commerce has not met this standard. and, thus, it should base TKS/TKT's final subsidy rate on FA.
- TKS/TKT acted to the best of its ability under the circumstances, fully responding to Commerce's questionnaire and requesting a one-day extension to file that submission with Commerce. Commerce unlawfully never decided the extension request.
- TKS/TKT based its extension request on how much more time it required at that point and why, and it premised the request on the need to address technical document issues to make the filing.

*Petitioners' Rebuttal:*[122]
- Commerce properly determined that application of total AFA is warranted under section 776 of the Act because "TKS/TKT failed to cooperate by not acting to the best of its ability to comply with a request for information."[123]
- TKS/TKT prevented itself from complying with the deadline when it decided to wait until shortly before the deadline to submit its extension request, even though TKS/TKT's counsel did not receive the final part of the questionnaire response until 10:58 a.m. on the deadline due date.
- Because TKS/TKT was aware of the deadline for the initial questionnaire response and had the opportunity to file an earlier extension request that Commerce could timely consider, TKS/TKT's failure to submit an earlier request or to timely file a complete response "indicates an inattentiveness or carelessness with regard to its obligations" that warrants the application of AFA.[124]
- TKS/TKT also failed to cooperate to the best of its ability by not submitting the information that was missing from its response once it realized its allegedly inadvertent error.

**Commerce's Position:**  Under section 776(a) of the Act, Commerce shall apply "facts otherwise available" if: (1) necessary information is not on the record; or (2) an interested party or any other person (A) withholds information that has been requested, (B) fails to provide information within the deadlines established, or in the form and manner requested by the Department, subject to subsections (c)(1) and (e) of section 782 of the Act, (C) significantly impedes a proceeding, or (D) provides information that cannot be verified as provided by section 782(i) of the Act. Further, section 776(b) of the Act provides that Commerce may use an adverse inference in applying the facts otherwise available when a party fails to cooperate by not acting to the best of its ability to comply with a request for information.  In selecting a rate for AFA, Commerce selects a rate that is sufficiently adverse "as to effectuate the purpose of the facts available rule to

---

[121] *Id.* (citing *Nippon Steel Corp. v. United States*, 118 F. Supp. 2d, 1366, 1377 (CIT 2000) (*Nippon Steel 2000*); *Nippon Steel 2001*, Slip Op 01-52 at 10-15; *Acciai Speciali Terni, S.p.A v. United States*, 120 F. Supp. 2d 1101, 1104 (CIT 2000); *F. Lli De Cecco Di Filippo Fara San Martino S.p.A. v. United States*, 980 F. Supp. 485 (CIT 1997)).
[122] *See* Petitioners' Rebuttal Brief at 19-20.
[123] *Id.* at 19 (citing *Preliminary Determination* PDM at 6).
[124] *Id.* at 19-20 (citing *Dongtai Peak*, 777 F.3d at 1356; *Bebitz (CVD)*, 433 F. Supp. 3d at 1308 (affirming Commerce's application of AFA); *Bebitz (AD)*, 433 F. Supp. 3d at 1327-29 (same)).

induce respondents to provide Commerce with complete and accurate information in a timely manner."[125]

We continue to find that the application of FA is warranted with respect to TKS/TKT, based on the company's failure to respond to the Initial Questionnaire in a timely manner, such that information necessary to this investigation is not on the record, and that this action has significantly impeded this proceeding. Moreover, we also affirm our findings from the *Preliminary Determination* that TKS/TKT failed to cooperate by not acting to the best of its ability to comply with a request for information, and that adverse inferences are, therefore, warranted under section 776(b) of the Act to determine whether TKS/TKT received a benefit, and the amount of that benefit, for each program under investigation.[126] TKS/TKT was fully aware of the established deadlines in this case, as evidenced by its multiple extension requests, and was advised of the potential consequences of failing to provide the information requested in the Initial Questionnaire in a timely manner, including the potential application of AFA.[127]

Moreover, TKS/TKT's counsel has practiced before Commerce in multiple proceedings over many years and was aware of the need to file any extension requests as soon as he suspected additional time may have been necessary, so as to ensure that Commerce was fully able to consider such requests. Although TKS/TKT's counsel maintains that he intended to file an entire response that he had received from his client at 10:58 a.m. that morning before the 5:00 p.m. deadline,[128] he did not do so. Instead, counsel belatedly filed an extension request at 3:50 p.m., too late for Commerce to consider the request and respond in writing, and without making any other effort to alert the Commerce officials conducting this investigation of its filing issues. Accordingly, we find that TKS/TKT was aware of its responsibilities to meet the established deadline, but nonetheless failed to submit its documents in a timely manner. As a result, Commerce, consistent with its practice, determines that TKS/TKT failed to cooperate by not acting to the best of its ability to comply with a request for information. The fact that TKS/TKT "put forth *some* effort is not inconsistent with Commerce's conclusion that {the respondent} failed to act 'to the *best* of its ability.'"[129]

Further, we disagree with TKS/TKT's interpretation of *Nippon Steel 2000*. Selectively quoting *Nippon Steel 2000*, TKS/TKT argues that "more is required…before an adverse inference may be drawn"[130] and that an untimely questionnaire submission does not equal a failure to cooperate. However, in *Nippon Steel 2000*, the CIT stated:

> At a minimum, Commerce must find that a respondent could comply, or would have had the capability of complying if it knowingly did not place itself in a condition where it could not comply. Commerce must also find either a willful decision not to comply or behavior below the standard for a reasonable respondent. Insufficient attention to statutory duties under

---

[125] *See Notice of Final Determination of Sales at Less Than Fair Value: Static Random Access Memory Semiconductors from Taiwan*, 63 FR 8909, 8932 (February 23, 1998).

[126] *See Preliminary Determination* PDM at 6.

[127] *See* Initial Questionnaire, Cover Letter at 3.

[128] *See* TKS/TKT's Brief at 6; *see also* TKS/TKT's Request for Reconsideration at 2.

[129] *See Bebitz (CVD)*, 433 F. Supp. 3d at 1308 (emphasis in original).

[130] *See* TKT's Brief at 28 (citing *Nippon Steel 2000*, 118 F. Supp. 2d at 1377).

the unfair trade laws is sufficient to warrant adverse treatment. It implies an unwillingness to comply or reckless disregard of compliance standards. Commerce must be in a position to compel meaningful attention to and compliance with its requests.[131]

Here, TKS/TKT could have complied if it had submitted its initial questionnaire response by the established deadline or made an extension request early enough for Commerce to be able to give it full consideration. We do not believe that our decision to apply AFA in this case is inconsistent with the facts discussed in *Nippon Steel 2000*.

TKS/TKT's failure to submit its questionnaire response by the deadline led to the absence of record evidence necessary to determine whether TKS/TKT benefited from the subsidies under investigation, impeded Commerce's ability to investigate the subsidies at issue, and demonstrated TKS/TKT's failure to cooperate to the best of its ability, which warrants the application of AFA.

Additionally, in *Nippon Steel 2003*, which the respondent also cites, the CAFC explained that for a party to comply with Commerce's request to the best of its ability, it must:

> . . . put forth its maximum effort to provide Commerce with full and complete answers to all inquiries in an investigation. While the standard does not require perfection and recognizes that mistakes sometimes occur, it does not condone inattentiveness, carelessness, or inadequate record keeping.[132]

The CAFC goes further, noting that the focus of section 776(a) "is a respondent's *failure to provide information*. The reason for the failure is of no moment. The mere failure of a respondent to furnish requested information – for any reason – requires Commerce to resort to other sources of information to complete the factual record on which it makes its determination" (emphasis in original).[133] The CAFC continues, "{section 776(b) of the Act} permits Commerce to 'use an inference that is adverse to the interests of {a respondent} in selecting from among the facts otherwise available,' only if Commerce makes the separate determination that the respondent 'has failed to cooperate by not acting to the best of its ability to comply.' The focus of subsection (b) is respondent's *failure to cooperate to the best of its ability*..."[134]

We determine that TKS/TKT did not put forth the "maximum effort" required of it. TKS/TKT retained and was represented by experienced trade counsel throughout the entirety of this proceeding, and, therefore, had the ability to understand Commerce's requests for information at the time such requests were issued. In addition, it was TKS/TKT's responsibility to provide complete and accurate information to Commerce so that we could analyze and determine the amount of any benefits received under the programs being investigated. The "failure to provide information" in a timely manner lies with TKS/TKT. As the CAFC held in *Maverick Tube*, it is the responsibility of Commerce, and not the responsibility of a respondent, to analyze and

---

[131] *See Nippon Steel 2000*, 118 F. Supp. 2d at 1379 (citations omitted).

[132] *See Nippon Steel 2003*, 337 F. 3d at 1373 and 1382.

[133] *Id.*, 337 F. 3d at 1381.

[134] *Id.*

determine if a benefit exists, and if it does, to determine the amount of benefit received.[135] Moreover, given TKS/TKT's retention of experience counsel, TKS/TKT's inability to comply with the instructions in the Initial Questionnaire to contact Commerce officials in case of difficulty filing a submission, to file an extension request early enough to consider it, or to file a complete response by 8:30 a.m. the following business day in accordance with the *Final Rule* is inexplicable, and evidence of the respondent's failure to act to the best of its ability.

Finally, it is well established that applying adverse inferences is not intended as a punitive measure, but rather is intended "to encourage future cooperation and ensure that a respondent does not obtain a more favorable {AD/CVD} rate by failing to cooperate."[136] Therefore, for this final determination, Commerce continues to find that the application of AFA to TKS/TKT is warranted in establishing the final subsidy rate, is supported by evidence on the record, and is in accordance with Commerce's practice under sections 776(a) and (b) of the Act.

**Comment 4:   Whether the Petitioners' Allegations of a Conflict-of-Interest Warrants the Application of FA Rather than AFA**

In September 2020, the petitioners requested that the Commerce disqualify and require immediate withdrawal from this proceeding of TKS/TKT counsel due to a direct and ongoing conflict of interest because the firm represented the petitioners' parent company in the previous investigation of silicon metal exports by TKT.  Commerce concluded that there was no ongoing conflict of interest because the two CVD investigations of silicon metal from Kazakhstan are not substantially related, and because the petitioners did not demonstrate that TKS/TKT could improperly use any information provided by the petitioners to TKS/TKT's counsel.[137]

*TKS/TKT's Comments:*[138]
- Commerce was aware of the petitioners' request that TKS/TKT's counsel be disqualified, which added confusion to the investigation at a critical time.  Commerce did not settle the issue until 28 days later, after the deadline for TKS/TKT's questionnaire response.
- The petitioners' claims regarding a conflict of interest diverted significant resources from questionnaire preparation and eliminated the safety margin for filing delays caused by unanticipated events.  Where a petitioner itself interferes in an investigation process, Commerce takes corrective action, including not applying AFA to a respondent.[139]
- The CAFC will vacate adverse margins determined by Commerce when Commerce does not consider "how the procedural irregularities" and "mitigating circumstances" in a proceeding affected respondent's "level of culpability" so that an AD/CVD margin is "not unduly punitive."[140]  For example, in *BMW*, the CAFC faulted Commerce for failing

---

[135] *See Maverick Tube Corp. v. United States*, 857 F.3d 1353, 1360-61 (Fed. Cir. 2017) (*Maverick Tube*); *see also Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea:  Final Affirmative Countervailing Duty Determination and Final Negative Critical Circumstances Determination*, 82 FR 16341 (April 4, 2017), and accompanying IDM.
[136] *See Mukand, Ltd. v. United States*, 767 F.3d 1300, 1307 (Fed. Cir. 2014).
[137] *See* Memorandum, "Silicon Metal from the Republic of Kazakhstan:  Representation of Tau-Ken Temir LLP by Squire Patton Boggs," dated October 6, 2020 (Disqualification Memorandum).
[138] *See* TKS/TKT's Brief at 29-40.
[139] *Id.* at 30 (citing *Stainless Steel Wire Rod from Taiwan*, 63 FR 40461, 40464 (July 29, 1998)).
[140] *Id.* (citing *BMW v. United States*, 926 F. 3d 1291, 1302 (Fed. Cir. 2019) (*BMW*).

to address "unique factual circumstances" surrounding the respondent's failure to submit a questionnaire response in determining the appropriateness of the selected AD/CVD margin.[141]

- It is always within the discretion of an administrative agency to relax or modify its procedural rules when the ends of justice require it.[142] The petitioners' interference in the investigation is a procedural irregularity, providing mitigating circumstances where the ends of justice support remedial action.

- A week prior to the due date for the submission of TKS/TKT's questionnaire response, the petitioners claimed that TKS/TKT's counsel and firm had a conflict of interest arising from their prior representation of TKS/TKT that precluded them from participating in the investigation, and that counsel should be immediately disqualified. This meritless claim seriously disrupted the questionnaire response process.

- The petitioners relied on *Makita*[143] as support for their claim; however, *Makita* holds that Commerce itself does not decide conflict of interests,[144] evidencing that the petitioners acted in bad faith. Further, although the petitioners first made their conflict claim directly to TKS/TKT's counsel, and counsel alerted them to their error, the petitioners continued to make the same baseless claims to Commerce. This can only be interpreted as an attempt to wrongly interfere in a Commerce investigation, and particularly in the questionnaire response process. Indeed, the petitioners failed to indicate any error in Commerce's ultimate determination that no conflict of interest was present, indicating that their claim was not legitimate.

- As a result of the petitioners' filing, the claims had to be fully addressed internally by TKS/TKT, its cross-owned companies, and the GOK, all of which were unfamiliar with the investigation process, and further diverting attention from the questionnaire response. The impact of the petitioners' filing was magnified at a time when COVID-19 prevented personal meetings to address such claims.

- Companies are hard-pressed to provide timely responses as it is, and days, hours, or even minutes can make a critical difference as to extremely tight deadlines. Commerce's rejection of TKS/TKT's response as untimely indicates that even 1.5 hours are significant.

