No. 2022-2204

IN THE UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT

TAU-KEN TEMIR LLP, JSC NMC TAU-KEN SAMRUK, MINISTRY OF
TRADE AND INTEGRATION OF THE REPUBLIC OF KAZAKHSTAN,

Plaintiffs-Appellants,

v.

UNITED STATES, GLOBE SPECIALTY METALS, INC., MISSISSIPPI
SILICON LLC,

Defendant-Appellees,

Appeal from the United States Court of International Trade in
Case No. 21-cv-00173, Senior Judge Leo M. Gordon

**BRIEF OF DEFENDANT-APPELLEE UNITED STATES**

BRIAN M. BOYNTON
Principal Deputy Assistant
Attorney General

PATRICIA M. McCARTHY
Director

L. MISHA PREHEIM
Assistant Director

OF COUNSEL:                        BRENDAN D. JORDAN
JARED CYNAMON                      Trial Counsel
Attorney                           U.S. Department of Justice

Office of the Chief Counsel
for Trade Enforcement & Compliance
U.S. Department of Commerce

Civil Division
Commercial Litigation Branch
P.O. Box 480, Ben Franklin Station
Washington, D.C.  20044
Tel:  (202) 616-0342
Email:  Brendan.D.Jordan@usdoj.gov

August 28, 2023

*Attorneys for Defendant-Appellee*
*United States*

# TABLE OF CONTENTS

STATEMENT OF RELATED CASES ................................................1

STATEMENT OF THE ISSUES ......................................................1

STATEMENT OF THE CASE .........................................................2

    I.    Nature Of The Case ............................................................2

STATEMENT OF FACTS AND COURSE OF PROCEEDINGS BELOW .......2

    I.    Commerce's Countervailing Duty Investigation ...................2

    II.    Court Of International Trade Proceedings...........................7

SUMMARY OF THE ARGUMENT ..................................................8

ARGUMENT................................................................................9

    I.    Standard Of Review...........................................................9

    II.    Relevant Legal Framework ...............................................10

    III.    Commerce's Decision To Grant In-part TKT's First Two Extension Requests And Deny TKT's Third Extension Request Was Lawful And Supported By Substantial Evidence............................................12

        A. Commerce Did Not Act Unreasonably Or Unlawfully When It Granted TKT's First Two Extension Requests In-part .................13

        B. Commerce Did Not Abuse Its Discretion Or Act Irrationally, Unlawfully, Or Arbitrarily When It Denied TKT's Third Extension Request ........................................................................17

    IV.    Commerce Did Not Act Unlawfully Or Abuse Its Discretion In Rejecting TKT's Untimely Response.................................23

        A. Commerce Satisfied The Applicable Standard For Rejecting Late Filings.........................................................................23

B. Commerce's Rejection Of TKT's Late Filing Permissibly
Considered Counsel's Experience And Was Appropriate..............27

C. Commerce Did Not Treat TKT Unreasonably Or Arbitrarily........30

V.    Commerce Did Not Abuse Its Discretion In Applying An Adverse
Facts Available Rate To TKT ...........................................................33

A. Commerce's Decision To Assign TKT An AFA Rate Is Supported
By Substantial Evidence ..............................................................34

B. Commerce Calculated The Correct Rate For All Appellants .........39

CONCLUSION ............................................................................................41

# TABLE OF AUTHORITIES

**Cases**                                                                                        **Page(s)**

*Bebitz Flanges Works Priv. Ltd. v. United States*,
    433 F. Supp. 3d 1297 (Ct. Int'l Trade 2020) ..........................................13, 25, 35

*Bebitz Flanges Works Priv. Ltd. v. United States*,
    433 F. Supp. 3d 1309, 1327 (Ct. Int'l Trade 2020) ................................13, 22, 26

*Canadian Solar, Inc. v. United States*,
    23 F.4th 1372 (Fed. Cir. 2022)............................................................................10

*Celik Halat v. Tel Sanayi A.S.*,
    557 F. Supp. 3d 1348 (Ct. Int'l Trade 2022) .....................................................37

*Celik Halat v. Tel Sanayi A.S.*,
    557 F. Supp. 3d 1363 (Ct. Int'l Trade 2022) .....................................................37

*Corus Staal BV v. United States*,
    502 F.3d 1370 (Fed. Cir. 2007)....................................................................14, 17

*Deacero S.A.P.I. de C.V. v. United States*,
    996 F.3d 1283 (Fed. Cir. 2021)...........................................................................34

*Dongtai Peak Honey Indus. v. United States*,
    777 F.3d 1343 (Fed. Cir. 2015)...................................................................*passim*

*Fine Furniture (Shanghai) Ltd. v. United States*,
    748 F.3d 1365 (Fed. Cir. 2014).........................................................................40

*F.Lii de Cecco di Filippo Fara S. Martino S.p.A. v. United States*,
    216 F.3d 1027 (Fed. Cir. 2000).........................................................................38

*Habas Sinai Ve Tibbi Gazlar Istihsal Endustrisi A.S. v. United States*,
    992 F.3d 1348 (Fed. Cir. 2021)......................................................................9, 36

*KYD, Inc. v. United States*,
    607 F.3d 760 (Fed. Cir. 2010)...........................................................................36

*Maverick Tube Corp. v. United States*,
   107 F. Supp. 3d 1318 (2015).............................................................24

*Mueller Comercial de Mexico, S. de R.L. de C.V. v. United States*,
   753 F.3d 1227 (Fed. Cir. 2014).......................................................40

*Nan Ya Plastics Corp. v. United States*,
   810 F.3d 1333 (Fed. Cir. 2016).......................................................36

*Neo Solar Power Corp. v. United States*,
   190 F. Supp. 3d 1255 (Ct. Int'l Trade 2016) ...............................35

*Nippon Steel Corp. v. United States*,
   337 F.3d 1373 (Fed. Cir. 2003).........................................29, 30, 34

*NTN Bearing Corp. v. United States*,
   74 F.3d 1204 (Fed. Cir. 1995)....................................................24, 25

*Oman Fasteners, LLC v. United States*,
   Ct. No. 22-00348, Slip Op. 23-17 (Ct. Int'l Trade Feb. 15, 2023)...............28, 29

*POSCO v. United States*,
   296 F. Supp. 3d 1320 (Ct. Int'l Trade 2018) ...............................36

*PSC VSMPO-Avisma Corp. v. United States*,
   688 F.3d 751 (Fed. Cir. 2012)....................................................15, 38

*Qingdao Sea-Line Trading Co. v. United States*,
   766 F.3d 1378 (Fed. Cir. 2014).......................................................31

*Sage Prods., Inc. v. Devon Indus.*, Inc.,
   126 F.3d 1420 (Fed. Cir. 1997).......................................................14

*Singleton v. Wulff*,
   428 U.S. 106 (1976).........................................................................14

*Tau-Ken Temir LLP v. United States*,
   587 F. Supp. 3d 1346 (Ct. Int'l Trade 2022) ................................ 1

*Timken U.S. Corp. v. United States*,
  434 F.3d 1345 (Fed. Cir. 2006) .................................................................24, 25

*United States v. Zannino*,
  895 F.2d 1 (1st Cir. 1990) ..........................................................................31, 40

*Viet I-Mei Frozen Foods Co. v. United States*,
  839 F.3d 1099 (Fed. Cir. 2016) ........................................................................10

*Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*,
  435 U.S. 519 (1978) ..........................................................................................15

*Yantai Timken Co. v. United States*,
  1754, 521 F. Supp. 2d 1356 (2007), *aff'd*, 300 F. App'x 934 (Fed. Cir. 2008) ...26

## Statutes

19 U.S.C. § 1516(a) .................................................................................................10

19 U.S.C. § 1516(b) .................................................................................................10

19 U.S.C. § 1671b(b) ...............................................................................................11

19 U.S.C. § 1671d(a) ...............................................................................................11

19 U.S.C. § 1677e ....................................................................................................36

19 U.S.C. § 1677e(a) ...........................................................................................34, 39

19 U.S.C. § 1677e(b) .............................................................................................6, 34

## Rules

Fed. Cir. R. 47.5.........................................................................................................1