- Prior to Commerce declaring that there was no conflict of interest, TKS/TKT, its cross-owned companies, and the GOK were all unclear if TKS/TKT had counsel, or if that counsel could be relied upon for advice. If TKS/TKT's counsel in fact had a conflict of interest, as the petitioners claimed, then TKS/TKT, its cross-owned companies, and the GOK would have needed to immediately seek out and discuss the preparation of their responses with other independent counsel.

- High adverse CVD rates are intended to induce respondent cooperation; here, however, imposing high adverse CVD rates encourages a petitioner to interfere in an investigation.

---

[141] *Id.* (citing *BMW*, 926 F. 3d at 1302; and *Ball Bearings and Parts Thereof from Japan and United Kingdom: Final Results of Antidumping Duty Administrative Reviews; 2010-2011*, 80 FR 4248 (January 27, 2015), accompanying IDM at 9).

[142] *Id.* (citing *DuPont Teijin Films v. United States*, 931 F. Supp. 2d 1297 (CIT 2013) (citing *American Farm Lines v. Black Ball Freight Service*, 397 U.S. 532, 539 (1970))).

[143] *Id.* (citing *Makita v. United States*, 819 F. Supp. 1099 (CIT 1993) (*Makita*)).

[144] *Id.* (citing *Makita*, 819 F. Supp. at 1101-02 and 1106-08).

Commerce should not be indifferent to such interference and should quickly act to provide a remedy, and especially when it is unclear whether the respondent has counsel.

- Commerce has held elsewhere that a petitioner's interference in an investigation supports non-adverse margins.

*Petitioners' Rebuttal:*[145]

- The petitioners' conflict of interest claim cannot excuse TKS/TKT's failure to submit a complete and timely response to the Initial Questionnaire.
- The petitioners did not interfere with the investigation by raising an allegedly bad faith and frivolous conflict of interest allegation before Commerce. In contrast, the petitioners' submissions to Commerce demonstrate the good faith basis for the claim.
- The petitioners acknowledge Commerce's determination with respect to its request to disqualify TKS/TKT's counsel, and do not seek to relitigate it in the final determination.
- Commerce should reject TKS/TKT's spurious claim, which is a last-ditch attempt by TKS/TKT to excuse its untimely and incomplete subsidy questionnaire response by reassigning blame for TKS/TKT's counsel's own professional miscalculations and poor judgment. The petitioners' claim has no bearing on TKS/TKT's failure to submit a complete and timely response to the initial questionnaire.
- Commerce was not required to grant an extension based on the conflict issue "on its own initiative" as TKS/TKT suggests.[146] TKS/TKT could, and should, have requested an additional extension, submitted early enough to provide Commerce sufficient time to consider it, if TKS/TKT was confused about its counsel's role or needed more of a "safety margin" to prepare and file the initial questionnaire response. Indeed, Commerce properly found that "if petitioners' claims interfered with TKS/TKT's ability to prepare and timely submit a response to Commerce's initial questionnaire, TKS/TKT should have requested additional time to respond."[147]
- TKS/TKT's decision to not submit an earlier extension request in light of the conflict of interest issue was either a deliberate strategic choice or an error in judgment by TKS/TKT or its counsel, and TKS/TKT must bear the consequences.
- Rule 11 of the Federal Rules of Civil Procedure "imposes an affirmative duty on attorneys to certify that they have conducted a reasonable inquiry and determined that any papers filed with the court are well-grounded in fact, legally tenable and not interposed for any improper purpose.[148] Rule 11 also requires any party submitting written submissions to represent that such filings are not being presented for any improper purpose, such as to harass, or delay a proceeding, that the claims made therein are not frivolous, and that factual contentions or denials thereof are supported by evidence. An analogous duty to comply with Rule 11 exists with respect to submissions to Commerce.[149]
- The petitioners' filing easily satisfies the Rule 11 standard, including providing citations to court decisions (*i.e.*, *Makita*), as well as in-depth legal and factual analysis that directly

[145] *See* Petitioners' Rebuttal Brief at 31-36.
[146] *Id.* at 32 (citing TKS/TKT's Brief at 29).
[147] *Id.* at 32 (citing Second Rejection Letter).
[148] *Id.* at 33 (citing *Wire Rope Imps. Ass'n v. United States*, 18 C.I.T. 478, 481 (May 26, 1994) (citing *Cooter & Gell v. Hartmarx Corp.*, 496 US 384, 393 (1990))).
[149] *Id.* at 33 (citing *e.g.*, *PAM, S.P.A. v. United States*, 582 F.3d 1336, 1339 (Fed. Cir. 2009)).

addressed TKS/TKT's responses. The petitioners did not present the claim for an improper purpose, and instead sought to avoid unnecessary delay, harassment, or costs by discreetly presenting the matter to TKS/TKT's counsel at the outset of the investigation, despite having no ethical obligation to do so. By first addressing its concerns directly to TKS/TKT's counsel, the petitioners afforded TKS/TKT's counsel additional time to respond to the issue.

- The petitioners did not file the request for disqualification with Commerce until it became clear that TKS/TKT's counsel would not act and only after multiple consultations with the D.C. Bar's legal ethics counsel and the District of Columbia Court of Appeals Office of Disciplinary Counsel.
- It was not improper to the petitioners to raise the conflict of interest claim before Commerce, as the CIT has expressly recognized Commerce's "plenary authority and responsibility to supervise professional conduct," including restricting access to documents under an administrative protective order.[150] TKS/TKT itself has acknowledged Commerce's authority to supervise professional conduct in the context of its unsubstantiated and irrelevant antitrust allegations. TKS/TKT cannot claim that Commerce should handle matters involving professional conduct and then argue against issues involving such conduct from being presented to Commerce.
- The fact that Commerce determined that no ongoing conflict of interest exists does not mean that the conflict of interest claim was frivolous or made in bad faith. An action is frivolous where the factual contentions are baseless or when the claim is based on an indisputably meritless legal theory.[151] The petitioners' conflict of interest claim here is not "clearly baseless" or "based on an indisputably meritless legal theory," as the petitioners have presented ample legal and evidentiary support for the claim.
- The CAFC has held that there was no evidence of bad faith litigation or frivolous arguments even where the underlying substance of the defense lacked merit.[152] Commerce has never characterized the allegation as "clearly baseless" or "indisputably meritless," and instead merely stated that "Commerce does not find that an ongoing conflict of interest exits."[153]
- Commerce rejected TKS/TKT's repeated allegations of bad faith and "sham" claims, having denied TKS/TKT's requests to terminate the investigation on this basis. TKS/TKT undermines its own claim in this regard, acknowledging that Commerce took nearly a month to review, examine, and assess the issue. A "clearly baseless" or "indisputably meritless" claim would not have required the time or expertise TKS/TKT describes.

**Commerce's Position:** As noted above, in September 2020, the petitioners alleged that TKS/TKT's counsel had a conflict of interest in representing TKS/TKT in this investigation due to his prior representation of one of the petitioners in an International Trade Commission (ITC) proceeding involving silicon metal from Kazakhstan. After analyzing this claim, Commerce

---

[150] Id. at 34-35 (citing Makita, 819 F. Supp. at 1104).
[151] Id. at 35 (citing Nance v. Kelly, 912 F.2d 605, 606 (2nd Cir. 1990) (per curium) (quoting Neitzke v. Williams, 490 US 319, 327 (1989) (Neitzke))).
[152] Id. at 35-36 (citing DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc., 567 F.3d 1314, 1339 (Fed. Cir. 2009)).
[153] Id. at 36 (citing Disqualification Memorandum).

issued the Disqualification Memorandum, finding that TKS/TKT's counsel was not acting inappropriately in representing TKS/TKT in this proceeding.

In the Disqualification Memorandum, we drew an analogy to the situation underlying the decision in *GEO Specialty*, involving a petitioner's attempt to disqualify its former counsel from representing a respondent in a subsequent and separate proceeding.[154] The CIT found in that case that a lawyer who recurrently handled a type of problem for a former client was not precluded from later representing another client in a wholly distinct problem of that type, even though the subsequent representation involves a position adverse to the prior client.[155] The CIT also noted that the petitioner in that case failed to explain how the information learned in the representation of GEO Specialty might be useful to the two Chinese companies involved in that proceeding or impact the new shipper review.[156] Based on these findings, in the Disqualification Memorandum, we stated that:

> Commerce does not find that an ongoing conflict of interest exists because the two CVD investigations of silicon metal from Kazakhstan are not substantially related. Based on the findings in *GEO Specialty*, the current investigation must be treated as a separate matter, irrespective of the fact that it covers the same subject matter, as the time periods of the investigations are not contemporaneous, the investigations are before different agencies, and because the petitioner has not demonstrated that TKT can make any improper use of any information provided by the petitioner to Squire Patton Boggs.[157]

For the reasons stated in the Disqualification Memorandum, and based on the petitioners' desire not to reopen this issue,[158] we continue to find that there is no basis for disqualifying TKS/TKT's counsel from representing the company in this investigation.

The remaining question before us is whether the petitioners impermissibly interfered with TKS/TKT's preparation and submission of its initial questionnaire response. We find no evidence that the petitioners' allegation of a conflict of interest interfered with the respondent's ability to respond to Commerce's Initial Questionnaire in a timely manner. The record simply does not support this conclusion. Commerce issued its Initial Questionnaire to TKS/TKT on July 23, 2020, with a response due 39 days later, on August 31, 2020. Commerce subsequently extended this deadline twice at the request of TKS/TKT, for a total of 15 additional days to respond to the initial questionnaire.[159] While TKS/TKT maintains that it had only one week to consider and respond to the petitioners' claims, information on the record clearly indicates that the petitioners first raised their concerns directly with TKS/TKT's counsel on August 13, 2020, more than a month before TKS/TKT's response to the Initial Questionnaire was due.[160] The

---

[154] *See* Disqualification Memorandum (citing *GEO Specialty Chem., Inc. v. Husisian*, 951 F. Supp. 2d 32, 42 (D.D.C. 2013) (*Geo Specialty*)).

[155] *Id.*

[156] *Id.* (citing *Geo Specialty*, 951 F. Supp. 2d 32, 43).

[157] *Id.* at 3.

[158] *See* Petitioners' Rebuttal Brief at 31; *see also* Petitioners' Letter, "Silicon Metal from Kazakhstan: Response to Tau-Ken Temir LLP's Request to Terminate the Investigation," dated October 16, 2020, at 2.

[159] *See* First TKS/TKT Extension; *see also* Second TKS/TKT Extension.

[160] *See* Request to Disqualify at Exhibit 1.

31

petitioners' submission indicates that both parties were in subsequent communication regarding this issue,[161] and that TKS/TKT's counsel provided a direct response to the petitioners, dated August 27, 2020,[162] which closely parallels its response to the petitioners' submission to Commerce on this issue on September 17, 2020.[163] TKS/TKT clearly had several weeks to consider this issue prior to the petitioners' raising it before Commerce, as well as to discern the status of its counsel.

The petitioners requested that Commerce disqualify TKS/TKT's counsel on September 8, 2020, two days before TKS/TKT's initial questionnaire was due to be submitted.[164] The following day, on September 9, 2020, TKS/TKT submitted its second request that the due date for the Initial Questionnaire be extended.[165] In its extension request, TKS/TKT cited as the following reasons for its need for additional time: (1) Commerce's additional information requests regarding TKS/TKT affiliates; (2) the affiliation supplemental questionnaire response it had filed the previous day; (3) the scope of the reporting burden; (4) the unfamiliarity of personnel with the response process; and (4) difficulties stemming from COVID-19 quarantine requirements.[166] Notably, TKS/TKT did not reference any additional burden placed upon it by the petitioners' submission of the previous day, nor any uncertainty regarding the role of counsel vis-à-vis TKS/TKT. Nor did TKS/TKT claim that the petitioners' submission had any deleterious effect on its ability to timely submit its response to the Initial Questionnaire on the revised due date, September 15, 2020.[167] Further, following Commerce's rejection of TKS/TKT's initial questionnaire response as untimely, TKS/TKT similarly failed to argue that the petitioners interfered in its response preparation process as part of its October 2, 2020, reconsideration request.[168] In that letter, TKS/TKT merely notes that its counsel only received the complete questionnaire response at 10:58 a.m. on the date the submission was due.[169] Thus, the record does not support TKS/TKT's contentions.

TKS/TKT is not precluded from now claiming that the petitioners' request for disqualification hindered its ability to submit a timely questionnaire response. However, the weight of the record evidence leads us to conclude that this request did not hinder TKS/TKT's submission of its response in a timely manner. At the time the petitioners' submission, the due date for TKS/TKT's initial questionnaire response was only two days away. It would be unreasonable to expect that Commerce could have reached a decision regarding the disqualification of TKS/TKT's counsel before the due date for the questionnaire response (even after the subsequent extension of five additional days). As such, we find it difficult to understand why TKS/TKT or its counsel would divert significant resources from the preparation of the questionnaire response to respond to the petitioners' disqualification submission, especially since much of the argument had already been prepared and communicated to the petitioners in

---

[161] *Id.* at Exhibits 2 and 3.
[162] *Id.* at Exhibit 3.
[163] *See* TKS/TKT's Technical Issues Letter.
[164] *See* Request to Disqualify.
[165] *See* TKS/TKT's Letter, "Silicon Metal From Kazakhstan," dated September 9, 2020.
[166] *Id.*
[167] *See* Third TKS/TKT Extension Request.
[168] *See* TKS/TKT's Request for Reconsideration.
[169] *Id.*

August.[170]  Nor is it clear why, in only a one-week period, TKS/TKT and its counsel would be rendered uncertain as to whether their attorney-client relationship would continue, or why this would affect the efficacy of their efforts to prepare and submit a timely questionnaire response, particularly where, as TKS/TKT argues, *Makita* stands for the proposition that Commerce does not decide conflict-of-interest matters.  In summary, we find that no evidence that the petitioners' claim overly burdened TKS/TKT, preventing it from submitting its initial questionnaire response in a timely manner, or otherwise prejudicing its due process in this investigation.