**Regulations**

19 C.F.R. § 351.103(b) ..................................................................5, 12

19 C.F.R. § 351.205(b)(1) ...................................................................11

19 C.F.R. § 351.210(b)(1) ...................................................................11

19 C.F.R. § 351.301(c)(1) ...................................................................11

19 C.F.R. § 351.302 ...........................................................12, 19, 31

19 C.F.R. § 351.302(b) ..............................................................*passim*

19 C.F.R. § 351.302(c)...............................................................*passim*

19 C.F.R. § 351.303(b)(1)...................................................................29

19 C.F.R. § 351.308 ...........................................................................34

**Other Authorities**

SAA, H.R. Doc. No. 103-316, 870, reprinted in 1994 U.S.C.C.A.N. 4040......36, 38

**Federal Register**

*Extension of Time Limit,*
  78 Fed. Reg. 57,790 (Dep't of Commerce September 20, 2013).................*passim*

*Silicon Metal from Kaz.,*
  73 Fed. Reg. 20,365 (Dep't of Commerce Apr. 19, 2021)................................... 7

*Silicon Metal from Kaz.,*
  85 Fed. Reg. 45,173 (Dep't of Commerce July 27, 2020) ................................. 3

*Silicon Metal from Kaz.,*
  85 Fed. Reg. 78,122 (Dep't of Commerce Dec. 3, 2020) ................................... 6

*Silicon Metal from Kaz.*,
    86 Fed. Reg. 11,725 (Dep't of Commerce Feb. 26, 2021)................................... 2

## <u>STATEMENT OF RELATED CASES</u>

Pursuant to Rule 47.5 of this Court's Rules, counsel for defendant-appellee, the United States, states that he is unaware of any other appeal from this civil action that previously was before this Court or any other appellate court under the same or similar title. Counsel is also unaware of any case pending in this or any other court that may directly affect or be affected by this Court's decision in this appeal.

## <u>STATEMENT OF THE ISSUES</u>

1. Whether the decision of the United States Department of Commerce (Commerce) to grant in-part TKT's first two extension requests and deny TKT's third extension request is in accordance with law and supported by substantial evidence.

2. Whether Commerce's decision to reject TKT's untimely questionnaire response submission is in accordance with law and supported by substantial evidence.

3. Whether Commerce's calculation of a countervailing duty rate using facts available with an adverse inference {AFA} is in accordance with law and supported by substantial evidence.

## STATEMENT OF THE CASE

### I.    Nature Of The Case

This appeal concerns Commerce's final determination in the countervailing

duty investigation of silicon metal from Kazakhstan.  Plaintiff-Appellants Tau-Ken

Temir LLP, JSC NMC Tau-Ken Samruk, and the Ministry of Trade and Integration

of the Republic of Kazakhstan {collectively, TKT}, appeal the decision of the

Court of International Trade, *Tau-Ken Temir LLP v. United States*, 587 F. Supp. 3d

1346 (Ct. Int'l Trade 2022), sustaining the final determination.  *See* Appx55-86.

## STATEMENT OF FACTS AND COURSE OF PROCEEDINGS BELOW

### I.    Commerce's Countervailing Duty Investigation

This case arises out of Commerce's countervailing duty investigation of

silicon metal from the Republic Kazakhstan.  *See Silicon Metal from Kaz.*, 86 Fed.

Reg. 11,725 (Dep't of Commerce Feb. 26, 2021) (Final Determination of the

Countervailing Duty Investigation); Appx190-245 (Issues and Decision

Memorandum or IDM).  On June 30, 2020, Commerce received a countervailing

duty petition from two domestic producers of silicon metal, Globe Specialty

Metals, Inc. and Mississippi Silicon LLC {the petitioners}, that complained of

imports of silicon metal from Kazakhstan.  *See* Appx499.  On July 20, 2020,

Commerce initiated its countervailing duty investigation and selected TKT as

mandatory respondents. *See Silicon Metal from Kaz.*, 85 Fed. Reg. 45,173 (Dep't

of Commerce July 27, 2020) (Initiation Notice).

On July 23, 2020, Commerce issued an Initial Questionnaire to the

Government of Kazakhstan and requested that the Kazakh Government forward

the questionnaire to Tau-Ken Temir LLP and JSC NMC Tau-Ken Samruk. *See*

Appx604 (Initial Questionnaire section stating that the Kazakh "government is

responsible for forwarding copies of this cover letter and questionnaire to these

respondent companies."). The Initial Questionnaire further stated that "all

submissions for all proceedings must be filed electronically using . . . {the

ACCESS filing system}" and "{a}n electronically filed document must be

received successfully in its entirety by ACCESS by 5 p.m. Eastern Time (ET) on

the dates indicated on the cover page of the enclosed questionnaire." Appx604-05.

The Initial Questionnaire further explained that "Commerce must conduct this

investigation in accordance with statutory and regulatory deadlines" and if the

respondents could not meet Commerce's deadlines, they "must notify the official

in charge *and* submit a request for an extension." Appx605 (emphasis added).

The Initial Questionnaire included multiple hyperlinks to the ACCESS Help

page, External User Guide, Handbook, and Federal Register Notice concerning

electronic filing procedures. Appx605. In addition, the Initial Questionnaire

explains that Commerce "will not accept any requested information submitted after

the established deadlines" and that if "Commerce does not receive either the

requested information or a written extension request before 5 p.m. ET on the

established deadlines, {Commerce} may conclude that the government or the

respondent compan{ies} have decided not to cooperate in this proceeding."

Appx606.  The Initial Questionnaire established August 6, 2020 as the deadline for

the affiliated companies identification portion of TKT's section III response and

August 31, 2020, as the deadline for TKT's Section II response and the remaining

portions of their section III response.  Appx607.

   On August 6, 2020, TKT timely filed their affiliation response without

complication.  Appx204; Appx719.  On August 12, 2020, Commerce identified

certain areas in TKT's affiliation response that required additional information and

gave TKT until August 18, 2020 at 5:00 p.m. to submit the additional information.

*See* Appx778.  On August 18, 2020, TKT timely filed a supplemental response

responding to Commerce's August 12, 2020 request.  Appx830.

   On August 25, 2020, at 10:19 a.m., TKT requested a two-week extension

from August 31, 2020 to September 14, 2020, to answer the subsidy questionnaire.

Appx882.  TKT cited the amount of information requested, TKT's newness to the

process, and the COVID-19 pandemic as reasons for the extension.  *Id*.  Commerce

granted that request, in-part, and extended the deadline to September 10, 2020.  *See*

Appx882; *see also* Appx932.

4

On September 9 at 8:50 a.m., TKT filed their second extension request seeking an extension from September 10 to September 17, 2020 to answer Commerce's subsidy questionnaire. *See* Appx1091. Commerce granted that request, in-part, extending the deadline to September 15, 2020 at 5:00 p.m. *See* Appx1142. On September 15 at 3:50 p.m., 70 minutes before the deadline, TKT filed their third extension request that sought "a one day extension from today September 15, 2020 to tomorrow September 16, to answer the subsidy questionnaire." *See* Appx1306.

Given how soon the extension request was filed before the actual deadline, Commerce was unable to respond by the 5:00 p.m. deadline. *See* Appx204. By operation of law, TKT's deadline was automatically extended from September 15, 2020 at 5:00 p.m. to September 16, 2020 at 8:30 a.m., the beginning of the next business day, given that TKT filed an extension request prior to the 5:00 p.m. deadline and Commerce had not ruled on that request prior to the close of the business day. *See Extension of Time Limit*, 78 Fed. Reg. 57,790, 57,792 (Dep't of Commerce September 20, 2013); *see also* 19 C.F.R. § 351.103(b).

Although TKT began the process of filing their submission at 5:31 a.m. on September 16, 2020, they failed to submit a complete filing by the 8:30 a.m. deadline. *See* Appx204. TKT submitted what they represent as their "completed" filing at 10:11 a.m. on September 16, 2020. *See* TKT Br. at 7, 11. However,

Commerce did not retroactively grant TKT's last-minute extension, meaning that the final deadline for the subsidy questionnaire was September 16, 2020 at 8:30 a.m.  Further, TKT's filing made at 10:11 a.m. on September 16, 2020 was not complete as they were missing the business proprietary versions of Exhibits III-A-1 through III-A-8, and the beginning portion of Exhibit III-A-9.  *See* Appx1763; Appx210.  Accordingly, Commerce rejected TKT's submission because they failed to file a complete submission by the September 16, 2020 8:30 a.m. deadline.  *See* Appx205 (citing Appx2138); *see also Extension of Time,* 78 Fed. Reg. 57,790, at 57,792.