## Comment 5:  Whether Petitioners' Allegations of a Conflict-of-Interest Create an Actionable Violation of Antitrust Laws

*TKS/TKT's Comments:*[171]

- Commerce should not operate in an AD/CVD silo and allow itself to undermine U.S. competition law.  Under antitrust case law based on the First Amendment to the U.S. Constitution, private entities are immune from liability under the antitrust laws for attempts to influence enforcement of laws, even if such enforcement would produce anticompetitive effects.
- First Amendment rights supersede U.S. antitrust laws; however the "sham exception" to the *Noerr-Pennington* doctrine holds that the petitioning process *via* sham claims to achieve an anticompetitive result destroys that immunity.[172]  Here, the petitioners made sham claims of a conflict of interest at time-sensitive points in the questionnaire process to disrupt it.  The resultant 120 percent AFA margin is contrary to U.S. competition laws.
- In the previous CVD investigation of silicon metal from Kazakhstan, the ITC questioned one of the petitioner's anti-competitive practices, insinuating that that petitioner was participating in anticompetitive behavior.  Further, one of the petitioners, Globe, previously unsuccessfully defended against an antitrust violation in conjunction with an AD/CVD action that led to the termination of the action.[173]
- The ITC would be unlikely to accept a margin with clear anticompetitive effect, such as the rate applied in the *Preliminary Determination*, which resulted as a result of the petitioners' misconduct.
- The petitioners would have Commerce enable a violation of antitrust law and act at cross-purpose with other parts of the U.S. government, which is especially troublesome given the recent surge in U.S. antitrust enforcement in recognition of the pernicious drag of anticompetitive practices on the U.S. economy and where the U.S. Administration and Congress have recently pushed the Commission in particular in this regard.[174]

---

[170] *See* Disqualification Letter at Exhibit 3.

[171] *See* TKS/TKT's Brief at 40-42.

[172] *Id.* at 41 (citing *California Motor Transport v. Trucking Unlimited*, 404 US 508 (1972) (*California Motor Transport*)).

[173] *Id.* at 42 (citing *Elkem Metals Co., American Alloys, Inc., Applied Industrial Materials Corp. CC Metals & Alloys and Globe Metallurgical Inc. v. United States*, Slip Op. 03-66 (CIT 2003).

[174] *Id.*  We note that TKS/TKT cites to several articles not on the record of this investigation in support of this contention.  As these materials themselves are not on the record, we do not address TKS/TKT's argument on this matter.

*Petitioners' Rebuttal:*[175]

- Commerce should disregard TKS/TKT's antitrust allegation, which is both unsubstantiated and inapplicable here.  In conjunction with its tactic to allege a "sham" conflict of interest claim, TKS/TKT pursues this wholly irrelevant legal avenue to shift blame for its own shortcomings with respect to its submissions in this investigation.

- TKS/TKT's brief contains new and untimely submitted factual information in contravention of 19 CFR 351.301(c), and should be rejected.

- The First Amendment protects "the right of the people… to petition the Government for a redress of grievances."  Petitioning the government of the United States is protected from antitrust scrutiny under the *Noerr-Pennington* doctrine, which establishes that antitrust and other civil claims may not be based on activity associated with petitioning the government.[176]  Such immunity from antitrust laws also extends to petitioning federal agencies such as Commerce.[177]

- TKS/TKT wrongly suggests that the limited "sham" exception to *Noerr-Pennington* immunity applies here.  The Supreme Court has "carved out only a narrow exception for 'sham' litigation" to the *Noerr-Pennington* doctrine.[178]  "Under the sham exception, activity 'ostensibly directed toward influencing governmental action' does not qualify for *Noerr {Pennington}* immunity if it 'is a mere sham to cover… an attempt to interfere directly with the business relationships of a competitor.'"[179]

- To qualify as a "sham," a plaintiff must demonstrate that petitioning activity is "objectively baseless in the sense that no reasonable litigation could realistically expect success on the merits" and that it "conceals an attempt to interfere *directly* with the business relationships of a competitor through the 'use {of} the government *process* – as opposed to the *outcome* of that process – as an anticompetitive weapon.'"[180]  A plaintiff "must have brought baseless claims in an attempt to thwart competition (*i.e.*, in bad faith)."[181]

- TKS/TKT's claim that the petitioners' request to disqualify gives rise to the sham exception fundamentally misreads the law.  TKS/TKT needs to show that this proceeding, *i.e.*, the CVD investigation as a whole, "is a mere sham to cover… an attempt to interfere directly with the business relationship of a competitor."[182]  TKS/TKT has not made such a claim, instead focusing on a single procedural filing with the larger substantive administrative proceeding, and, as a result, its argument should be rejected out of hand.

---

[175] *See* Petitioners' Rebuttal Brief at 37-40.

[176] *Id.* at 37-38 (citing *E.R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 US 127 (1961) (*Noerr*), and *United Mine Workers v. Pennington*, 381 US 657 (1965) (*Pennington*)).

[177] *Id.* at 38 (citing *California Motor Transport*, 404 US at 510-11 (finding that the petition protection afforded under *Noerr* generally extends to administrative and judicial proceedings, and to efforts to influence executive and legislative action)).

[178] *Id.* (citing *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 US 545, 556 (2014) (*Octane Fitness*)).

[179] *Id.* (citing *Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus.*, 508 US 49, 51 (1993) (*Real Estate Investors*) (quoting *Noerr*, 365 US at 144).

[180] *Id.* at 38-39 (citing *Real Estate Investors*, 508 US at 60-61 (1993) (quoting *City of Columbia v. Omni Outdoor Adver., Inc.*, 499 US 365, 380 (1991)) (emphasis in original)).

[181] *Id.* at 39 (citing *Octane Fitness*, 572 US at 556).

[182] *Id.* (citing *Noerr*, 365 US at 144).

- TKS/TKT does not and cannot satisfy the two-prong test for the narrow "sham" exception. TKS/TKT fails to establish the triggering mechanism for the test, because the conflict of interest claim is not "objectively baseless," and is instead based on well-grounded law and fact resulting from a reasonable inquiry conducted by the petitioners.
- Even if TKS/TKT satisfied the first factor of the "sham" exception process, it fails to meet the second factor, because it cannot demonstrate that the petitioners raised the conflict of interest issues for anticompetitive purposes. The petitioners have no anticompetitive purpose or intent, but merely wish to petition Commerce in the context of a CVD investigation as the Act allows.

**Commerce's Position:** TKS/TKT's argument that Commerce is enabling the petitioners to violate antitrust laws by virtue of entertaining the merits of the petitioners' Disqualification Letter is unsubstantiated.

The *Noerr-Pennington* doctrine states that the Petition Clause of the First Amendment of the United States Constitution prohibits imposing liability under the Sherman Act for attempting to persuade the legislature or the executive to take particular action.[183] It protects those who petition administrative agencies through immunity from liability for their petitioning conduct.[184] The petitioners made an argument that a conflict of interest existed here, but, as discussed in Comment 4 above, we found that no conflict of interest existed. It was an argument provided to the agency on the basis of facts and law as the petitioners understood it, and we do not disagree with the petitioners that, at minimum, those facts and arguments have at least a passing relevance to this CVD investigation of silicon metal from Kazakhstan. While the legal and economic standards for antitrust investigations do not normally govern or pertain to Commerce's practices and procedures in an investigation, under the *Noerr-Pennington* doctrine we agree that parties have the right to make good faith arguments based on relevant facts and law.[185]

Furthermore, as the petitioners have argued, with respect to the "sham exception," to qualify as a "sham," a party must demonstrate that petitioning activity is "objectively baseless in the sense that no reasonable litigation could realistically expect success on the merits" and that it "conceals an attempt to interfere *directly* with the business relationships of a competitor through the 'use {of} the government *process* – as opposed to the *outcome* of that process – as an anticompetitive weapon.'[186] When the petitioners alleged that TKS/TKT's counsel had a conflict of interest in representing TKS/TKT in this investigation due to his prior representation of one of the petitioners in an ITC proceeding involving silicon metal from Kazakhstan, although Commerce determined, as noted above, that no conflict existed, that does not mean that the petitioners' allegation was, in any case, a "sham." Indeed, Commerce prepared and issued an entire Disqualification Memorandum to address the issue because the concerns raised by petitioners unquestionably had merit and justified a thorough and comprehensible analysis by the agency.

---

[183] *See E.R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961) (*Noerr*); *see also United States Workers v. Pennington*, 381 U.S. 657 (1965).

[184] *See California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972).

[185] *See, e.g., Certain Softwood Lumber Products from Canada: Final Results of the Countervailing Duty Administrative Review, 2017-2018*, 85 FR 77163 (December 1, 2020), and accompanying IDM at 70.

[186] *Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus*, 508 U.S. 49, 60-61 (1993) (citing *City of Columbia v. Omni Outdoor Advert, Inc.*, 499 U.S. 365, 380 (1991)).

35

We, therefore, strongly disagree that such an allegation was "objectively baseless" or that the petitioners in no way could have expected a different result from Commerce.

In truth, the petitioners' claims in this regard had merit, but for the reasons we have explained above, it is acceptable for TKS/TKT's counsel to represent his client in this proceeding. That being said, there is zero merit in TKS/TKT's claim that raising this issue and making it part of this investigation creates antitrust concerns. Accordingly, we determine that there are no concerns about antitrust violations as a result of the petitioners' claims in this regard as alleged by TKS/TKT.

**Comment 6:  Whether the Petitioners' Alleged Violation of a Confidentiality Agreement Warrants the Application of FA Rather than AFA**

*TKS/TKT's Comments:*[187]
- Commerce should not enable violations of confidentiality agreements and undermine its mandate to promote U.S. business abroad. Commerce has an interest to coordinate internally as to its other missions to promote U.S. trade and business abroad and a desire that confidentiality agreements be sacrosanct.
- In the previous CVD investigation of silicon metal from Kazakhstan, TKS/TKT documented that one of the petitioners and its counsel impermissibly used BPI obtained by the petitioner from TKS/TKT under a non-disclosure joint venture agreement as the basis for its prior CVD petition, and the petitioners admitted that they had done so.
- The petition in this investigation relied on the fruits of the petitioners' prior impermissible conduct, citing Commerce's public statements regarding that prior investigation subsidy findings, *i.e.*, findings based on AFA, to support the CVD petition in this investigation.
- The petitioners have been silent with regard to this fraud and do not deny it, particularly where false certifications would risk criminal liability.
- The petitioners are attempting to have Commerce sacrifice its principles to allow prohibitive trade-stopping CVD rates that have nothing to do with any actual subsidies.

*Petitioners' Rebuttal:*[188]
- TKS/TKT has provided no support for its allegation that the petitioners relied on BPI obtained under a non-disclosure joint venture agreement as the basis for the CVD petition in this investigation. Neither of the submissions referenced by TKS/TKT mention this issue or even contain an attachment.
- The petition in this investigation was based entirely on publicly available information, citing Commerce's public findings in the prior CVD investigation of silicon metal from Kazakhstan, which were based on AFA.
- In the previous CVD investigation, Commerce applied AFA based on TKS/TKT's failure to provide CVD questionnaire responses on behalf of two of its cross-owned companies, as well as the GOK's failure to provide information about the electricity for LTAR

---

[187] *See* TKS/TKT's Brief at 42-44.
[188] *See* Petitioners' Rebuttal Brief 40-42.

program.[189] Commerce made no reference to any violation of a non-disclosure agreement in the preliminary or final determination or accompanying decision memoranda.

- To the extent that TKS/TKT may be attacking Commerce's findings in the previous CVD investigation, TKS/TKT's assertion is improper and must fail.
- As there is no support for TKS/TKT's allegation of a non-disclosure agreement violation on the record of this investigation, and the petition was based entirely on public information, there was no basis or need for the petitioners to address that allegation in a factual submission, accompanied by company certifications, as TKS/TKT suggests.

**Commerce's Position:** In its Request to Terminate letter, TKS/TKT requested that Commerce terminate this investigation based, in part, on claims that one of the petitioners, Globe, improperly relied on information obtained from TKS as part of a potential joint venture agreement under a non-disclosure agreement. This information, TKS/TKT alleges, forms a basis for the petition underlying this investigation, as well as the previous CVD investigation of silicon metal from Kazakhstan.[190] In support of its allegation, TKS/TKT included as an attachment to its Request to Terminate letter a submission made to Commerce in the previous CVD investigation, dated June 16, 2017.[191] This letter includes allegations that the petition in the previous CVD investigation, as well as an additional AD/CVD proceeding brought in Canada, relied on BPI and documents obtained *via* the potential joint venture between TKS and Globe.[192] As part of these allegations, the June 16, 2017, letter to Commerce references several documents contained in the petition for the previous CVD investigation and the Canadian proceeding related to Globe's use of information obtained in violation of its confidentiality agreement with TKS.[193]

As an initial matter, Commerce addressed TKS/TKT's Request to Terminate in a memorandum dated October 6, 2020, declining to terminate the investigation.[194] With respect to TKS/TKT's allegation that the petition underlying this investigation stems from impermissible conduct by the petitioners, we continue to find that the information on the record does not support such a conclusion. TKS/TKT's June 16, 2017, letter, as an attachment to TKS/TKT's Request to Terminate, makes several references to the petition in the previous CVD investigation of silicon metal from Kazakhstan, as well as a contemporaneous AD/CVD proceeding in Canada.[195] However, the documents related to those proceedings that are referenced by TKS/TKT are not on the record of this investigation. Nor is the information purportedly obtained by Globe from TKS as part of the attempted joint venture. With this information missing from the record, it is impossible for Commerce to render a judgment that the petitioners acted inappropriately in bringing the present action.