On December 3, 2020, Commerce published its Preliminary Determination, which indicated that TKT's failure to fully respond to the Initial Questionnaire, and failure to do so in a timely manner, resulted in Commerce not having access to information necessary to its investigation.  *See Silicon Metal from Kaz.*, 85 Fed. Reg. 78,122 (Dep't of Commerce Dec. 3, 2020) (preliminary determination); Appx2190 (Preliminary Decision Memorandum).  Commerce further determined that TKT failed to cooperate by not complying to the best of their ability with Commerce's request for information and as a result adverse inferences were warranted pursuant to 19 U.S.C. § 1677e(b).  *Silicon Metal from Kaz.*, 85 Fed. Reg. 78,122, at 78,123; *see also* Appx215.

On February 26, 2021, following briefing on Commerce's preliminary determination, Commerce published its final determination, which adopted the conclusions as spelled out in its preliminary determination memorandum. *See* Appx215; *see also* Appx137-139. On April 19, 2021, the order for silicon metal from Kazakhstan was published in the Federal Register. *See* Appx296-297 (order); *Silicon Metal Kaz.,* 73 Fed. Reg. 20,365 (Dep't of Commerce Apr. 19, 2021).

## II.   Court Of International Trade Proceedings

After the order was published in the federal register, TKT filed suit in the Court of International Trade {trial court} challenging Commerce's determination to reject TKT's response and Commerce's resulting determination to use AFA. *See* Appx2585-87. The trial court ultimately rejected TKT's motion for judgment on the administrative record and sustained Commerce's final determination. Appx1-3.

The trial court indicated that TKT did not appear to raise an argument that their third extension request demonstrated "good cause." Appx63. However, the trial court found that even if TKT had not waived the argument, Commerce did not abuse its discretion or act unlawfully in denying TKT's extension request. The trial court reasoned that Commerce's denial of an extension was reasonable in light of the fact that this was TKT's third extension, the extension request only provided vague and conclusory statements for why it was needed, and unlike the other

extensions TKT sought, was made only minutes before the deadline.  Appx75-6.

The trial court also noted that TKT's failure to follow the instructions in the Initial

Questionnaire that required parties to contact Commerce if encountering technical

difficulties further supported the reasonableness of Commerce's decision to deny

TKT's extension request.  *Id.*  The trial court compared Commerce's denial of

TKT's extension request in this case to other extension cases and found that

Commerce did not act arbitrarily with respect to TKT.  Appx78-9.  Because TKT

failed to submit a complete filing by the deadline and because TKT did not put

forth a maximum effort to provide Commerce with the requested information by

the deadline, the trial court determined that Commerce did not abuse its discretion

or act unlawfully in deciding to reject TKT's filing and determine TKT's margin

based on AFA.

This appeal followed.[1]

## SUMMARY OF THE ARGUMENT

Commerce's rejection of TKT's extension requests, its rejection of TKT's

untimely questionnaire response, and its assessment of a countervailing duty based

---

[1] TKT submitted multiple corrected opening briefs, some of which made a number of substantive changes.  Following several correction notices, TKT moved for leave to file a replacement opening brief.  In a June 30, 2023 order, this Court granted the motion to the extent that ECF No. 41-3 would be accepted as TKT's corrected opening brief.  *See* ECF No. 54.  Accordingly, this brief responds to ECF No. 41-3 and not any prior or subsequent corrected brief filed by TKT.

on AFA were all lawful and supported by substantial evidence. TKT asks this Court—without any basis in law or fact—to prevent Commerce from exercising its discretion, enforcing its own deadlines, and applying its regulations concerning adverse inferences. In support, TKT offers little more than conclusory statements lacking citations to the record. On the other hand, the record is clear that TKT received two extensions of time to file its subsidy questionnaire response, that TKT made no effort to communicate with Commerce regarding technical issues it encountered, that TKT filed its third extension request with barebones reasoning only minutes before the deadline, and that TKT still failed to submit a timely and complete filing even after receiving an automatic 15.5 hour extension following its last minute extension request. Given these circumstances, Commerce did not act unreasonably or contrary to law in rejecting TKT's extension requests, rejecting TKT's late submission, and assigning a rate based on AFA.

## ARGUMENT

## I.   Standard Of Review

When reviewing a judgment from the Court of International Trade in a countervailing duty case, this Court reviews the Trade Court decision on a *de novo* basis. *Habas Sinai Ve Tibbi Gazlar Istihsal Endustrisi A.S. v. United States*, 992 F.3d 1348, 1352 (Fed. Cir. 2021). In doing so, this Court applies the same standard of review applied by Trade Court in its review of Commerce's

countervailing duty investigation. *Id*. Although this amounts to repeating the trial court's review, this Court has declared that it will "give great weight" to the trial court's "informed opinion," which "is nearly always the starting point of {the Court's} analysis." *Canadian Solar, Inc. v. United States*, 23 F. 4th 1372, 1378 (Fed. Cir. 2022).

TKT brought suit in the trial court pursuant to 19 U.S.C. §§ 1516(a)(2)(A)(i)(II) and (a)(2)(B)(i), which permits an interested party to a countervailing duty investigation to challenge Commerce's final determination. *See* Appx2586. In such actions, the trial court and this Court "shall hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(ii). Substantial evidence is such "evidence that a reasonable mind might accept as adequate to support a conclusion." *Canadian Solar*, 23 F. 4th at 1378. When assessing whether Commerce's factual findings are supported by substantial evidence, this Court looks to "the record as a whole." *Id*. Further, "[a]n agency finding may still be supported by substantial evidence even if two inconsistent conclusions can be drawn from the evidence." *Viet I-Mei Frozen Foods Co. v. United States*, 839 F.3d 1099, 1106 (Fed. Cir. 2016).

## II.    **Relevant Legal Framework**

Commerce, generally, is required by statute to make its final determination in an investigation within 140 days of initiation. 19 U.S.C. § 1671d(a); *see* 19 C.F.R. § 351.210(b)(1). To that end, Commerce normally will issue its preliminary results in an investigation not later than 65 days after the date of publication in the Federal Register of the notice of initiation. 19 U.S.C. § 1671b(b); 19 C.F.R. § 351.205(b)(1). In furtherance of this timeline, Commerce may issue questionnaires to any person including initial and supplemental questionnaires. *See* 19 C.F.R. § 351.301(c)(1). "Initial questionnaire responses are due 30 days from the date of receipt of such questionnaire," however, "{t}he time limit for response to individual sections of the questionnaire, if the Secretary requests a separate response to such sections, may be less than the 30 days allotted for response to the full questionnaire." 19 C.F.R. § 351.301(c)(1)(i).

Parties subject to an investigation are permitted to file requests to extend the deadlines for making submissions to Commerce. The party seeking an extension must file the extension request before the established deadline and state the reasons why there is "good cause" to extend the deadline. 19 C.F.R. § 351.302(b)-(c). Parties that make extension requests should not assume that Commerce will grant their requests. *See Extension of Time,* 78 Fed. Reg. 57,790, at 57,792. To avoid having a deadline pass without Commerce deciding on an extension request, Commerce has advised parties to avoid last-minute requests. *Id*. For submissions

11

that are due at the close of business, 5:00 p.m. ET, the deadline will be automatically extended to the opening of business the following day, 8:30 a.m. ET, if the extension request was filed before the 5:00 p.m. deadline and Commerce did not yet respond to the request. *Id.*; 19 C.F.R. § 351.103(b).