---

[189] *Id.* at 41 (citing *Silicon Metal from the Republic of Kazakhstan: Final Affirmative Countervailing Duty Determination*, 83 FR 9831 (March 8, 2018) (*Silicon Metal from Kazakhstan*), and accompanying IDM at 5-6.
[190] *See* Request to Terminate at 3.
[191] *Id.* at Attachment.
[192] We note that, while the existence of a non-disclosure agreement and potential joint venture were bracketed as BPI in the June 16, 2017, letter, the existence of these documents as the basis of its allegation is publicly referenced in TKS/TKT's Request for Reconsideration.
[193] *See* Request to Terminate at Attachment.
[194] *See* Disqualification Memorandum.
[195] *See* Request to Terminate at Attachment.

Finally, we do not find TKS/TKT's argument that the petitioners or their counsel admitted wrongdoing with respect to their actions in the previous investigation persuasive. TKS/TKT seems to rely on the attachments to its June 16, 2017, letter in making this point, specifically stating in that letter that "one could not imagine a more damning reply as to these transgressions than provided by the USA Petitioner Globe's own counsel"[196] in the exhibits thereto. However, these exhibits contain no admission of wrongdoing, nor a particularly "damning reply," given that the petitioners' counsel in the previous CVD investigation merely stated in response to TKS/TKT's counsel that "{t}he allegations in Globe's petition that Tau-Ken Temir is receiving countervailable subsidies are supported by extensive evidence from public sources" and that "{TKT} has publicly acknowledged the accuracy of the information in the petition in its own submissions to the {Commerce}."[197] Thus, we find no merit to TKS/TKT's arguments, and we continue to find no basis to terminate this investigation.

**Comment 7: Whether the AFA Rate Applied in the Preliminary Determination is Warranted**

In the *Preliminary Determination*, Commerce applied an AFA rate of 20 percent to six programs that were preliminarily found to be countervailable, resulting in a total preliminary subsidy rate of 120 percent.

*TKS/TKT's Comments:*[198]
- Commerce's AFA margin has no basis in reality and is contrary to law. Congress, through the Act, requires the corroboration of adverse inference rates, and "clearly intended that such rates should be reasonable and have some basis in reality."[199]
- "Commercial reality" and "accurate" have been found to "represent reliable guideposts for Commerce's" application of AFA.[200] There is no basis that the 120 percent rate applied in the *Preliminary Determination* is reasonable, accurate, or at all reflects reality, and as such it is contrary to law.
- Commerce should not impose capital punishment, *i.e.*, effective exclusion from the U.S. market, for a minor infraction, particularly whereas here Commerce has yet not decided on TKS/TKT's timely one-day extension request.

*Petitioners' Rebuttal:*[201]
- Commerce properly followed the applicable law and its practice regarding the selection of the AFA rates in the *Preliminary Determination*, and it should continue to do so in the final determination.
- The 120 percent AFA subsidy rate reflects the aggregate of program-specific rates that Commerce properly selected pursuant to section 776(d) of the Act and its established hierarchy.

---

[196] *Id.* at page 2 of the Attachment.
[197] *Id.* at Exhibit 3 of the Attachment.
[198] *See* TKS/TKT's Brief at 40.
[199] *Id.* (citing *F.Lii de Cecco di Filippo Fara S. Martino S.p.A. v. United States*, 216 F.3d 1027, 1034 (Fed. Cir. 2000); and *BMW*, 926 F.3d at 1300 (quoting *Gallant Ocean (Thailand) Co. v. United States*, 602 F.3d 1319, 1323 (Fed. Cir. 2010)).
[200] *Id.* (citing *Papierfabrik Aug. Koehler SE v. United States*, 843 F.3d 1373, 1380-81 (Fed. Cir. 2016)).
[201] *See* Petitioners' Rebuttal Brief at 45-50.

- In the *Preliminary Determination*, Commerce properly calculated and applied an AFA rate to TKS/TKT for the Corporate Income Tax Exemption program for companies located in an SEZ equal to Kazakhstan's standard corporate income tax rate of 20 percent. Commerce applied an adverse inference that TKS/TKT paid no income tax during the POI by virtue of its location in the SEZ, and, therefore, the highest benefit TKS/TKT could have received from the Corporate Income Tax Exemption program was 20 percent.
- Commerce also applied that 20 percent rate as the AFA rate for each of the other programs that it found to be countervailable because that rate reflects the highest – and only – above-*de minimis* rate calculated for any subsidy program in a Kazakhstan CVD proceeding that TKS/TKT's industry could conceivably use, consistent with Commerce's AFA hierarchy. In the final determination, Commerce should again apply 20 percent program-specific AFA rates for all countervailable subsidy programs.
- Neither the program-specific AFA rates, which were based on primary information, nor the aggregate AFA rate, need be corroborated, and TKS/TKT has not argued that the AFA rate is uncorroborated.
- Section 776(c) of the Act only requires that corroboration when Commerce "relies on secondary information rather than on information obtained in the course of an investigation." In the *Preliminary Determination*, Commerce properly relied only on primary information obtained during the course of this investigation from the GOK to determine the subsidy rates and therefore need not corroborate this information.
- Even when corroboration is required, "the statute's corroboration requirement is program-specific," and there is no requirement to corroborate the aggregate subsidy rate.[202]
- The total AFA rate need not, as TKS/TKT argues, rely on commercial reality, as that requirement has since been superseded by statute, which now explicitly states that Commerce "is not required… to demonstrate that the countervailable subsidy rate… reflects an alleged commercial reality of the interested party."[203]
- All of the cases that TKS/TKT cites to support its argument involved proceedings that began before the Act was revised in 2015 and, thus, are inapplicable because the law has changed. Consistent with the current law, Commerce need not estimate what TKS/TKT's countervailable subsidy rate would have been if it had cooperated with this investigation or demonstrate that TKS/TKT's countervailable subsidy rate reflects reality.
- TKS/TKT's total AFA rate is not unduly punitive. TKS/TKT makes a false equivalence between "capital punishment" and "effective exclusion from the U.S." market.
- The application of total AFA is warranted based on TKS/TKT's and the GOK's failures to cooperate to the best of their ability because TKS/TKT failed to submit a complete and timely initial subsidy questionnaire response, and the GOK failed to respond to the ILV Questionnaire.
- TKS/TKT's counsel was well aware of the potential consequences of failing to submit a complete and timely questionnaire response. Although TKS/TKT made a late afternoon one-day extension request, TKS/TKT's failure to request an earlier extension was deliberate – either a strategic choice or an error in judgment.

---

[202] *See* Petitioners' Rebuttal Brief at 47 (citing *POSCO v. United States*, 296 F. Supp. 3d 1320, 1352 n.47 (CIT 2018) (*POSCO*)).

[203] *Id.* at 48 (citing *POSCO*, 296 F. Supp. 3d at 1352).

- Commerce properly calculated TKS/TKT's total AFA rate as the aggregate of program-specific rates that were properly calculated and applied in accordance with the Act and Commerce's established AFA hierarchy, the same as it had in the prior CVD investigation of silicon metal from Kazakhstan.
- The prior CVD investigation put TKS/TKT on notice that its failure to provide information requested by Commerce could trigger total AFA and how Commerce would select the program-specific AFA rates and, thus, what its likely total AFA rate would be.

**Commerce's Position:** We disagree with TKS/TKT that the subsidy rate selected by Commerce in the *Preliminary Determination* was inappropriate because it had no basis in reality or was otherwise contrary to law. On the contrary, Commerce explained in detail how it applies its CVD hierarchy in selecting from available rates when applying AFA in a CVD investigation.[204] In particular, we noted that the 20 percent rate applied to Corporate Income Tax Exemption program was the highest above-*de minimis* rate used for any non-company-specific program in a CVD case involving the same country that the company's industry could conceivably use, and for which we preliminarily found that there is a financial contribution and that the benefit was specific.[205] This remains true in the final determination. The 20 percent rate selected for the income tax program at issue remains the highest rate available on the record, and forms the basis of the rate for each of the eight programs Commerce has found to be countervailable in this final determination, resulting in a total subsidy rate of 160 percent *ad valorem* for TKS/TKT and all other producers/exporters in Kazakhstan.

Furthermore, we agree with the petitioners that it is not necessary for Commerce to corroborate the information relied on to establish the AFA rate or to consider the commercial reality of an interested party. Section 776(c) of the Act states that whenever Commerce "relies on secondary information rather than on information obtained in the course of an investigation… {Commerce} shall, to the extent practicable, corroborate that information from independent sources…" The Act mandates that Commerce corroborate only secondary information, rather than "information obtained in the course of an investigation," *i.e.*, primary information, such as the tax rate applicable to the Corporate Income Tax Exemption program which was provided by the GOK as part of this investigation.[206] As this tax rate is not secondary information, it need not be corroborated. Further, section 776(d)(3)(b) of the Act, which states that it is not necessary for Commerce, when applying AFA, "to demonstrate that the countervailable subsidy rate or dumping margin used by the administering authority reflects an alleged commercial reality of the interested party," remains applicable to this final determination as well. As a result, we need not consider whether the final subsidy rate applied in this final determination reflects the commercial reality of TKS/TKT.

---

[204] *See Preliminary Determination* PDM at 7-8.
[205] *Id.* at 8.
[206] *See* Letter from the GOK, "Countervailing Duty Questionnaire Response," dated September 9, 2020 (GOK IQR), at Exhibit CITI.

Barcode:4091341-01 C-834-811 INV - Investigation -

**Comment 8:   Whether Commerce Should Rely on Information Provided by the Government of Kazakhstan in Determining the Countervailability of Programs**

*GOK's Comments:*[207]
- The GOK timely provided detailed answers, with all relevant supporting documents, to Commerce's initial and supplemental questionnaires.  Notwithstanding all the information provided and the effort the GOK made to cooperate in the investigation, Commerce preliminary determined that countervailable subsidies are being provided to producers and exporters of silicon metal in Kazakhstan and calculated the estimated countervailable subsidy rates based on AFA.
- Given that the GOK's information is available on the record, according to section 776 of the Act, Commerce should determine the estimated countervailable subsidy rates upon this information on the record instead of applying AFA.
- The application of AFA in the *Preliminary Determination* violates both World Trade Organization (WTO) and U.S. law.
- Commerce ignored the GOK's responses regarding corporate income tax, customs duties, electricity provision, and debt forgiveness.  Commerce did not take into account the fact that TKT[208] did not receive any corporate income tax reductions during the POI due to the absence of taxable income or that there is no customs duty exemption program for the SEZ members.
- The GOK proved that TKS/TKT has paid customs duties in accordance with the established procedure for the SEZ members, according to which imported goods are not exempt from duties but are temporarily placed until being exported to the territory of Kazakhstan or other countries.
- Also, the SEZ in which TKS/TKT is located does not provide its members with any kind of preferences for electricity; thus, there is no program providing electricity for LTAR.
- There is no debt forgiveness program.
- Programs that do not exist cannot be incorporated into the final subsidy rate.

*TKS/TKT's Comments:*[209]
- In the GOK's initial questionnaire response, the GOK answered Commerce's subsidy questionnaire as to any subsidies provided to TKT and its cross-owned companies, providing Commerce with the information pertinent to its subsidy analysis.
- Commerce issued a supplemental questionnaire to the GOK two months later, despite section 782(d) of the Act requiring a "prompt" issuance of a deficiency questionnaire. Either Commerce believes that the GOK's initial questionnaire response did not have any deficiencies, or that two months is prompt.
- Either the GOK initial questionnaire response was complete, or TKS/TKT's 1.5 hour response delay in filing its questionnaire response was not significant.
- Commerce's *Preliminary Determination* indicated that the GOK's questionnaire responses were irrelevant as to Commerce's treatment of TKS/TKT.  By this and other

---

[207] *See* GOK's Case Brief at 3-4.
[208] We note that the GOK limited its arguments to TKT.
[209] *See* TKS/TKT's Brief at 26-28.

Commerce actions, there was no point for the GOK thereafter to answer further questions, such as questions in the verification questionnaire. Commerce should blame itself for creating a situation where the GOK would not pointlessly respond to the verification questionnaire.

- The courts reject Commerce's use of AFA where it does not achieve its objective to deter non-compliance.[210] The CAFC has stated that "an adverse inference may not be drawn merely from a failure to respond… only under circumstances in which it is reasonable for Commerce to expect that more forthcoming responses should have been made."[211] Given its own actions, Commerce should have expected no response because, for the GOK, cooperation was futile.[212]

- The courts reject any view that Commerce can impose adverse inferences on a company respondent for the questionnaire response actions of its government.[213]

*Petitioners' Rebuttal to the GOK:*[214]

- Commerce cannot rely on the information submitted by the GOK because that information is unverifiable and deficient. The information submitted by the GOK does not and cannot provide a basis for determining whether or the extent to which TKS/TKT and its cross-owned affiliates received countervailable subsidies because it cannot be verified due to the GOK's failure to cooperate with Commerce's verification. Commerce should apply AFA based on the GOK's failure to cooperate, consistent with established case law.

- The GOK's unverifiable questionnaire responses also lack information that is necessary for Commerce's subsidy analysis. The GOK completely ignored and failed to respond to Commerce's ILV Questionnaire, an act which alone justifies the application of AFA.

- The ILV Questionnaire explicitly requested specific information regarding three programs under investigation, the Provision of Electricity for LTAR, the Provision of Water for LTAR, and the Provision of Drainage Services for LTAR, in order for Commerce to verify whether those programs provided countervailable subsidies.

- The GOK's failure to provide the requested information means that the information that the GOK previously submitted in its questionnaire responses cannot be verified, thus establishing an independent basis for the application of AFA.