Commerce will not consider extension requests made after the submission deadline absent "extraordinary circumstances." 19 C.F.R. § 351.302. Commerce defines an "extraordinary circumstance" as "an unexpected event" that "(i) {c}ould not have been prevented if reasonable measures had been taken; and (ii) {p}recludes a party or its representative from timely filing an extension request through all reasonable means." 19 C.F.R. § 351.302(c)(2). "Examples of extraordinary circumstances include a natural disaster, riot, war, force majeure, or medical emergency . . . {and}{e}xamples that are unlikely to be considered extraordinary circumstances include insufficient resources, inattentiveness, or the inability of a party's representative to access the Internet on the day on which the submission was due." *Extension of Time,* 78 Fed. Reg. 57,790, at 57,793.

## II. Commerce's Decision To Grant In-part TKT's First Two Extension Requests And Deny TKT's Third Extension Request Was Lawful And Supported By Substantial Evidence

TKT's opening brief fails to show that Commerce acted unlawfully when it determined that TKT failed to make a requisite showing of good cause for its extension requests. Commerce's regulations provide that a party may request an

extension "{b}efore the applicable time limit . . . expires" and that the request shall

be in writing and "state the reasons for the request."  19 C.F.R. § 351.302(c).  If

Commerce determines that the request establishes good cause it "may . . . extend

{the} time limit established . . ." 19 C.F.R. § 351.302(b).  Further, "Commerce's

regulation, 19 C.F.R. § 351.302(b) and (c), provides the agency with substantial

discretion whether to grant or deny an extension," *Bebitz Flanges Works Priv. Ltd.*

*v. United States*, 433 F. Supp. 3d 1297, 1305–06 (Ct. Int'l Trade 2020) (*Bebitz*

*CVD*), and "Commerce is not required to provide good cause or justification for

rejecting untimely submissions," *Bebitz Flanges Works Priv. Ltd. v. United States*,

433 F. Supp. 3d 1309, 1327 (Ct. Int'l Trade 2020) (*Bebitz AD*).[2]

### A.    Commerce Did Not Act Unreasonably Or Unlawfully When It Granted TKT's First Two Extension Requests In-part

TKT argues in this appeal that Commerce's decision to extend the

questionnaire response deadline from August 31 to September 10, instead of

TKT's preferred date of September 14, and Commerce's subsequent decision to

extend the questionnaire response deadline from September 10 to September 15,

instead of TKT's preferred date of September 17 are unsupported by substantial

evidence.  TKT Br. at 6-7.  As a threshold matter, TKT did not raise this issue

---

[2] This brief refers to two cases with the caption of *Bebitz Flanges Works Private Ltd. v. United States*.  We refer to the case dealing with a countervailing duty order, 433 F. Supp. 3d 1297, as *Bebitz CVD* and the case dealing with an antidumping duty order, 433 F. Supp. 3d 1309, as *Bebitz AD*.

before the trial court or make any sort of argument at the trial court that Commerce

acted improperly with respect to TKT's first two extension requests. *See*

Appx2671-2714. Accordingly, TKT has waived this argument. *See Singleton v.*

*Wulff*, 428 U.S. 106, 120 (1976) ("a federal appellate court should not consider an

issue not passed upon below . . ."); *Corus Staal BV v. United States*, 502 F.3d

1370, 1378 n.4 (Fed. Cir. 2007) (finding that appellant waived argument on appeal

where it "did not raise that argument before the Court of International Trade . . .");

*Sage Prods., Inc. v. Devon Indus.*, Inc., 126 F.3d 1420, 1426 (Fed. Cir. 1997).

However, even if the Court finds that TKT did not waive this argument

regarding the first two extensions, Commerce's first two extension decisions are

supported by substantial evidence and are not unreasonable. In its first two

extension decisions, Commerce stated that "{f}or the reasons stated in TKT's

submission{s}, Commerce is hereby granting . . . partial extension{s}." Appx932;

Appx1142. TKT's first two requests cite the large amount of information

requested by the questionnaire, TKT's newness to the process, and COVID as

reasons for extensions. Appx882; Appx1091. However, TKT's extension request

did not provide any explanation as to why these three reasons necessitated a

fourteen or seven day extension, for the first and second requests, respectively, as

opposed to a shorter or longer period of time. *Id*.

Commerce's determination that such reasons only warranted a ten day extension for the first request and five days for the second request, as opposed to fourteen and seven days, was a rational exercise of its discretion given the wide latitude afforded to Commerce to administer its countervailing duty and anti-dumping regulations. *See Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*, 435 U.S. 519, 543 (1978); *see PSC VSMPO-Avisma Corp. v. United States*, 688 F.3d 751, 760 (Fed. Cir. 2012) ("absent such constraints or circumstances, courts will defer to the judgment of an agency regarding the development of the agency record."). Further, countervailing duty investigations are subject to deadlines defined by regulation and this Court has held that Commerce "must be permitted to enforce the time frame provided in its regulations." *Dongtai Peak Honey Indus. v. United States*, 777 F.3d 1343, 1351 (Fed. Cir. 2015). TKT's argument that Commerce could have still completed its investigation within the timeline defined by regulation if it had fully granted TKT's first two extension requests ignores the fact that respondents do not dictate whether and when Commerce actually needs the requested information. *Id.* at 1352 ("{i}t is not for {the investigated party} to establish Commerce's deadlines or to dictate to Commerce whether and when Commerce actually needs the requested information.").

Given the wide discretion this Court affords Commerce to set its own schedule for countervailing duty investigations, it was not irrational for Commerce to come to a different judgment regarding how long of an extension was warranted based on the reasons TKT provided in their request.  Commerce did not abuse its discretion or act contrary to law by refusing to wholesale adopt TKT's subjective view as to how much more time was warranted in light of TKT's newness to the process, COVID, and the volume of information requested.

Further, TKT was not prejudiced by Commerce's first extension as TKT ultimately received a later deadline, September 16 at 8:30 a.m., than what it sought in its first extension request, a deadline of September 14, 2020.  The fact that TKT's third extension sought a sooner deadline than their second extension request and that counsel for TKT apparently believed that TKT would be able to meet the September 15, 2020 deadline until just about an hour before that deadline, *see* TKT. Br. at 8, further underscores that Commerce's approach was not unreasonable.[3]

---

[3] TKT complains that Commerce has given itself an extension for COVID reasons in another case and that therefore, Commerce should have given TKT more time to submit its subsidy questionnaire.  *See* TKT Br. at 7.  However, the outcome of the extension in that other case has no bearing on whether TKT established good cause for an extension in this case.

TKT argues that "Commerce can still decide extension requests made close to the deadline after the deadline . . . {and} Commerce unlawfully, inconsistently failed to do so here."  TKT Br. at 17-18.  However, Commerce's rejection of TKT's response from the record and Commerce's written correspondence to TKT where Commerce explained its rejection of TKT's response represents a clear and direct response to TKT's September 15, 2020 extension request.  Appx210; Appx1712-13; Appx2138-40.  Thus, Commerce did render a decision on TKT's extension request.  Further, while it is true Commerce *can* retroactively grant extensions, it is not true that it *must*.  The *Extension of Time* regulation provides that Commerce "will continue to grant extensions of time limits *to the extent that they are warranted* and deadlines for the segment permit."  78 Fed. Reg. 57,790, at 57,795 (emphasis added).  Because TKT failed to show good cause, granting a retroactive extension was not warranted.