- In the ILV Questionnaire, Commerce expressly warned the GOK if the requested information was not received, it may apply AFA. Consistent with its warning to the GOK and section 776 of the Act, Commerce should conclude that the GOK has not cooperated to the best of its ability in this proceeding and apply total AFA, or at least apply AFA to conclude that the three LTAR programs discussed in the ILV Questionnaire are countervailable.

- The application of FA is warranted because necessary information relevant to whether the programs are countervailable is not on the record, and the GOK has withheld and failed

---

[210] *Id.* at 27 (citing Cf. *Olympic Adhesives v. United States*, Court No. 89-1367 (Fed. Cir. 1990)).
[211] *Id.* (citing *Nippon Steel 2003*, 373 F.3d at 1381).
[212] *Id.* at 27-28 (citing *San Martino*, 980 F. Supp. at 485).
[213] *Id.* at 28 (citing *Clearon Corp. v. United States*, 474 F. Supp. 3d 1339 (CIT October 8, 2020) (*Clearon*); and *Guizhou Tyre Co. v. United States*, 415 F. Supp. 3d 1402, 1405 (CIT 2019) (*Guizhou Tyre*)).
[214] *See* Petitioners' Rebuttal Brief at 20-22.

Case 1:21-cv-00173-LMG Document 36-2 Page 31 Filed 06/01/21 Page 43 of 56
Case: 22-2204 Document: 36-2 Page: 36 Filed: 04/11/2023 (139 of 156)

Barcode:4091341-01 C-834-811 INV - Investigation -

to provide information that was requested by Commerce, significantly impeded the proceeding, and provided information about those programs that cannot be verified.

- The application of AFA is warranted because the GOK failed to cooperate by not acting to the best of its ability to comply with Commerce's requests for information.

*Petitioners' Rebuttal to TKS/TKT:*[215]

- The courts have rejected TKS/TKT's argument that Commerce cannot impose AFA on a company respondent for the actions of its government.[216] In *Fine Furniture II*, the CAFC upheld Commerce's application of AFA based on a government's failure to respond regarding a program, which adversely affected the company respondent's subsidy rate, noting that "on its face, the statute authorizes Commerce to apply adverse inferences when an interested party, including a foreign government, fails to provide the requested information."[217]
- The CAFC also noted in *Fine Furniture II* that "a remedy that collaterally reaches {the company respondent} has the potential to encourage the {government respondent} to cooperate so as not to hurt its overall industry,"[218] and "{a}lthough it is unfortunate that cooperating respondents may be subject to collateral effects due to the adverse inferences applied when a government fails to respond to Commerce's questions, this result is not contrary to the statute or its purposes, nor is it inconsistent with this court's precedent."[219]
- The cases cited by TKS/TKT did not hold that Commerce could never impose adverse inferences affecting a company respondent based on a foreign government's actions; rather, they addressed Commerce's factual findings regarding a specific program not relevant here, *i.e.*, the Export Buyer's Credits provided by the Government of China.
- In *Clearon* and *Guizhou Tyre*, the CIT rejected Commerce's findings because Commerce did not adequately explain why it could not verify non-use of the program at issue in light of the government's failure to provide the requested information.[220]
- In *RZBC*, the CIT applied *Fine Furniture II*, recognizing that "Commerce has authority to apply AFA when, as here, a government is uncooperative but a respondent is cooperative."[221]
- As in *Fine Furniture II* and *RZBC*, adverse inferences are warranted based on the foreign government's failure to cooperate with the proceeding. There is no verifiable information on the record regarding the subsidy programs under investigation in light of the GOK's failure to cooperate to the best of its ability here, and there is no information on the record from TKS/TKT regarding the subsidies under investigation because Commerce properly rejected TKS/TKT's incomplete and untimely initial questionnaire response.

---

[215] *See* Petitioners' Rebuttal Brief at 22-25.
[216] *Id.* at 22 (citing *Fine Furniture (Shanghai) Ltd. v. United States*, 748 F.3d 1365, 1371 (Fed. Cir. 2014) (*Fine Furniture II*); and *RZBC Group Shareholding Co. v. United States*, 222 F. Supp. 3d 1196, 1208 (CIT 2017) (*RZBC*)).
[217] *Id.* at 23 (citing *Fine Furniture II*, 748 F.3d at 1371).
[218] *Id.* (citing *Fine Furniture II*, 748 F.3d at 1373).
[219] *Id.*
[220] *Id.* at 24 (citing *Clearon*, 474 F. Supp. 3d at 1349-54; and *Guizhou Tyre*, 415 F. Supp. 3d at 1403-05).
[221] *Id.* (citing *RZBC*, 222 F. Supp. 3d at 1208-09 (citing *Fine Furniture II*, 748 F.3d at 1372)).

- The application of AFA based on the GOK's failure to cooperate is even less problematic here than in *Fine Furniture II* or *RZBC* because TKS/TKT is not a cooperating respondent.
- Contrary to TKS/TKT's claim that Commerce is to blame for the GOK's failure to respond to the ILV Questionnaire, there is no indication that Commerce would not consider the GOK's responses. In the *Preliminary Determination*, Commerce found that two programs, the Provision of Water for LTAR and the Provision of Drainage System Services for LTAR, were not countervailable based on information the GOK provided in its questionnaire responses.[222]
- In its ILV Questionnaire, Commerce asked for additional information to verify whether those two programs, as well as the Provision of Electricity for LTAR program, are countervailable. Given Commerce's findings in the *Preliminary Determination*, there is every indication Commerce would have considered the GOK's response to the ILV Questionnaire and made appropriate findings regarding the LTAR programs in the final determination if the GOK had submitted the response.
- The GOK's failure to respond to the ILV Questionnaire means that the information the GOK previously submitted in its questionnaire responses cannot be verified. Commerce should therefore apply AFA to conclude that the three LTAR programs are countervailable and to determine the subsidy rates for these programs.
- The GOK's unverifiable questionnaire responses do not contain all of the information necessary to determine whether and the extent to which TKS/TKT benefited from the subsidies under investigation.
- There were numerous significant deficiencies in the GOK's initial questionnaire response, resulting in the need for Commerce to issue a supplemental questionnaire to the GOK.
- Commerce cannot rely on the GOK's responses as a substitute for TKS/TKT's responses for other reasons as well. The GOK's questionnaire responses failed to provide information about any subsidies to three of TKS/TKT's cross-owned companies, GRES-2, KEGOC, and KazSilicon. The GOK's questionnaire responses also do not contain any information about the free-on-board (FOB) sales values of TKT, TKS, or their cross-owned companies, which would serve as the denominator in the subsidy rate calculations. Such sales information would have to come from the companies themselves and are not available on the record.
- Contrary to TKS/TKT's claim that there are no subsidies, the GOK's initial questionnaire response indicates that TKS/TKT benefits from at least some of the subsidy programs under investigation, namely, the property tax exemption program and the land tax and land use fee exemption.[223] However, the GOK did not provide the information necessary to determine the extent to which TKS/TKT benefited from those programs.
- The information provided by the GOK regarding TKS/TKT's use of the Corporate Income Tax Exemption program was not usable, as Commerce specifically asked the GOK to provide information regarding deductions from taxable income or other tax benefits on the tax return filed during the POI.

---

[222] *Id.* at 25 (citing *Preliminary Determination* PDM at 18).
[223] *Id.* at 28 citing GOK IQR at 10-11, 14-15, 17-18, 22.

- The record contains no evidence of the extent to which TKS/TKT could or did export goods on which customs duties were deferred under the Customs Duty Exemption from the Saryarka SEZ to the territory of Kazakhstan or other countries.
- Commerce, therefore, properly drew the adverse inference "that TKS/TKT did not export goods to the customs territory of Kazakhstan or other countries, and that any customs duties owed on any goods imported into the SEZ are still deferred within the meaning of 19 CFR 351.510(a)(2)." Commerce treated these deferrals of customs duties "as a contingent liability interest-free loan" in accordance with 19 CFR 351.510(a)(2) and 351.505(d), and drew the adverse inference "that the event upon which the repayment depends, *i.e.* the export of the goods from the SEZ, is not viable, and . . . therefore, treat{ed }the deferred customs duties as grants in accordance with 19 CFR 351.505(d)(2)."[224]
- The GOK failed to provide significant information necessary for Commerce to determine and verify whether the three LTAR programs are countervailable and the extent to which TKT and its cross-owned companies may have benefited from such programs, such as responses to the Standard Questions Appendix with respect to these programs.
- Necessary information regarding the debt forgiveness benefit that TKS/TKT received is missing from the record, and Commerce correctly concluded in the *Preliminary Determination* that the program provided a benefit to TKS/TKT.

**Commerce's Position:** We disagree with the GOK and TKS/TKT that the information submitted by the GOK as part of its initial questionnaire response and supplemental questionnaire response is sufficient to find the programs at issue not used by the mandatory respondents or their cross-owned companies, or, alternatively, to find that these programs were used by TKS/TKT and to establish the subsequent AFA rate.

In certain situations, Commerce has relied on a government's response where a company respondent failed to cooperate. For example, in *Lined Paper from India*, Commerce used information in the Government of India's (GOI's) response in making its findings because AR Printing & Packaging India Pvt. Ltd., a mandatory respondent, did not respond to Commerce's questionnaire.[225] Specifically, we assumed, as AFA, that the respondent received a countervailable benefit in all instances in which the reported information in the GOI's response indicated that a program was specific and constituted a financial contribution.[226] In *CTL Plate from Indonesia*, Commerce also relied on some of the information submitted in the Government of Indonesia's questionnaire response to address financial contribution and specificity even when Krakatau Steel, a mandatory respondent, failed to respond to Commerce's questionnaires.[227] In

---

[224] *Id.* at 29-30 citing *Preliminary Determination* PDM at 14.
[225] *See Certain Lined Paper Products from India: Final Results of Countervailing Duty Administrative Review; Calendar Year 2010*, 78 FR 22845 (April 17, 2013) (*Lined Paper from India*), and accompanying IDM at "Summary."
[226] *Id.*
[227] *See Final Affirmative Countervailing Duty Determination: Certain Cut-to-Length Carbon-Quality Steel Plate from Indonesia*, 64 FR 73155, 73156 (December 29, 1999) (*CTL Plate from Indonesia*), where Commerce discussed that "… Krakatau failed to respond to any of {Commerce's} questionnaires. The GOI provided some, although not

*Warmwater Shrimp from Malaysia*, Commerce determined it was appropriate to rely on the
Government of Malaysia's (GOM's) response in lieu of a company's response with regard to
provincial or regional programs when applying AFA in certain instances. Specifically, we found
that, with respect to such programs, when the GOM could "demonstrate through complete,
verifiable, positive evidence that non-cooperating companies (including all their facilities and
cross-owned affiliates) are not located in the provinces whose subsidies are being investigated,"
Commerce would not apply an AFA rate for such programs.[228] Conversely, for similar reasons
we find TKS/TKT's reliance on *Clearon* and *Guizhou Tyre* inapposite. In both of these cases,
the CIT rejected Commerce's finding that necessary information regarding the program was
missing from the record, which is a predicate for the application of AFA. As the CIT found that
there was other evidence on the record that the cooperating respondents did not use the program,
it found that Commerce did not adequately explain why it could not verify non-use of the
program in light of the Government of China's failure to provide the requested information.[229]

In the instances referenced above, the respective governments provided responses that included
useable information about, and specific to, non-cooperating company respondents. This is in line
with Commerce's general practice regarding CVD investigations, wherein we rely on
information provided by governments to determine whether a financial contribution exists under
section 771(5)(D) of the Act and whether any benefit provided by the program under
investigation is specific under section 771(5A) of the Act. Conversely, in examining whether the
final element of a subsidy exists, *i.e.*, benefit, Commerce typically examines information
provided by the company respondents that produce and/or export the goods in question. In the
case of benefit, Commerce does not limit its analysis to the mere receipt of assistance from an
authority. The receipt of such assistance is only one part of our subsidy analysis, as additional
information is required to reach a conclusion that assistance provides any benefit. Specifically,
Commerce requires additional information from company respondents to perform this analysis,
comparing the value of that assistance to the company's sales in order to calculate a subsidy rate.
Moreover, this analysis may, in the case of non-recurring subsidies, take account of several
years' worth of assistance, as well as corresponding sales data and supporting documentation
used in the analysis.

Considering Commerce's practice as described above, the information provided by the GOK is
lacking in certain respects. First, while the GOK stated affirmatively in its responses that certain
programs were not used by TKS/TKT, its responses were not inclusive of every cross-owned
company for which Commerce requested a response from TKS/TKT. Instead, the GOK limited

---

all, of the information requested about Krakatau. In the Preliminary Determination, relying upon section 782(e) of
the Act, {Commerce} the Department determined that based on the GOI's submission of some data, the
administrative record was not so incomplete that it could not serve as a reliable basis for reaching a preliminary
determination. Therefore, {Commerce} used the GOI's data where possible, *i.e.*, {Commerce} relied on
information provided by the GOI to reach a preliminary determination that Krakatau had not used the Rediscount
Loan Program and Tax Holiday Program. {Commerce} only resorted to the facts otherwise available in those
instances where data necessary for the calculation of Krakatau's subsidy rate was missing.… In addition, …
{Commerce} determined that in those instances when resort to facts available was necessary, the use of an adverse
inference was warranted under section 776(b) of the Act because {Commerce} determined that Krakatau failed to
cooperate by not acting to the best of its ability in complying with requests for information in this investigation."
[228] *See Certain Frozen Warmwater Shrimp from Malaysia: Final Affirmative Countervailing Duty Determination*,
78 FR 50381, August 19, 2013 (*Warmwater Shrimp from Malaysia*), and accompanying IDM at 29.
[229] *See Clearon* at 474 F. Supp. 3d at 1349-54; *see also Guizhou Tyre*, 415 F. Supp. 3d at 1403-05.

its responses to three companies within the TKS/TKT group, TKS, TKT, and SM, the three companies TKS/TKT identified in its initial questionnaire response as needing to provide a full questionnaire response.[230] However, Commerce did not limit its investigation to these companies, instead expanding the universe of companies for which we required information and requesting that TKS/TKT provide full questionnaire responses to include GRES-2, KEGOC, and KazSilicon.[231] We did not specifically request additional information regarding these companies from the GOK because their additional responses would not affect the financial contribution or specificity information for which we would rely on the GOK's response. This is appropriate, because while the GOK may declare a program used or not used, our analysis is not reliant on the GOK's responses alone. As we explained in Comment 1, above, part of the intention of applying adverse inferences is to induce cooperation from company respondents by ensuring that they do not receive more favorable treatment than if they had not cooperated fully. In Comment 1, we further explained our finding that TKS/TKT failed to act to the best of its ability in providing a timely-filed questionnaire response. It therefore stands to reason that it would be inappropriate to ignore our AFA precedent by concluding that TKS/TKT did not use a program, despite failing to provide a timely questionnaire response. To the extent that the GOK provided statements that programs were not used by TKS, TKT, or SM, the three companies referenced in the GOK's response, this information is not enough to conclude that the other TKS/TKT companies from which we requested full questionnaire responses did not use the programs under investigation. Finding cross-ownership among several companies with TKS/TKT, we concluded that these programs were used and attributable to TKS/TKT in the *Preliminary Determination*.[232] Moreover, given our finding that the information provided by the GOK is unverifiable, we cannot rely, as we did in the *Preliminary Determination*, on the GOK's statements that it did not provide water or drainage services for LTAR in the Saryarka SEZ.