### B.   Commerce Did Not Abuse Its Discretion Or Act Irrationally, Unlawfully, Or Arbitrarily When It Denied TKT's Third Extension Request

Again, as a threshold matter, TKT has waived an argument that Commerce unreasonably denied TKT's third extension request.  The trial court found that "it appears that {TKT} fail{ed} to develop an argument demonstrating that {TKT} satisfied the 'good cause' standard."  *See* Appx63; *see also Corus Staal*, 502 F.3d at 1378 n.4.  Although, the trial court postulated that it was possible that TKT

"combined arguments regarding 'good cause' and the denial of the third extension request with arguments challenging Commerce's rejection of Plaintiffs' Response," the trial court observed that it "could deem this issue waived." Appx63. Despite the trial court's stated inclination to deem this argument waived, the trial court did not definitively decide the issue of waiver and instead focused its discussion on why TKT's motion for judgment on the administrative record would still fail even if the issue of good cause for an extension was not waived. *Id.*

This Court should concur with the trial court's stated inclination and deem this argument waived. The only possible basis the trial court could conceive of for not deeming a 'good cause' argument waived is that a good cause argument was subsumed within an argument that Commerce erred in not accepting an untimely response. However, the issue of whether Commerce erred in refusing to accept TKT's late filing is distinct from whether good cause exists for an extension. An argument regarding accepting a late filing presupposes that TKT's 10:11 a.m. submission on September 16, 2020 ran afoul of the operative deadline and should be accepted for notwithstanding its lateness. On the other hand, an argument regarding good cause for an extension of time contends that the deadline should be later in time, for good cause, and thus TKT's 10:11 a.m. submission on September 16, 2020 would not be late. In other words, the issue of good cause concerns the propriety of the September 16 at 8:30 a.m. deadline whereas the issue of

Commerce's rejection of the late filing concerns whether there are certain mitigating factors that can excuse an indisputably late submission. The fact that no discussion of "good cause" figured into TKT's briefing before the trial court further suggests that any argument regarding the propriety of rejecting a late filing did not encompass an argument regarding whether Commerce lawfully rejected TKT's extension request. *See* Appx63; *see also* Appx2671-2714. Accordingly, TKT cannot raise the issue of whether there was good cause to grant their third extension request for the first time on appeal and has waived this argument.

Even if TKT has not waived this argument, Commerce acted reasonably in not retroactively granting TKT's third extension. First, Commerce's regulations requiring "good cause," *see* 19 C.F.R. § 351.302, were known and in effect prior to TKT's September 16, 2020 at 8:30 a.m. deadline. Therefore, TKT's argument that Commerce's extension policy is a "gotcha" policy has no merit. *See* TKT Br. at 34 (arguing that Commerce's extension policy is a "gotcha" policy).

Moreover, the mere fact that a request for an extension of time was made before the filing deadline does not compel Commerce to grant it. Indeed, "Commerce may grant extension requests *if it determines the extension request provides good cause for extending the deadline.*" *Dongtai Peak*, 777 F.3d at 1352 (emphasis added) (citing 19 C.F.R. § 351.302(b)).

In *Dongtai Peak*, this Court determined Commerce properly exercised its discretion in rejecting the respondent's submission because the respondent failed to show "good cause" for an extension as required by § 351.302(b). *Id.* at 1351. Notably, even though the *Dongtai Peak* respondent cited technical difficulties and an overseas client, the Court held that the respondent had not demonstrated why the company was unable to file its extension request earlier. *Id.* Here, TKT's counsel received the subsidy questionnaire response from TKT by 10:58 a.m. on September 15, over six hours before the filing deadline. *See* TKT Br. at 7. However, TKT provided no reasoning why their counsel was unable to file an extension either before receiving these files at 10:58 a.m. or just after receiving the files. *See* TKT Br. at 7. Indeed, Counsel for TKT was able to file TKT's first two extension requests, six days and one full day before the respective deadlines. Thus, similar to the respondent in *Dongtai Peak*, TKT failed to show good cause for a third extension.

Further, the only reasoning TKT provides in its third extension request is a vague statement that there "are some technical/computer issues to resolve . . . {and} {t}he prior extension requests indicate the need for time to answer the questionnaire." Appx1306. This vague statement does not explain why the nearly 17 hours between the time TKT filed its extension request and the 8:30 a.m. deadline the following day would be insufficient for TKT to correct technical

issues and complete its filing.  Nor does TKT explain what the technical issues were or why the specific technical issues required an additional period of time beyond the automatic 15.5 hour extension TKT received.

Additionally, the fact that TKT did not make any telephone calls or otherwise attempt to communicate with Commerce about their technical filing issues in any way beyond their last-minute extension request, further provides substantial evidence that Commerce's finding that TKT's third extension lacked good cause.  The initial questionnaire instructs respondents that if they are "unable to comply with the electronic filing requirement . . . {they} must promptly notify the officials in charge and submit a full written explanation of the reasons {they} are unable to file the document electronically."  Appx614.  The Initial Questionnaire also provided the ACCESS Help Desk phone number, *see id*., as well as the name, direct telephone number, and direct email address of the "official in charge," Appx607.

TKT does not dispute that their counsel failed to make any contact with the official in charge, call the Help Desk line, or directly reach out to any individual at Commerce during the six hours between when TKT sent the file to its counsel and the deadline.  TKT Br. at 12.  Instead, TKT argues that its extension request was sufficient communication because "the ACCESS filing immediately notifies/contacts all concerned at Commerce."  TKT Br. at 27.  However, the fact

21

that Commerce was unable to render a decision on the extension request prior to the close of business suggests that this filing did not timely alert those unspecified individuals of "concern[]." *Id.* Nevertheless, even if TKT's last minute ACCESS filing did reach relevant individuals at Commerce, it was not irrational for Commerce to deem TKT's barebones reference to "technical/computer issues" in their extension request as failing to provide a "full written explanation of the reasons {the recipient is} unable to file the document electronically." Appx1306; Appx614.

Accordingly, Commerce did not abuse its discretion or act contrary to law in deciding there was no good cause for an extension where TKT made no attempt to contact Commerce on the day of filing and made a barebones and last minute extension request that vaguely cited technical problems.

Further, "Commerce is *not* required to provide good cause or justification for rejecting untimely submissions and proceeding as if respondent has not provided requested information." *Bebitz AD*, 433 F. Supp. 3d at 1327 (citing *Dongtai Peak*, 777 F.3d at 1352). As explained above, the standard imposes a burden *on the respondent* to show "good cause." *Id*. Moreover, "it is not for {TKT} to . . . dictate to Commerce whether and when Commerce actually needs the requested information," *Dongtai Peak*, 777 F.3d at 1352. Indeed, the Federal Circuit rejected another respondent's "presumption that Commerce had adequate

time to process this review," on the grounds that "Commerce should not be burdened by requiring acceptance of untimely filings . . . ." *Dongtai Peak*, 777 F.3d at 1352. Thus, so long as the record provides substantial evidence supporting Commerce's rejection of TKT's extension request, this Court must sustain Commerce's exercise of its discretion. Accepting TKT's argument would effectively nullify the good cause requirement and render the deadlines Commerce establishes in investigatory proceedings to be toothless and subject to gamesmanship.

## III. Commerce Did Not Act Unlawfully Or Abuse Its Discretion In Rejecting TKT's Untimely Response

Because TKT's subsidy questionnaire response was filed after the September 16, 2020 at 8:30 a.m. deadline without good cause for an extension of that deadline, TKT's submission was indisputably late and it was not an abuse of discretion for Commerce to reject TKT's submission solely on that basis. It is within Commerce's discretion to enforce its own deadlines and it can hardly be unreasonable or unlawful for Commerce to do exactly that.

### A. Commerce Satisfied The Applicable Standard For Rejecting Late Filings

TKT contends that Commerce erred in rejecting TKT's filing because there are three "legal factors that must be considered to reject a filing as untimely," all of which are in favor accepting TKT's late filing. TKT Br. at 13. TKT argues that

the three factors Commerce must consider in rejecting an untimely submission are, "(1) Commerce's interest in finality of its final (not preliminary) decision, (2) the burden on Commerce "in the investigation" at issue (not broadly) to consider the filing to calculate the CVD/AD margin, and (3) whether the information in the filing increases accuracy of calculated subsidy margins."  TKT Br. at 13.

However, that is not the standard for accepting late submissions.  As the trial court correctly stated, "Commerce has discretion both to set deadlines and to enforce those deadlines by rejecting untimely filings."  Appx61-62 (internal citations omitted).  "Agency decisions on acceptance or rejection of documents submitted for the record are reviewed for abuse of discretion."  *Id.*; *see also Maverick Tube Corp. v. United States*, 107 F. Supp. 3d 1318, 1331 (2015) ("Strict enforcement of time limits and other requirements is neither arbitrary nor an abuse of discretion when Commerce provides a reasoned explanation for its decision.").