While we find that the GOK's provision of some information regarding some of the companies cross-owned with TKS/TKT does not preclude us from finding that these programs were used by TKS/TKT and its cross-owned companies, and that benefits were attributable to the group as a whole, we also take note that, even if we were to rely solely on the information provided by the GOK, there is not enough information on the record to calculate an actual benefit other than the AFA rate applied in the *Preliminary Determination*. That is because the information provided by the GOK does not include the denominator portion of the information needed to conduct a benefit calculation, the sales of TKS/TKT and its cross-owned companies. For instance, we note that, while the GOK provided TKT's tax return filed in 2020,[233] any assistance identified therein is exclusive of aid provided to TKS/TKT's cross-owned companies, covers the wrong time period, and includes no sales information that we could use to establish a denominator. Such sales information is usually sourced from, and reconciled to, a company's financial statements. While the GOK did provide several years of financial statements from TKT, from 2014 through 2017, and this information could be useful in the context of examining a nonrecurring subsidy, in this case, these financial statements are deficient in several respects because there is no information from the POI, the financial statements exclude TKS/TKT's cross-owned companies, and because financial statements form only the starting point for a company respondent's

---

[230] *See* TKS/TKT's Letter, "Silicon Metal From Kazakhstan," dated August 6, 2020, at 9.

[231] *See* First Affiliation Supplemental Questionnaire; *see also* Second Affiliation Supplemental Questionnaire.

[232] *See Preliminary Determination* PDM at 6-7 and 10.

[233] *See* GOK IQR at Exhibit CITl.

reported sales figures. Companies generally do not just report gross sales as listed in their financial statements, but instead provide adjusted figures that account for FOB sales, domestic and export sales, and the removal of inter-company sales.

Nor are we persuaded by the GOK's arguments that the information it provided regarding the provision of electricity for LTAR, the exemption from customs duties, and debt forgiveness programs demonstrates that these programs are not countervailable. With respect to the provision of electricity for LTAR, the GOK argues that the Saryarka SEZ does not provide preferential prices on electricity.[234] However, as we stated in the *Preliminary Determination*, our finding that the GOK provides a financial contribution is based on the fact that "{i}n the case of the Saryarka SEZ, where TKT is located, 'Managing company of the Saryarka special economic zone' JSC (MC SEZ Saryarka) is registered in the state register of natural monopoly entities in the Karaganda region for the provision of services for the transmission of electrical energy"[235] and that "{t}he GOK identified the ultimate owner of MC SEZ Saryarka as a government institution."[236] We further noted that information provided by the GOK "indicates that electricity transmission is within the sphere of regulated services that are subject to the law" and that "the GOK has the authority to 'develop and approve the tariff setting rules' and to 'develop and approve the standard contracts for provision of regulated services.'"[237] Based on the facts provided by the GOK in its questionnaire responses, we therefore concluded that "{g}iven the ownership and monopolistic status of MC SEZ Saryarka, the company's role in transmitting electricity to companies in the Saryarka SEZ, and the GOK's role in establishing electricity transmission tariffs and subsequent purchase contracts… the provision of electricity for LTAR constitutes a financial contribution in the form of the provision of a good or services under section 771(D)(iii) of the Act and 19 CFR 351.511."[238] There is no information on the record to contradict this finding, and as described above in the "Use of Facts Otherwise Available and Adverse Inferences" section, we are finding that this program is specific under section 771(5A)(D)(iv) of the Act. With respect to TKS/TKT's receiving a benefit from this program, we affirm our finding in the *Preliminary Determination* that TKS/TKT benefited from this program, based on AFA.[239]

With respect to the exemption of customs duties, the GOK stated that goods imported into an SEZ are not exempt from the payment of duties, but that these duties are merely deferred. We noted in the *Preliminary Determination* that the GOK denied the existence of any customs duty exemption program, but nonetheless we found a program existed and that it was countervailable.[240] As we explained in the *Preliminary Determination*, "a deferral of import charges will be treated as a government-provided loan in the amount of the taxes deferred, according to the methodology described in 19 CFR 351.505."[241] We further explained that we were "treating these deferrals of customs duties as we would a contingent liability interest-free

---

[234] *See* GOK's Case Brief at 3-4.
[235] *See Preliminary Determination* PDM at 15.
[236] *Id.*
[237] *Id.*
[238] *Id.*
[239] *Id.* at 6.
[240] *Id.* at 14.
[241] *Id.*

loan" in accordance with 19 CFR 351.510(a)(2) and 19 CFR 351.505(d).[242] Such loans are essentially grants, in accordance with 19 CFR 351.505(d)(2), which function as customs duty exemptions as described in 19 CFR 351.510(a)(1).[243] While the GOK denies that these customs deferrals act as a program, it nonetheless confirms that TKS/TKT took advantage of such deferrals during the POI.[244] Consequentially, we consider these deferral procedures to constitute a program, and that, based on AFA, TKS/TKT paid no customs duties, such that the deferral program acts as an exemption program for the purpose of finding this program countervailable.

With respect to debt forgiveness, as we explained in the *Preliminary Determination*, we acknowledge that the GOK has claimed that the debt forgiveness program does not exist.[245] Nonetheless, we explained our findings that, based on the record, the GOK was the ultimate owner of the institution providing the debt forgiveness (the Investment Fund of Kazakhstan (IFK)), and that the record supported a finding that that the assets of Silicium Kazakhstan LLP (Silicium Kazakhstan), including its silicon metal production plant, were transferred, unencumbered by Silicium Kazakhstan's debt to the IFK, to Kremnyi Kazakhstan, which was in turn acquired by TKS/TKT, unencumbered by the predecessor company's debt.[246] We continue to find, as we did in the *Preliminary Determination*, that this severance of Silicium Kazakhstan's debt from the assets transferred to Kremnyi Kazakhstan constitutes a form of debt forgiveness for Kremnyi Kazakhstan, which was subsequently acquired debt-free by TKS/TKT.[247] As such, we continue to find in this final determination that the debt forgiveness program exists, that it provided a financial contribution to TKS/TKT in the form of debt forgiveness under section 771(5)(D)(i), and that it is *de jure* specific pursuant to section 771(5A)(D)(iii)(1) of the Act because the actual recipient of the debt forgiveness is limited to a certain enterprise, *i.e.*, TKS/TKT.

We also disagree with TKS/TKT's argument that Commerce in any way dissuaded the GOK from responding to the ILV Questionnaire. On the contrary, in the *Preliminary Determination*, Commerce relied on information provided by the GOK to determine that two programs, the Provision of Water for LTAR and the Provision of Drainage Services for LTAR, were not available to TKS/TKT and were therefore not countervailable.[248] We also relied on information provided by the GOK to reach our preliminary determination that the provision of electricity was *de facto* specific to the metallurgical industry.[249] Because we relied on the information provided by the GOK in reaching our findings regarding these programs in the *Preliminary Determination*, we included these programs in our ILV Questionnaire, in order to allow the GOK to provide additional or supporting information that would allow us to rely on this information in the final determination, in accordance with section 782(i) of the Act. In the ILV Questionnaire, we advised the GOK that failure to respond to the questionnaire may result in the application of partial or total facts available pursuant to section 776(a) of the Act, which may include adverse

---

[242] *Id.*

[243] *Id.*

[244] *See* GOK IQR at Exhibit IDg.

[245] *See Preliminary Determination* PDM at 16.

[246] *Id.* at 16-17.

[247] *Id.* at 17.

[248] *Id.* at 18.

[249] *Id.* at 15-16.

inferences pursuant to section 776(b) of the Act.[250]  To the extent that the respondents argue that the GOK's questionnaire responses indicate that TKS/TKT did not use these programs, in order for Commerce to rely on the GOK's responses on non-use of the programs by TKS/TKT, the GOK must provide accurate, complete, and verifiable information to support its claims.  The current record indicates that the GOK's responses on non-use of the programs are unverifiable assertions unsupported by the record.  Although TKS/TKT may be adversely impacted by virtue of information not provided by the GOK, it would be improper to depart from our practice, as outlined above.  As the CIT has noted:

> {A}n adverse inference in a CVD investigation may have "a collateral impact on a cooperating party," without being rendered "improper."  Where, as here, an adverse inference made against the {the government} "collaterally reaches" a cooperating company that is "within the {country}, benefitting directly from subsidies the {government} may be providing," then the adverse inference is permissible, because it "has the potential to encourage the {government} to cooperate so as not to hurt its overall industry."[251]

Finally, with respect to the GOK's WTO-related arguments, Commerce has conducted this investigation in accordance with the Act and our regulations, and U.S. law is fully compliant with our WTO obligations.  Moreover, it is the Act and Commerce's regulations that have direct legal effect under U.S. law, and not the WTO Agreements or WTO reports.  In this regard, WTO reports "do not have any power to change U.S. law or to order such a change."[252]

**Comment 9:   Whether Commerce Is Required to Exhaust Administrative Remedies**

*TKS/TKT's Comments:*[253]
- 28 USC § 2637(d) states that the "Court of International Trade shall, where appropriate, require the exhaustion of administrative remedies," and "indicates a congressional intent that, absent a strong contrary reason, the court should insist that parties exhaust their remedies before the pertinent administrative agencies."[254]
- The purpose of requiring the exhaustion of administrative remedies is to first provide for administrative opportunities for the resolution of issues, rather than ask the courts to decide issues that should have been fully addressed at the agency level.
- This doctrine equally applies to Commerce,[255] which has been silent on key issues.  If a respondent is left guessing as to what to argue, it is not given proper notice in that regard.[256]

---

[250] *See* ILV Questionnaire, Cover Letter at 1.
[251] *See Hebei Jiheng Chems. Co. v. United States*, 161 F. Supp. 3d 1322, 1332 (CIT February 18, 2016) (citing *Fine Furniture II*, 748 F.3d at 1372-73).
[252] *See Finished Carbon Steel Flanges from India:  Final Affirmative Countervailing Duty Determination*, 82 FR 29479 (June 29, 2017), and accompanying IDM at Comment 1.
[253] *See* TKS/TKT's Brief at 44.
[254] *Id.* (citing *Corus Staal BV v. United States*, 502 F.3d 1370, 1379 (Fed. Cir. 2007) (*Corus*)).
[255] *Id.* (citing *United States v. Nitek*, 806 F.3d 1376 (Fed. Cir. 2015) (*Nitek*)).
[256] *Id.* (citing *Nitek* and *United States v. Toth*, Slip Op. 06-61 (CIT June 20, 2016) (*Toth*)).

*Petitioners' Rebuttal:*[257]

- The legal requirement to exhaust administrative remedies does not apply to Commerce in AD/CVD proceedings. The CAFC has explicitly stated that "the court should insist that parties exhaust their remedies before the pertinent administrative agencies."[258] Commerce is not a party to this investigation, but rather is the administrative agency before which parties must exhaust their administrative remedies.

- The cases to which TKS/TKT cites for the assertion that exhaustion of administrative remedies applies to agencies did not involve Commerce proceedings, but were instead customs penalty cases brought by the U.S. government to enforce penalties imposed by U.S. Customs and Border Protection (CBP).

- The CAFC held in *Nitek* that the CIT did not abuse its discretion in finding that the U.S. government failed to exhaust its administrative remedies because CBP failed to inform the importer litigant of the culpability level subject to the claim and because CBP could have changed the level of culpability during the administrative proceeding but failed to do so.[259]

- In *Toth*, the CIT similarly held that, because CBP failed to pursue the claims based on the different culpability levels in the underlying administrative penalty proceeding, those claims did not exist before the court and they were dismissed.[260]

- Both *Nitek* and *Toth* are completely irrelevant to this proceeding, and TKS/TKT has not cited any case holding that Commerce itself must exhaust administrative remedies.

- While the CIT has recognized that "{w}hen Commerce fails to provide an opportunity for comment, it inhibits a plaintiff's opportunity to exhaust its administrative remedies,"[261] Commerce has provided TKS/TKT ample opportunities for comment and has fully addressed TKS/TKT's comments and arguments in this investigation.

- TKS/TKT made no fewer than nine written submissions regarding the issues that it raised in its case brief, including its untimely submission of its initial questionnaire response and its claim that the petitioners' allegation regarding a conflict of interest interfered with its ability to submit its questionnaire response. TKS/TKT also participated in two *ex-parte* meetings with Commerce to discuss those issues.