Moreover, TKT's reliance on *NTN* and *Timken* for proposition that there exists a three-factor test for accepting untimely filings is mistaken.  *See* TKT Br. at 13 (citing *NTN Bearing Corp. v. United States*, 74 F.3d 1204 (Fed. Cir. 1995) and *Timken U.S. Corp. v. United States*, 434 F.3d 1345 (Fed. Cir. 2006)).  *NTN* and *Timken* do not set out a factor test.  Both cases concern whether Commerce abused its discretion in refusing to accept late submitted corrections to mistakes made in previously accepted submissions.  This Court in *NTN* held that Commerce abused

24

its discretion in not accepting NTN's late-submitted corrections to clerical errors contained in a previous submission, 74 F.3d at 1208, and in *Timken* this Court sustained Commerce's rejection of Timken's late-submitted corrective information, given that Commerce had sufficient factual basis for refusing to make the corrections, 434 F.3d at 1357. In the instant case, TKT utterly failed to submit a questionnaire response by the September 16, 2020 at 8:30 a.m. deadline. Unlike in *NTN* and *Timken*, TKT did not make a timely submission that it later wished to supplement with correctional information.

Nevertheless, even if one applies this *sui generis* factor test that TKT proposes in its brief, it supports sustaining Commerce's determination. The *Bebitz CVD* case is instructive in this regard. In *Bebitz CVD*, the trial court determined that Commerce did not abuse its discretion by prioritizing the need for finality over Commerce's obligation to determine the most accurate countervailing duty margin. 433 F. Supp. 3d at 1305. The respondent in *Bebitz*, represented by the same counsel as TKT in the instant case, filed its fourth extension request 20 minutes before the 5:00 p.m. deadline. *See id*. at 1302. Given this short notice, Commerce was unable to respond, and the deadline automatically became 8:30 a.m. the next workday. *Id*. Just as in the instant case, the *Bebitz* respondent missed the 8:30 a.m. deadline and instead filed its response late, at 10:24 a.m. *See id*. The trial court was not persuaded by Bebitz's arguments that its untimely filing must be

accepted, and reiterated that it is not for the respondent "to establish Commerce's deadlines or dictate to Commerce whether and when Commerce actually needs the requested information." *Id*. at 1305 (citing *Dongtai Peak*, 777 F.3d at 1352). The trial court further held that "Commerce's regulation, 19 C.F.R. § 351.302(b) and (c), provides the agency with substantial discretion whether to grant or deny an extension request and, particularly in light of the multiple extensions Commerce did provide, Bebitz fails to establish that Commerce abused its discretion or otherwise acted unlawfully in denying Bebitz's requests for additional extensions." *Id*. at 1305–06; s*ee also Yantai Timken Co. v. United States*, 1754, 521 F. Supp. 2d 1356, 1371-72 (2007), *aff'd*, 300 F. App'x 934 (Fed. Cir. 2008). Further, in the instant case, the trial court found that "[t]he circumstances here are parallel to those in *Bebitz CVD*, and the court sees no reason to differ in the outcome, particularly in light of the multiple extensions already granted to TKT . . ." Appx74.

TKT's argument that its submission was made "well before Commerce's final decision," TKT Br. at 14, and thus did not implicate concerns over finality and did not unduly hinder or burden Commerce's investigation fails to account for the wide discretion afforded to Commerce in establishing its deadlines and in determining the time in which it needs information. *See Bebitz CVD*, 433 F. Supp. 3d 1309. TKT also fails to meaningfully distinguish *Bebitz CVD* from the instant

case. TKT argues that the *Bebitz CVD* respondent's submissions were seriously incomplete and inaccurate and that such issues were caused by the *Bebitz CVD* respondent, not counsel. However, the extent or the cause of the flaws in the *Bebitz CVD* respondent's submission is beside the point, which is that the respondent in both *Bebitz CVD* and the instant case both made late and incomplete submissions despite receiving multiple extensions.

### B. Commerce's Rejection Of TKT's Late Filing Permissibly Considered Counsel's Experience And Was Appropriate

In explaining why TKT's extension request failed to show good cause, Commerce observed that counsel failed to make an extension request at least one day prior to the deadline despite previously doing so for the two previous extension requests. Appx208; Appx2138-39. Commerce noted that TKT counsel's decision to attempt filing on the afternoon of September 15, 2020 without previously requesting an extension at least a day before the deadline represented an unwise gamble on his part. Appx208. TKT contends that in making this "gambled unwisely" comment, Commerce relied on speculation. TKT Br. at 19. However, TKT concedes that its counsel thought that he would be able to timely file the submission until 3:50 pm on September 15, 2020, 70 minutes before the deadline. *See* TKT Br. at 8. It is therefore undisputed that after receiving documents from TKT at 10:58 a.m. on September 15, 2020, counsel for TKT thought he would be able to make the filing with no concern for seeking an extension until just 70

27

minutes before the deadline.  The gloss Commerce put on these undisputed facts by calling TKT's actions an 'unwise gamble' does not constitute "speculative" fact-finding.

TKT's argument that their counsel's judgment regarding the timing of when to file was not mistaken in light of past guidance from Commerce is also misplaced.  *See* TKT Br. at 21.  General precautionary language from Commerce indicating the importance of beginning filings early does not equate to a promise that filings commenced hours beforehand will necessarily be accepted.  Commerce noted that TKT was represented by "experienced" counsel who was familiar with the filing process in countervailing duty investigations.  Appx208; Appx215.  Indeed, given counsel's past experience in *Bebitz CVD*, where counsel also ran into last-minute filing difficulties, filed a last minute extension, got an automatic 15.5 hour extension, and still failed to meet the deadline, it was, or should have been, clear to counsel that making ACCESS filings requires plenty of time and precaution.  Commerce therefore did not abuse its discretion in citing counsel's experience as a basis for not accepting a late filing and in finding that TKT failed to put forth "maximum effort" to comply with the request.  Appx215.

TKT's reliance on *Oman Fasteners* for the proposition that a late filing can be excusable even with experienced counsel is misplaced as TKT ignores factual distinctions between *Oman Fasteners* and the instant case.  *See* TKT Br. at 20-21

(citing *Oman Fasteners, LLC v. United States*, Ct. No. 22-00348, Slip Op. 23-17 at

5-9 (Ct. Int'l Trade Feb. 15, 2023)).  In *Oman Fasteners*, the respondent was

largely able to complete its filing before the 5:00 p.m. deadline, with the exception

of certain exhibits that mostly consisted of Excel versions of PDF exhibits the

respondent previously uploaded to ACCESS.  *See Oman Fasteners,* at 6.  The

respondent was then able to complete the filing by 5:16 p.m., 16 minutes after the

deadline.  On the other hand, TKT automatically received a 15.5 hour extension,

still failed to meet the newly extended deadline, and even when it made its

untimely filing at 10:11 a.m. on September 16, 2020, its submission was

incomplete.  *See* Appx66-67; *see also* Appx210 ("{TKT's} BPI submission was

missing the business proprietary versions of Exhibits III-A-1 through III-A-8, and

the beginning portion of Exhibit III-A-9, while the public versions of these

particular files themselves were also untimely, again demonstrating that the

questionnaire response was not filed 'in its entirety' by the deadline . . .") (citing

19 C.F.R. § 351.303(b)(1)).

Also, TKT's reliance on *Nippon Steel* for the proposition that filings do "not

require perfection and  . . . mistakes {can} sometimes occur" is misplaced.  *See*

TKT Br. at 22 (citing *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1382

(Fed. Cir. 2003).  The full quote from the section of *Nippon Steel* reads, "{w}hile

the standard does not require perfection and recognizes that mistakes sometimes

occur, it does not condone *inattentiveness, carelessness*, or inadequate record keeping." *Nippon Steel*, 337 F.3d at 1382 (emphasis added). Here, TKT was aware of their responsibility to meet the established deadline, but still filed a last minute extension request and even then, failed to submit the requisite documents in a timely manner. *Id.*; *see Nippon Steel*, 337 F.3d at 1383 (". . . it is reasonable for Commerce to expect that more forthcoming responses should have been made; *i.e.*, under circumstances in which it is reasonable to conclude that less than full cooperation has been shown."). Thus, it was not unreasonable based on this evidence for Commerce to view TKT's actions in making this filing as a failure to put forth sufficient effort and as something more than a simple 'mistake.'