- After Commerce properly rejected TKS/TKT's untimely-filed questionnaire response, Commerce carefully considered the issues raised in TKS/TKT's letters and the *ex-parte* meetings and fully addressed them in a detailed letter to TKS/TKT's counsel.[262]

- In its Second Rejection Letter, also referenced in the *Preliminary Determination*,[263] Commerce affirmed its rejection of TKS/TKT's untimely and incomplete initial questionnaire response, rejected TKS/TKT's request to terminate the investigation, and noted that TKS/TKT could have submitted an extension request if the petitioners' disqualification request had interfered with TKS/TKT's ability to respond to the initial questionnaire.

---

[257] *See* Petitioners' Rebuttal Brief at 42-45.
[258] *Id.* at 43 (citing *Corus*, 502 F.3d at 1379).
[259] *Id.* (citing *Nitek*, 806 F.3d at 1378, 1381-82 (Fed. Cir. 2015)).
[260] *Id.* at 43-44 (citing *Toth* at 4-5 (CIT 2016)).
[261] *Id.* at 44 (citing *Fine Furniture I*, 865 F. Supp. c at fn.14).
[262] *Id.* at 45 (citing Second Rejection Letter).
[263] *Id.* (citing *Preliminary Determination* PDM at 3 and fn.20).

- Even after Commerce issued its Second Rejection Letter and *Preliminary Determination*, TKS/TKT still had an opportunity to be heard in its briefs and at a hearing.

**Commerce's Position:** We agree with the petitioners that the requirements of 18 USC § 2637(d) are not applicable to Commerce in this instance. The petitioners correctly note that in *Corus* the CAFC insisted that "parties exhaust their remedies *before the pertinent administrative agencies*."[264] Commerce is not a "party" to this investigation, but rather is the "pertinent administrative agenc{y}" before which this investigation is being adjudicated. Furthermore, 18 USC § 2637(d) is specific to actions brought before the CIT, not to Commerce's own final determination in an investigation.

Further, we find that TKS/TKT's reliance on *Nitek* and *Toth* are misplaced, as both of these cases involve the United States, and CBP in particular, as parties to an action before the CIT involving the collection of duties, rather than any agency acting in an administrative capacity.

**Comment 10: Whether Commerce Imposed Provisional Measures Without Adequate Consideration**

*TKS/TKT's Comments:*[265]
- Despite the tremendous impact of the *Preliminary Determination* on importers, Commerce failed to provide a clear explanation for its decision on several issues, thereby significantly impeding TKS/TKT's ability to challenge Commerce's findings.
- Commerce must base its determinations, including preliminary determinations, on substantial record evidence,[266] with "a rational connection between the facts found and the choices made."[267]
- Commerce's *Preliminary Determination* falls well short of the CAFC's standards for clarity and reasonableness. The CAFC states that a court will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned, {but} the required explanation must reasonably tie the determination under review to the governing statutory standard and to the record evidence by indicating what statutory interpretations the agency is adopting and what facts the agency is finding."[268]
- Commerce did not provide sufficient explanation or detail to support its decisions and did not review the full record of the investigation containing facts relevant to the determination.
- As the *Preliminary Determination* is the first moment in which importers face real monetary consequences, Commerce should be held to a higher standard than it has shown in this investigation.
- The petitioners should request alignment of the final determination in this CVD investigation with the final less-than-fair-value (LTFV) determination in the companion

---

[264] *See Corus*, 502 F.3d at 1379 (emphasis added).

[265] *See* TKS/TKT's Brief at 45-47.

[266] *Id.* at 45 (citing *Asociacion Colombiana de Exportadores v. United States*, 6 F. Supp. 2d 865, 880 (CIT 1998)).

[267] *Id.* (citing *Siderca, S.A.I.C. v. United States*, 350 F. Supp. 2d 1223, 1236 (CIT 2004) (citing *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)).

[268] *Id.* at 46 (citing *CP Kelco v. United States*, 949 F.3d 1348, 1356 (Fed. Cir. 2020) (quoting *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 US 281, 286 (1974)).

investigation of silicon metal from Malaysia, as they already have with the final determinations in the companion LTFV investigations of silicon metal from Iceland and Bosnia and Herzegovina. Such an alignment would extend the signature date for the final determination until June 10, 2021, and would be a partial first step to address their interference in this CVD investigation.

- Absent an alignment request from the petitioners, Commerce could make a neutral subsidy rate decision based on the questionnaire responses submitted to date, including the GOK's response and TKS/TKT's initial questionnaire response.
- Commerce could, as it has in the past, issue an affirmative final subsidy finding where no duties or cash deposits are imposed until a future administrative review, at which time Commerce could determine if there are any subsidies without the petitioners' interference.[269]

*Petitioners' Rebuttal:*[270]
- TKS/TKT's proposed remedies are not warranted.
- Commerce's findings in the *Preliminary Determination*, including its application of total AFA, selection of AFA subsidy rates, and calculation of the total AFA subsidy rate, were proper and consistent with the manner in which Commerce regularly conducts CVD investigations.

**Commerce's Position:** We disagree with TKS/TKT's characterization of Commerce's actions in this proceeding, as well as its suggested remedies. TKS/TKT states that Commerce did not provide sufficient explanation or detail to support its decisions. On the contrary, we provided extensive explanations regarding our findings in the *Preliminary Determination*, as well as in multiple memoranda and letters drafted in response to TKS/TKT's filings on the record of this investigation. For instance, in a one-week period, we released multiple letters and memoranda explaining why we: (1) would not accept TKS/TKT's untimely filing of its initial questionnaire response;[271] (2) would accept KazSilicon's timely filed initial questionnaire response;[272] and (3) rejected the petitioners' request to disqualify TKS/TKT's counsel from participating in this investigation.[273]

Further, in October, we twice held meetings or conference calls with TKS/TKT's counsel to discuss its rejected submissions, as well as TKS/TKT's request that Commerce terminate the investigation, first with the Director of the office handling this investigation,[274] and then with the Assistant Secretary of Enforcement & Compliance.[275] Commerce subsequently addressed its decision not to terminate the investigation, while providing further explanation to TKS/TKT

---

[269] *Id.* at 47 (citing *Small Business Telephones from Taiwan*, 43 FR 42543, 42550 (October 17, 1989) (*SBTS from Taiwan*), affirmed in *Auto Telecom Co., Ltd. v. United States*, 765 F. Supp. 1094 (CIT 1991).

[270] *See* Petitioners' Rebuttal Brief at 50-51.

[271] *See* First Rejection Letter.

[272] *See* Memorandum, "Silicon Metal from the Republic of Kazakhstan: Acceptance of KazSilicon Response," dated October 2, 2020.

[273] *See* Disqualification Memorandum.

[274] *See* Memorandum, "Countervailing Duty Investigation of Silicon Metal from the Republic of Kazakhstan: *Ex-Parte* Telephone Call with Counsel for Respondent," dated October 16, 2020.

[275] *See* Memorandum, "Countervailing Duty Investigation of Silicon Metal from the Republic of Kazakhstan: *Ex-Parte* Telephone Call with Counsel for Respondent," dated October 27, 2020.

regarding the rejection of TKS/TKT's initial questionnaire response, and our decision not to disqualify TKS/TKT's counsel from participating in this investigation.[276] In addition to responding to inquiries and allegations from both TKS/TKT and the petitioners, we also fielded inquiries from the GOK regarding the rejection of TKS/TKT's response, holding an *ex-parte* conference call between the Ambassador from Kazakhstan to the United States and the Assistant Secretary for Enforcement & Compliance.[277] Recently, as Commerce prepared for this final determination, and subsequent to the deadline for the submission of briefs and rebuttal briefs, we issued two separate letters to TKS/TKT explaining its decision to reject TKS/TKT's submission of untimely-filed new factual information and untimely arguments.[278]

The *Preliminary Determination*, as well as the numerous memoranda and letters issued by Commerce in this investigation, indicate the facts that Commerce relied upon in making our findings in this investigation, as required by the Act. Furthermore, Commerce afforded TKS/TKT the opportunity to comment further in its case brief, and we have considered these arguments once again prior to issuing a final determination.

With respect to the TKS/TKT's proposed remedies, it is not within Commerce's authority to align the final determination in this CVD investigation with the final determination in the LTFV investigation of silicon metal from Malaysia, absent a request to do so by the petitioners under 19 CFR 351.210(b)(4). Moreover, as explained in further detail in Comment 3, we do not find it appropriate to make a "neutral subsidy margin decision" based solely on the GOK's questionnaire responses or on TKS/TKT's rejected initial questionnaire response, which as TKS/TKT has noted, has not been maintained on the record of this investigation. Nor do we find it appropriate make an affirmative finding while requiring no cash deposits of estimated CVD duties. While we acknowledge that Commerce has done so before,[279] this action is rare and based on case-specific circumstances which are not present here. In the instance referenced by TKS/TKT, Commerce only applied a zero percent cash deposit rate for "All Others." This finding was deemed appropriate under the dumping-specific "multinational corporation" methodology,[280] which is not applicable to the current CVD proceeding.

**Comment 11: Whether Commerce Should Find that Two Additional Programs Are Countervailable**

In the *Preliminary Determination*, Commerce found that two programs, the Provision of Water for LTAR and Provision of Drainage System Services for LTAR, were not countervailable based on information provided by the GOK.

---

[276] *See* Second Rejection Letter.
[277] *See* Memorandum, "Countervailing Duty Investigation of Silicon Metal from the Republic of Kazakhstan: *Ex-Parte* Telephone Call with Ambassador Erzhan Kazykhanov," dated December 2, 2020.
[278] *See* Commerce's Letter, "Countervailing Duty Investigation of Silicon Metal from the Republic of Kazakhstan: Rejection and Removal of Submissions from the Record," dated January 27, 2021; *see also* Commerce's Letter, "Countervailing Duty Investigation of Silicon Metal from the Republic of Kazakhstan: Request for Reconsideration," February 11, 2021.
[279] *See* SBTS *from Taiwan*.
[280] *See* section 773(d) of the Act.

Filed By: Justin Neuman, Filed Date: 2/23/21 4:07 PM, Submission Status: Approved

*Petitioners' Comments:*[281]

- In the *Preliminary Determination*, Commerce found that two programs, the Provision of Water for LTAR and Provision of Drainage System Services for LTAR, were not countervailable, based on information that the GOK provided about those programs in its questionnaire responses.
- Since the *Preliminary Determination*, the GOK failed to respond to Commerce's ILV Questionnaire, which explicitly requested specific information regarding those programs. The GOK's failure to provide the requested information signifies that the information that the GOK provided cannot be verified.
- In the ILV Questionnaire, Commerce expressly warned the GOK that failure to submit the requested information could result in the application of AFA. Consistent with this warning, Commerce should conclude that the GOK has decided not to cooperate in this proceeding and apply total AFA; as a result, Commerce should conclude that the Provision of Water for LTAR and Provision of Drainage System Services for LTAR programs are countervailable and determine subsidy rates for these programs.
- The application of AFA is warranted here based on the GOK's failure to respond to the ILV Questionnaire because the GOK has failed to cooperate by not acting to the best of its ability to comply with Commerce's request for information.
- Section 782(d) of the Act, which requires that Commerce provide a party with one opportunity to correct a deficient submission, is not relevant here because it does not apply to verification,[282] or where there is a complete failure to respond.[283]
- Commerce should apply AFA rates of 20 percent to both the water and drainage service programs, consistent with its precedent and practice.
- In both the prior CVD investigation of silicon metal from Kazakhstan and the *Preliminary Determination*, Commerce properly calculated and applied an AFA rate for the Corporate Income Tax Exemption program for companies located in the SEZ in question, equal to Kazakhstan's standard corporate income tax rate of 20 percent.
- Because the 20 percent rate from the Corporate Income Tax Exemption program reflects the highest, and only, above-*de minimis* rate calculated for any subsidy program in a Kazakhstan CVD proceeding that TKS/TKT's industry could conceivably use, relying on this rate is consistent with Commerce's AFA hierarchy.

**Commerce's Position:** We agree that the programs that were found to be not countervailable in the *Preliminary Determination*, the Provision of Water for LTAR and the Provision of Drainage Services for LTAR, should be found to be countervailable for purposes of this final determination. Pursuant to section 782(i)(1) of the Act, which requires Commerce to "verify all information relied upon in making a final determination in an investigation," on December 7, 2020, we issued the ILV questionnaire to the GOK "to collect additional or supporting documentation related to information that {the GOK } already submitted in this investigation."[284]

---

[281] *See* Petitioners' Brief at 2-6. We received no additional comments from other parties on these programs.
[282] *Id.* at 5 (citing *Hung Vuong Corp. v. United States*, Slip Op. 20-174, at 44 (CIT 2020) ("{T}he Court construes § 1677m(d) as inapplicable at the verification stage")).
[283] *Id.* at 5 (citing *Ta Chen Stainless Steel Pipe, Inc. v. United States*, 298 F.3d 1330, 1338 (Fed. Cir. 2002) ("The statute only applies when a 'response to a request' is deemed to not comply. A failure to respond is not the same as a 'response' as required by the statute")).
[284] *See* ILV Questionnaire, Cover Letter at 1.

Our ILV questionnaire was limited in scope to programs for which we relied on information provided by the GOK to make countervailability findings in the *Preliminary Determination*. Hence, we asked the GOK to provide documentation supporting information it provided in its initial and supplemental questionnaire responses, including its assertions that the Provision of Water for LTAR and the Provision of Drainage Services for LTAR programs were not available to the company respondents, and thus not countervailable. The GOK did not respond to the ILV Questionnaire.