### C.    Commerce Did Not Treat TKT Unreasonably Or Arbitrarily

Commerce did not treat TKT arbitrarily or unfairly. In their brief TKT lists other proceedings in which Commerce either decided to grant an extension request or accept a late filing and cites the existence of these other instances as evidence of Commerce's supposed unreasonable and arbitrary treatment of TKT. *See* TKT Br. at 23-33. TKT's argument that the grant of an extension or acceptance of a late filing in other cases necessarily renders Commerce's action in this case unreasonable and arbitrary engages in false equivalences. It is well-established that Commerce is not bound by its actions in prior proceedings, because each proceeding "is a separate exercise of Commerce's authority that allows for

different conclusions based on different facts in the record." *Qingdao Sea-Line Trading Co. v. United States*, 766 F.3d 1378, 1387 (Fed. Cir. 2014). Indeed, each proceeding Commerce handles raises distinct scheduling and docket management issues that Commerce itself is best positioned to address. For this reason, the extension of time regulations make clear that the decision of whether to grant an extension of time is an inherently discretionary matter that is evaluated on a case-by-case basis. *See Extension of Time,* 78 Fed. Reg. 57,790, at 57,792 (Commerce has "discretion to extend the time limit"); 19 C.F.R. § 351.302 ("[Commerce] *may*, for good cause, extend any time limit established by this part") (emphasis added); *see also* Appx79 ("[T]he only conclusion that can be drawn from Commerce's prior determinations is that Commerce has an administrative 'practice' to treat extensions on a case-by-case basis.").

Further, TKT's barebones recitation of other administrative proceedings fails to provide any legal analysis. *See United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990) ("It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones."). The lack of any analysis in TKT's bullet point list of other proceedings fails to capture nuances and relevant factual distinctions. For example, TKT cites to a countervailing duty review on stainless steel flanges from India, and includes the ACCESS Barcode for a letter sent to the

31

government of India providing additional time to file.  TKT Br. at 23.  However, TKT's cursory discussion of that case omits that "the Government of India reached out to multiple Department of Commerce (Commerce) employees for assistance with its ACCESS filing . . . which had been rejected for technical issues."  *See* the Administrative Review of the Countervailing Duty on Stainless Steel Flanges from India (C-533-878) dated February 17, 2023, ACCESS Barcode:  4343287-01.[4]  As previously discussed, TKT made no similar attempt to reach Commerce to assist with their filing.

TKT's list of other proceedings is also cherry picked and fails to recognize that Commerce also routinely rejects untimely filed submissions and rejects extension request for failing to provide good cause.  For example, in *Dongtai Peak*, this Court found that Commerce lawfully rejected the respondent's extension requests and supplemental responses because:  (1) the extension requests were submitted after the established deadline in violation of 19 C.F.R. § 351.302(c), and (2) the respondent failed to show "good cause" for an extension as required by § 351.302(b).  *See Dongtai Peak*, 777 F.3d at 1351.  The court rejected the *Dongtai Peak* appellant's invocation of other cases where an extension was granted or

---

[4] The parties did not agree that ACCESS filings from other Commerce proceedings should be part of the joint appendix.  Nevertheless, TKT included citations to such documents in their opening brief without including them as a part of an appendix.  We only cite to an ACCESS document from the Indian steel flanges proceeding in response to TKT's invocation of ACCESS filings from other proceedings.

untimely filing was accepted as evidence that the same should occur in *Dongtai Peak*.  The court reasoned that in the "various administrative reviews cited by the appellant, Commerce found good cause was shown and therefore exercised its discretion in granting the untimely extension requests" whereas it was lacking in *Dongtai Peak*.  *Dongtai Peak*, 777 F. 3d at 1352.  The present case is no different as TKT failed to establish good cause for an extension and failed to establish why Commerce should accept TKT's untimely filing, whereas the respondents in those other proceedings established that there was good cause for an extension or the circumstances justified accepting a late filing.  *See also* Appx79 ("Accordingly, the court finds Plaintiffs' arguments relying on Commerce's granting of extension requests in other proceedings unpersuasive.  In fact, the only conclusion that can be drawn from Commerce's prior determinations is that Commerce has an administrative 'practice' to treat extensions on a case-by-case basis.").

## IV.  Commerce Did Not Abuse Its Discretion In Applying An Adverse Facts Available Rate To TKT

Because TKT did not put forth a maximum effort to provide Commerce with a complete subsidy questionnaire response by the applicable deadline, Commerce did not abuse its discretion in assigning a rate based on AFA.

## A. Commerce's Decision To Assign TKT An AFA Rate Is Supported By Substantial Evidence

If Commerce determines that "necessary information is not available on the record" or "an interested party or any other person . . . withholds information that has been requested by {Commerce}," "fails to provide such information by the deadlines . . . or in the form and manner requested," "significantly impedes a proceeding," or "provides such information but the information cannot be verified," then Commerce is permitted to use "facts otherwise available" in making its determinations.  19 U.S.C. § 1677e(a); *see* 19 C.F.R. § 351.308 (providing for "determinations on the basis of facts available").  Commerce uses "facts otherwise available" to "fill in . . . gaps" in the administrative record.  *Nippon Steel*, 337 F.3d at 1381.

Further, "if an interested party 'fails to cooperate by not acting to the best of its ability to comply with a request for information,' then Commerce 'may use an inference that is adverse to the interests of that party in selecting from among the facts otherwise available,' commonly referred to as AFA."  *Deacero S.A.P.I. de C.V. v. United States*, 996 F.3d 1283, 1295–96 (Fed. Cir. 2021) (alterations in original) (quoting 19 U.S.C. § 1677e(b) (brackets omitted)); *see* 19 C.F.R. § 351.308 (similar).  To avoid AFA, "interested parties" must "cooperate . . . to the best of {their} ability," 19 U.S.C. § 1677e(b), meaning they must "do the maximum {they are} able to do," *Nippon Steel*, 337 F.3d at 1382.  This

standard "does not require perfection and recognizes that mistakes sometimes occur," but "it does not condone inattentiveness, carelessness, or inadequate record keeping." *Id.*

TKT does not challenge Commerce's decision to resort to facts available as such, and only challenges Commerce's decision to make an adverse inference. *See* Appx83. However, Commerce reasonably determined that TKT failed to cooperate by not acting to the best of their ability to comply with the request for information, thus warranting AFA. Appx213-216. Substantial evidence supports this determination.

First, TKT's untimely submission occurred following three previous extensions of time. *See* Appx932; Appx1142; Appx204-5; *see also Bebitz CVD*, 433 F. Supp. 3d at 1305–06. Second, TKT was represented by experienced counsel who was aware of the consequences of failing to make timely submissions and the potential of ACCESS filing challenges. *See* pp. 27-28, *supra*. Third, TKT failed to mitigate its technical problems by contacting either the official in charge of the investigation or the ACCESS help desk before the close of business. *Cf. Neo Solar Power Corp. v. United States*, 190 F. Supp. 3d 1255, 1261 (Ct. Int'l Trade 2016) (respondent "could have ameliorated harm caused by technical problems by" contacting "the ACCESS Help Desk before the deadline expired to receive assistance with a response to the technical problem"). Finally, when TKT

did submit the response to the Initial Questionnaire, after the 8:30 a.m. September 16 deadline, it was incomplete.  Accordingly, substantial evidence supports that TKT did not act to "the best of its ability" and put forth the maximum effort to respond, and therefore it was rational for Commerce to assign an AFA rate to TKT.

TKT argues that it was improper to apply an adverse inference because doing so removed the incentive for TKT to cooperate with the remainder of the investigation and is a draconian measure.  *See* TKT Br. at 35.  However, assigning a party an AFA rate when that party does not cooperate or act to the best of its ability to comply with an information request is permissible and not punitive.  *See KYD, Inc. v. United States*, 607 F.3d 760, 768 (Fed. Cir. 2010).  Also, "[t]he legislative purpose of 19 U.S.C. § 1677e permits Commerce to employ adverse inferences about the missing information to ensure that the party does not obtain a more favorable result by failing to cooperate than if it had cooperated fully." *Habas*, 992 F.3d at 1354; *see Nan Ya Plastics Corp. v. United States*, 810 F.3d 1333, 1348 (citing SAA at 870, 1994 U.S.C.C.A.N. at 4199).  Further, the statute does not support that Commerce may only use "facts otherwise available" that reflect the commercial reality of the affected party.  *Habas*, 992 F.3d at 1354; *see also POSCO v. United States*, 296 F. Supp. 3d 1320, 1352 n.47 (Ct. Int'l Trade 2018) ("Commerce is *not* required "to demonstrate that the countervailable subsidy rate . . . reflects an alleged commercial reality of the interested party").