In reaching our finding that the Provision of Water for LTAR and the Provision of Drainage Services for LTAR programs are countervailable, we are relying on facts otherwise available, under section 776(a) of the Act, with an adverse inference pursuant to section 776(b) of the Act, because we find that the GOK failed to act to the best of its ability in not responding to Commerce's ILV Questionnaire. In selecting from among the possible rates to apply to these programs, we are applying the same methodology that was used in the *Preliminary Determination* to establish a 20 percent *ad valorem* subsidy rate for each program,[285] resulting in a total final subsidy rate of 160 percent *ad valorem*.

## VIII. RECOMMENDATION

We recommend approving all of the above positions and adjusting countervailable subsidy rates, as appropriate. If these positions are accepted, we will publish the final determination in the *Federal Register* and notify the ITC of our determination.

☒                              ☐
_____          _____
Agree                          Disagree

2/22/2021

X  *James Maeder*
_____

Signed by: JAMES MAEDER
James Maeder
Deputy Assistant Secretary
 for Antidumping and Countervailing Duty Operations

---

[285] *See Preliminary Determination* PDM at 7-8.

**COMMERCE COUNTERVAILING DUTY ORDER**

Case 1:21-cv-00173-LMG Document 67-46 Filed 11/05/21 Page 277 of 278
Case 1:22-cv-00044 Document 36-2 Page 166 Filed 04/11/2023 (154 of 156)
Barcode:4111325-01 C-834-811 INV - Investigation
Federal Register / Vol. 86, No. 73 / Monday, April 19, 2021 / Notices                 20365

to secure the payment of estimated antidumping duties with respect to entries of the subject merchandise entered or withdrawn from warehouse, for consumption on or after September 12, 2020 (*i.e.*, 90 days prior to the date of the publication of the *Preliminary Determinations*), but before December 11, 2020 (*i.e.*, the date of publication of the *Preliminary Determinations*).

**Provisional Measures**

Section 733(d) of the Act states that suspension of liquidation pursuant to an affirmative preliminary determination may not remain in effect for more than four months, except where exporters representing a significant proportion of exports of the subject merchandise request Commerce extended the four-month period to no more than six-months. Commerce published the *Preliminary Determinations* on December 11, 2020. Commerce's *Final Determinations* were not extended and were published on February 26, 2021. Therefore, the four-month period beginning on the date of publication of the *Preliminary Determinations* ended on April 9, 2021. Furthermore, section 737(b) of the Act states that definitive duties are to begin on the date of publication of the ITC's final injury determination.

Therefore, in accordance with section 733(d) of the Act, we will instruct CBP to terminate the suspension of liquidation and to liquidate, without regard to antidumping duties, unliquidated entries of silicon metal from Bosnia and Iceland entered, or withdrawn from warehouse, for consumption after April 9, 2021, the date on which the provisional measures expired, until and through the day preceding the date of publication of the ITC's final injury determination in the **Federal Register**. Suspension of liquidation will resume on the date of publication of the ITC's final determinations in the **Federal Register**.

**Notifications to Interested Parties**

This notice constitutes the antidumping duty orders with respect to silicon metal from Bosnia and Iceland pursuant to section 736(a) of the Act. Interested parties can find a list of antidumping duty orders currently in effect at *http://enforcement.trade.gov/ stats/iastats1.html*.

These orders are published in accordance with section 736(a) of the Act and 19 CFR 351.211(b).

Dated: April 14, 2021.

Christian Marsh,

*Acting Assistant Secretary for Enforcement and Compliance.*

**Appendix—Scope of the Orders**

The scope of these orders covers all forms and sizes of silicon metal, including silicon metal powder. Silicon metal contains at least 85.00 percent but less than 99.99 percent silicon, and less than 4.00 percent iron, by actual weight. Semiconductor grade silicon (merchandise containing at least 99.99 percent silicon by actual weight and classifiable under Harmonized Tariff Schedule of the United States (HTSUS) subheading 2804.61.0000) is excluded from the scope of these orders.

Silicon metal is currently classifiable under subheadings 2804.69.1000 and 2804.69.5000 of the HTSUS. While the HTSUS numbers are provided for convenience and customs purposes, the written description of the scope remains dispositive.

[FR Doc. 2021–08112 Filed 4–16–21; 8:45 am]

BILLING CODE 3510–DS–P

---

**DEPARTMENT OF COMMERCE**

**International Trade Administration**

**[C–834–811]**

**Silicon Metal From the Republic of Kazakhstan: Countervailing Duty Order**

**AGENCY:** Enforcement and Compliance, International Trade Administration, Department of Commerce.

**SUMMARY:** Based on affirmative final determinations by the Department of Commerce (Commerce) and the International Trade Commission (ITC), Commerce is issuing a countervailing duty order on silicon metal from the Republic of Kazakhstan (Kazakhstan).

**DATES:** Applicable April 19, 2021.

**FOR FURTHER INFORMATION CONTACT:** Justin Neuman, AD/CVD Operations, Office V, Enforcement and Compliance, International Trade Administration, U.S. Department of Commerce, 1401 Constitution Avenue NW, Washington, DC 20230; telephone: (202) 482–0486.

**SUPPLEMENTARY INFORMATION:**

**Background**

In accordance with sections 705(a), 705(d), and 777(i)(1) of the Tariff Act of 1930, as amended (the Act), and 19 CFR 351.210(c), on February 26, 2021, Commerce published its affirmative final determination that countervailable subsidies are being provided to producers and exporters of silicon metal from Kazakhstan.[1] On April 12, 2021,

the ITC notified Commerce of its affirmative final determination that pursuant to sections 705(b)(1)(A)(i) and 705(d) of the Act, an industry in the United States is materially injured by reason of subsidized imports of silicon metal from Kazakhstan.[2]

**Scope of the Order**

The product covered by this order is silicon metal from Kazakhstan. For a complete description of the scope of the order, *see* the Appendix to this notice.

**Countervailing Duty Order**

On April 12, 2021, in accordance with sections 705(b)(1)(A)(i) and 705(d) of the Act, the ITC notified Commerce of its final determination that an industry in the United States is materially injured by reason of subsidized imports of silicon metal from Kazakhstan.[3] Therefore, in accordance with section 705(c)(2) of the Act, Commerce is issuing this countervailing duty order. Because the ITC determined that imports of silicon metal from Kazakhstan are materially injuring a U.S. industry, unliquidated entries of such merchandise from Kazakhstan, which are entered or withdrawn from warehouse for consumption, are subject to the assessment of countervailing duties.

Therefore, in accordance with section 706(a) of the Act, Commerce will direct U.S. Customs and Border Protection (CBP) to assess, upon further instruction by Commerce, countervailing duties for all relevant entries of silicon metal from Kazakhstan. Countervailing duties will be assessed on unliquidated entries of silicon metal from Kazakhstan which are entered, or withdrawn from warehouse, for consumption on or after December 3, 2020, the date of publication of the *Preliminary Determination*,[4] but will not include entries occurring after the expiration of the provisional measures period and before the publication of the ITC's final injury determination under section 705(b) of the Act, as further described below.

---

[1] See *Silicon Metal From the Republic of Kazakhstan: Final Affirmative Countervailing Duty*

*Determination*, 86 FR 11725 (February 26, 2021) (*Final Determination*) and accompanying Issues and Decision Memorandum.

[2] See ITC's Letter, ITC Notification, dated April 12, 2021 (ITC Notification Letter).

[3] *Id.*

[4] See *Silicon Metal From the Republic of Kazakhstan: Preliminary Affirmative Countervailing Duty Determination, and Alignment of Final Determination with Final Antidumping Duty Determination*, 85 FR 78122 (December 3, 2020) (*Preliminary Determination*).

Barcode:4111325-01 C-834-811 INV - Investigation -

## Suspension of Liquidation and Cash Deposits

In accordance with section 706 of the Act, Commerce will instruct CBP to reinstitute the suspension of liquidation of silicon metal from Kazakhstan, as described in the appendix to this notice, effective on the date of publication of the ITC's notice of final determination in the **Federal Register**, and to assess, upon further instruction by Commerce, pursuant to section 706(a)(1) of the Act, countervailing duties for each entry of the subject merchandise in an amount based on the net countervailable subsidy rates below. On or after the date of publication of the ITC's final injury determinations in the **Federal Register**, CBP must require, at the same time as importers would deposit estimated normal customs duties on this merchandise, a cash deposit equal to the rates noted below. The all-others rate applies to all producers or exporters not specifically listed below.

| Company | Subsidy rate (percent) |
|---|---|
| Tau-Ken Temir LLP and JSC NMC Tau-Ken Samruk[5] .......... | 160.00 |
| All Others ...................... | 160.00 |

## Provisional Measures

Section 703(d) of the Act states that suspension of liquidation pursuant to an affirmative preliminary determination may not remain in effect for more than four months. In the underlying investigation, Commerce published the *Preliminary Determination* on December 3, 2020. Therefore, the four-month period beginning on the date of the publication of the *Preliminary Determination* ended on April 1, 2021. Furthermore, section 707(b) of the Act states that definitive duties are to begin on the date of publication of the ITC's final injury determination.

Therefore, in accordance with section 703(d) of the Act, we instructed CBP to terminate the suspension of liquidation and to liquidate, without regard to countervailing duties, unliquidated entries of silicon metal from Kazakhstan entered, or withdrawn from warehouse, for consumption, on or after April 2, 2021, the date the provisional measures expired, until and through the day preceding the date of publication of the ITC's final injury determination in the

---

[5] As discussed in the Issues and Decision Memorandum, Commerce has found the following companies to be cross-owned with Tau-Ken Temir LLP and JSC NMC Tau-Ken Samruk: Silicon Metal LLP, Metallurgical Combine KazSilicon LLP, National Welfare Fund "Samruk-Kazyna" JSC, "Ekibastuz GRES–2 station" JSC, and JSC KEGOC.

**Federal Register**. Suspension of liquidation will resume on the date of publication of the ITC's final determination in the **Federal Register**.

## Notification to Interested Parties

This notice constitutes the countervailing duty order with respect to silicon metal from Kazakhstan pursuant to section 706(a) of the Act. Interested parties can find a list of countervailing duty orders currently in effect at *http://enforcement.trade.gov/stats/iastats1.html*. This order is issued and published in accordance with section 706(a) of the Act and 19 CFR 351.211(b).

Dated: April 14, 2021.

**Christian Marsh,**
*Acting Assistant Secretary for Enforcement and Compliance.*

## Appendix

### Scope of the Order

The scope of this order covers all forms and sizes of silicon metal, including silicon metal powder. Silicon metal contains at least 85.00 percent but less than 99.99 percent silicon, and less than 4.00 percent iron, by actual weight. Semiconductor grade silicon (merchandise containing at least 99.99 percent silicon by actual weight and classifiable under Harmonized Tariff Schedule of the United States (HTSUS) subheading 2804.61.0000) is excluded from the scope of this order.

Silicon metal is currently classifiable under subheadings 2804.69.1000 and 2804.69.5000 of the HTSUS. While the HTSUS numbers are provided for convenience and customs purposes, the written description of the scope remains dispositive.

[FR Doc. 2021–08111 Filed 4–16–21; 8:45 am]
BILLING CODE 3510–DS–P

---

# DEPARTMENT OF COMMERCE

## National Institute of Standards and Technology

## Agency Information Collection Activities; Submission to the Office of Management and Budget (OMB) for Review and Approval; Comment Request; Safety and Health Information Collection

**AGENCY:** National Institute of Standards and Technology (NIST), Commerce.

**ACTION:** Notice of Information Collection, request for comment.

**SUMMARY:** The Department of Commerce, in accordance with the Paperwork Reduction Act of 1995 (PRA), invites the general public and other Federal agencies to comment on proposed, and continuing information collections, which helps us assess the

impact of our information collection requirements and minimize the public's reporting burden. The purpose of this notice is to allow for 60 days of public comment preceding submission of the collection to OMB.

**DATES:** To ensure consideration, comments regarding this proposed information collection must be received on or before June 18, 2021.

**ADDRESSES:** Interested persons are invited to submit written comments by mail to Maureen O'Reilly, Management Analyst, NIST, by email to *PRAcomments@doc.gov*. Please reference OMB Control Number 0693–0080 in the subject line of your comments. Do not submit Confidential Business Information or otherwise sensitive or protected information.

**FOR FURTHER INFORMATION CONTACT:** Requests for additional information or specific questions related to collection activities should be directed to Jeni Kostick, Office of Safety, Health, and Environment, NIST, 100 Bureau Drive, Gaithersburg, MD 20899, (301) 975–3263 or *jennifer.kostick@nist.gov*.

**SUPPLEMENTARY INFORMATION:**

### I. Abstract

The National Institute of Standards and Technology (NIST) is a unique federal campus which hosts daily a range of non-federal individuals. Non-federal individuals may include NIST Associates, volunteers, students, and visitors. In order to provide these individuals with proper health care and health documentation, NIST is pursuing approval of three health unit forms. The information is collected for the following purposes:

1. For medical treatment, testing, or recording of medical or safety equipment or incidents.

2. To refer information required by applicable law to be disclosed to a Federal, State, or local public health service agency, concerning individuals who have contracted certain communicable diseases or conditions. Such information is used to prevent further outbreak of the disease or condition.

3. To disclose information to the appropriate Federal, State, or local agencies responsible for investigation of an accident, disease, medical condition, or injury as required by pertinent legal authority.

4. To disclose to the Office of Workers' Compensation Programs about a claim for benefits filed.

Filed By: Justin Neuman, Filed Date: 4/19/21 11:15 AM, Submission Status: Approved

**FORM 19. Certificate of Compliance with Type-Volume Limitations**

Form 19
July 2020

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 22-2204

**Short Case Caption:** Tau-Ken Temir LLP v. US

> **Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑ the filing has been prepared using a proportionally-spaced typeface and includes 9372 words.

☐ the filing has been prepared using a monospaced typeface and includes _____ lines of text.

☐ the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: 04/11/2023

Signature: /s/ Peter Koenig

Name: Peter Koenig

Save for Filing