TKT's citation to the *Celik* cases for the proposition that assigning an AFA rate is draconian for a minor technicality is misplaced as TKT's failure to submit a timely and complete response was not a technicality.  *See* pp. 25, *supra*.  Further, the *Celik* cases can be distinguished from the present case.  In the *Celik* antidumping case, the respondent failed to upload one of its exhibits to its Section B response before the 5:00 p.m. ET deadline but was eventually able to upload the exhibit 21 minutes after the deadline.  *Celik Halat v. Tel Sanayi A.S.*, 557 F. Supp. 3d 1348, 1354 (Ct. Int'l Trade 2022).  And in the *Celik* countervailing duty case, the respondent timely filed a version of the initial questionnaire response on the due date but failed to file the final business proprietary version and the public version, of the document on the following business day, and the respondent's counsel erroneously made the filing 87 minutes after the 5:00 p.m. filing deadline.  *Celik Halat v. Tel Sanayi A.S.*, 557 F. Supp. 3d 1363, 1366 (Ct. Int'l Trade 2022).  Here, TKT received an automatic 15.5 hour extension, still missed the deadline, and then submitted a response that was not only untimely, but incomplete as whole exhibits were missing from the from the business proprietary version and public version.  Appx210.

Also, whether assigning the AFA rate affected TKT's narrow incentive or motivation to cooperate in other parts of the segment is inapposite.  *See* Appx85 (noting that this argument is a policy argument, not a legal argument).  Further,

AFA is used to incentivize parties to use their best efforts to comply with Commerce's requests on an *ex ante* basis. *See F.Lii de Cecco di Filippo Fara S. Martino S.p.A. v. United States*, 216 F.3d 1027, 1032 (Fed. Cir. 2000) (the AFA rate should be a reasonably accurate estimate of the respondent's actual rate, albeit with some built-in increase intended as a deterrent to non-compliance). That is, if entities subject to countervailing duty investigations know that there is a very real prospect of receiving an AFA rate for failure to make the maximum effort to comply with Commerce's requests, those entities will have a greater incentive to cooperate. In this sense, applying an AFA rate does incentivize cooperation.

Further, to the extent the AFA rate was different from a more "accurate" rate, courts "cannot set aside application of a proper administrative procedure because it believes that properly excluded evidence would yield a more accurate result if the evidence were considered." *PSC VSMPO-Avisma Corp. v. United States*, 688 F.3d 751, 761 (Fed. Cir. 2012). This is because, as explained by the Statement of Administrative Action (SAA) accompanying the Uruguay Round Agreements Act, the purpose of the AFA provision is "to ensure that the party does not obtain a more favorable result by failing to cooperate than if it had cooperated fully." SAA, H.R. Doc. No. 103-316, 870, reprinted in 1994 U.S.C.C.A.N. 4040, 4199 (1994).

## B. **Commerce Calculated The Correct Rate For All Appellants**

As a result of TKT's failure to timely file their response to the subsidy questionnaire, Commerce did not have access to information from corporate respondents that is used to assess whether government subsidies or assistance provided the private entities with a "benefit." *See* Appx214-16; Appx229; Appx234-37.  This information regarding whether a benefit was received is not something Commerce can glean solely from government submissions. *Id.* Nevertheless, TKT argues without factual support that the AFA rate, assuming it could apply at all, would not apply to appellants Tau Ken Temir LLP and JSC NMC Tau-Ken Samruk because it was the actions of the Kazakh Government that precipitated Commerce to apply AFA, not those two entities per se.  TKT Br. at 36. However, in this case, the non-government respondents[5] failed to provide necessary information "by the deadlines . . . or in the form and manner requested." 19 U.S.C. § 1677e(a).  Commerce explained in the IDM that it requires certain information that can only be provided from the respondents that produce or export the goods in question, including whether a benefit was received. *See* Appx234-37.

---

[5] TKT argues that the fact there is "only one Kazakh silicon metal producer" somehow means that an adverse inference cannot apply.  TKT Br. at 34.  TKT provides no authority for this proposition, and we are aware of none. *See also* Appx85.

Thus, contrary to TKT's argument, an AFA rate was not assigned purely based on the actions of the Kazakh government.

Further, even if the non-government respondents cooperated, which they did not, Commerce may also use an adverse inference, even if doing so may have collateral consequences for a cooperating party. *See Fine Furniture (Shanghai) Ltd. v. United States*, 748 F.3d 1365, 1373 (Fed. Cir. 2014) ("Cooperating respondents may be subject to collateral effects due to the adverse inferences applied when a government fails to respond to Commerce's questions," but "this result is not contrary to the statute or its purposes, nor is it inconsistent with this court's precedent."); *Mueller Comercial de Mexico, S. de R.L. de C.V. v. United States*, 753 F.3d 1227, 1236 (Fed. Cir. 2014).

Finally, TKT states that the countervailing duty rate Commerce ultimately calculated was flawed because it was "uncorroborated." TKT Br. at 39. This barebones statement fails to sufficiently develop an argument regarding whether the calculation of the AFA rate was incorrect and is therefore waived. *See Zannino*, 895 F.2d at 17 ("issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work . . .").

Nevertheless, even if this cursory argument is deemed to be developed, it is unfounded. Here, Commerce explained how the total subsidy rate for TKT was calculated in both the preliminary and final determinations. Appx229; *see* Appx2196-97. Simply, the Kazakh government reported that the standard income tax rate for corporations in Kazakhstan in effect during the period of investigation was 20 percent of taxable income. Appx2197; *see* Appx1242. After applying an adverse inference that TKT and their cross-owned companies paid no income tax during the period of investigation because of their income tax exemption, Commerce determined that given the information on the record, the highest benefit TKT could have received was 20 percent. Appx2197. Accordingly, Commerce applied the 20 percent *ad valorem* rate to each of the eight programs Commerce has found to be countervailable. Appx229; Appx2197. In explaining that the 160 percent subsidy rate was based upon a 20 percent tax rate for eight programs, Commerce provided support for its AFA subsidy rate determination based on information obtained through the investigation. Commerce further explained that because it is only using information obtained during the course of this investigation it need not "corroborate" that information. *See* Appx2198. Commerce's subsidy rate determination is therefore lawful and supported by substantial evidence.

## CONCLUSION

41

For these reasons, we respectfully request that the Court affirm the judgment of the Court of International Trade.

<div style="margin-left:50%">

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant
Attorney General

PATRICIA M. McCARTHY
Director

/s/ L. Misha Preheim by /s/ Claudia
Burke
L. MISHA PREHEIM
Assistant Director

</div>

OF COUNSEL:                          /s/ Brendan D. Jordan
JARED CYNAMON                        BRENDAN D. JORDAN
Attorney                             Trial Counsel
Department of Commerce               U.S. Department of Justice
Office of the Chief Counsel          Civil Division
for Trade Enforcement & Compliance   Commercial Litigation Branch
U.S. Department of Commerce          P.O. Box 480, Ben Franklin Station
                                     Washington, D.C. 20044
                                     Tel:  (202) 616-0342
                                     Email:  Brendan.D.Jordan@usdoj.gov

August 28, 2023                      *Attorneys for Defendant-Appellee*
                                     *United States*

42

## **CERTIFICATE OF COMPLIANCE**

Pursuant to Fed. R. App. P. 32(a)(7) and Federal Circuit Rule 32(b), the undersigned certifies that the word processing software used to prepare this brief indicates there are a total of 9586 words, excluding the portions of the brief identified in the rules.  The brief complies with the typeface requirements and type style requirements of Fed. R. App. P. 32(a)(5) and has been prepared using Times New Roman 14 point font, proportionally spaced typeface.

/s/ Brendan D. Jordan